IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

KILOTON TACTICAL, LLC, ERIC )
HANLEY, and FIREARMS FOR LIBERTY )
("FFL") COALITION, )
 )Case No. _____
Plaintiffs, )
 )
     v. )
 )
BUREAU OF ALCOHOL, TOBACCO, )
FIREARMS AND EXPLOSIVES; UNITED )
STATES DEPARTMENT OF JUSTICE; )
STEVEN M. DETTELBACH in his official )
capacity as THE DIRECTOR OF ATF, and )
AARON R. GERBER, in his official )
capacity as THE DIRECTOR OF )
INDUSTRY OPERATIONS FOR THE )
TAMPA FIELD DIVISION OF THE ATF, )
 )
Defendants. )
_____)

## **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Now come Plaintiffs, by and through Counsel, and for their Complaint state as
follows:

1.     Plaintiffs bring this action seeking a preliminary injunction to preserve

the status quo, followed by a declaratory judgment and permanent injunctive relief,

restraining Defendants from further implementing or otherwise enforcing a

Department of Justice ("DOJ") "zero tolerance" policy that was first promulgated in

2022 for partisan purposes and, since then, has been wielded as a political weapon

by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to revoke the federal firearms licenses ("FFL") of numerous gun dealers across the nation.  As grounds therefor, Plaintiffs allege the following:

## JURISDICTION AND VENUE

2.      The Court has jurisdiction over this action pursuant to 5 U.S.C. § 702, and 28 U.S.C. § 1331. This Court has authority to grant the remedy Plaintiffs seek under 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706.

3.      Venue is proper in this district pursuant to 5 U.S.C. § 703, and 28 U.S.C. § 1391(b)(2) and (e).

## PARTIES

4.      Plaintiff Kiloton Tactical LLC ("Kiloton") is a Florida limited liability company which holds an active Type 07 Manufacturer Federal Firearms License ("FFL") issued in 2016, FFL# 1-59-131-07-3G-50159.  As such, Kiloton is an entity regulated by federal law administered by Defendant ATF.  Kiloton is located and has had its principal place of business in DeFuniak Springs, Florida since its licensure in 2016.

5.      Beginning on May 24, 2022, Kiloton was the subject of an administrative compliance inspection conducted by ATF.  That inspection was the first ever compliance inspection conducted by ATF with respect to Kiloton's license since its initial licensure.

6.     On April 26, 2023, Kiloton sought to renew its FFL, filing a timely renewal application.

7.     On July 10, 2023, ATF issued a "Notice to Deny Application for License."  That notice was based on allegations of four categories of technical and recordkeeping errors in Kiloton's business activities under Kiloton's license, spelled out in six pages of text, and taken from the May 24, 2022 inspection, which had occurred more than a year earlier.  *See* Exhibit 1.

8.     Also on July 10, 2023, ATF sent an "EXPLANATION LETTER RE: NOTICE OF DENIAL OF RENEWAL APPLICATION" alleging that the ATF "is contemplating denying your renewal application filed on April 26, 2023 for your Federal firearms license and has decided to initiate the denial/revocation process."  *See* Exhibit 2.  The letter purports to "explain[] the Notice and Hearing process."  *Id*.  While the letter is styled as regarding ATF's "Notice to Deny Renewal Application," the letter actually discusses "revocation" of Kiloton's current, existing license.

9.     Plaintiff Firearms for Liberty Coalition ("FFL Coalition") is a growing, nationwide association of federal firearm licensees across the country, representing dozens of gun dealers across the country, including within this district, state, and in each state in this circuit.  Kiloton is a member of the FFL Coalition.  FFL Coalition's purpose is to defend gun dealers' Second Amendment rights and freedoms to sell firearms, ammunition, and accessories, as well as the rights of dealers' customers to

buy firearms.  Each of FFL Coalition's members is subject to the agency action challenged herein. *See* Declaration of Eric Blandford, Exhibit 16 at ¶ 8.

10.     The FFL Coalition's members, as FFLs, are subject to the "zero tolerance" policy challenged herein, and some of its members already have been subject to the ATF's "zero tolerance" policy.  *Id.* at ¶ 9.

11.     Because the ATF has the statutory right to warrantlessly visit and inspect an FFL's records without cause, it is inevitable that most or all of the FFL Coalition's members will face compliance inspections, where minor administrative errors could lead to revocation of licenses or other adverse actions.  *Id.* at ¶ 14.

12.     Kiloton has heard from customers who use Kiloton not only as their primary gun store and gunsmith, but also use the Kiloton gun range and receive training and instruction.  These customers wish to continue using Kiloton Tactical as their go-to gun store for their Second Amendment needs.  If Kiloton's FFL were revoked and Kiloton was forced to stop selling firearms, many of its customers would have to expend significant additional resources in the form of time and money to travel at times a great distance in order to acquire constitutionally protected arms and services.  The ATF's new "zero tolerance" policy generally, and ATF's attempt to shut down Kiloton Tactical specifically, infringes these customers' Second Amendment rights.

13.     Plaintiff Eric Hanley is one such customer of Kiloton Tactical.  Mr. Hanley uses Kiloton Tactical almost exclusively as his FFL of choice.  Mr. Hanley is an avid collector of World War I and World War II era firearms, which require a specialized and greater level of maintenance than modern firearms. *See* Declaration of Eric Hanley. Exhibit 13 at ¶ 6. As such, Kiloton Tactical is the only store Mr. Hanley has found that he will allow to work on his collection.  *Id*. at 8.

14.     Additionally, Mr. Hanely reports that Kiloton's prices for transfers are the "lowest and most reasonable" he has encountered, that Kiloton has an "on-site shooting range that is second to none," that Kiloton has a large selection of firearms and other products, and that Kiloton Tactical is a full-service FFL. Further, Mr. Hanley "never [has] to wonder whether they will be able to accommodate" his needs. *Id*. at ¶ 9.

15.     If the ATF revokes Kiloton Tactical's license, Mr. Hanley will be required to "spend more time, more money, and travel greater distances, in order to piece together the combination of products and services that Kiloton Tactical currently offers me in just one location." *Id*. at ¶ 14.

16.     Additionally, and alternatively, Kiloton Tactical has standing to sue on behalf of its customers. *See Craig v. Boren*, 429 U.S. 190, 195 (1976).  The ability of Kiloton's to protect their own interests is hindered because of the significant financial cost of bringing a lawsuit against the federal government.  As such, it would

be difficult for each of Kiloton's customers to bring his or her grievance piecemeal before a court.  Additionally, Kiloton's customers may be reluctant to bring such claims for fear of provoking the federal government.[1]

17.     Defendant U.S. Department of Justice ("DOJ") is an executive agency within the federal government of the United States. DOJ is headquartered at 950 Pennsylvania Avenue NW, Washington, D.C. 20530.  DOJ is the agency responsible for enforcing federal firearms laws.

18.     Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is a component of the DOJ, and is headquartered at 99 New York Avenue NE, Washington, D.C. 20226.  ATF is delegated authority to enforce federal gun control laws.  *See* 18 U.S.C. § 926(a); 26 U.S.C. § 7805(a); 26 U.S.C. § 7801(a)(2)(A).

---

[1] This is similar to the second of the three ancient Chinese curses: "May you be recognized by powerful people," or sometimes reported as "May you attract the attention of the government."  In the United States, attracting the attention of the government can have negative consequences.  *See, e.g.,* https://reason.com/2021/12/15/attract-government-attention-and-get-your-name-run-through-a-terrorist-database/, "Attract Government Attention and Get Your Name Run Through a 'Terrorist' Database" (December 15, 2021*).  See also Morehouse et al. v. ATF et al.*, 3:23-cv-00129-PDW-ARS (D. ND. Jul. 11, 2023), ECF #1 at ¶295 et seq (alleging selective and vindictive prosecution after ATF conducted a warrantless compliance inspection, and then moved to revoke an FFL, with the ATF inspector joking about how the inspection looked retaliatory for the FFL having sued ATF months earlier).

19.     Defendant Steven M. Dettelbach is the Director of ATF, is sued in his official capacity, and is responsible for overseeing the agency's promulgation of the agency action challenged herein.

20.     Defendant Aaron R. Gerber is the Director of Industry Operations for the Tampa Field Division of the ATF, is sued in his official capacity, and is responsible for implementing and enforcing the agency's action challenged herein against Plaintiff Kiloton.  Further, he is actively engaged in direct enforcement of ATF's zero tolerance policy.

## BACKGROUND

### I.     The Gun Control Act of 1968

21.     The Gun Control Act (GCA), 18 U.S.C. § 921 *et seq.*, as amended, is Congress' primary means of regulating the interstate commerce in firearms.

22.     The GCA traces its regulation of firearm commerce to the Federal Firearms Act of 1938 (FFA), which Congress repealed in 1968 via the Omnibus Crime Control and Safe Streets Act, later replacing the FFA with the GCA.  *See* 82 Stat. 234; 82 Stat. 1213.

23.     The original FFA created an unprecedented licensing scheme, which criminalized the interstate shipment or receipt of firearms by those not licensed under federal law.  The FFA also established the precursors to certain categories of so-called "prohibited persons" – those individual citizens who were categorically

7

barred by federal law from possessing firearms or ammunition – that would later appear in the GCA.  *See* 52 Stat. 1251.

24.    The GCA ultimately retained many of the FFA's provisions and expanded the scope of federal firearm regulation.

25.    Notable among the GCA's provisions are its restrictions on unlicensed interstate and foreign firearm commerce, firearm serial number marking requirements, expansion and codification of "prohibited persons" at 18 U.S.C. § 922(g), and licensing and recordkeeping requirements for those federally licensed to engage in the firearm business.

26.    Congress and the Attorney General have delegated administration of the GCA to the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).  28 U.S.C. § 599A; 28 C.F.R. § 0.130(a).

**II.    Licensing Requirements Under the GCA**

27.    The GCA establishes a regulatory framework for Federal Firearms Licensees (FFLs), those licensed under the GCA to engage in the business of manufacturing, dealing, or importing firearms or ammunition.

28.    Absent an FFL, the GCA criminalizes business activities relating to the manufacture, dealing, repairing, or importation of firearms.  18 U.S.C. § 922(a)(1). Federal criminal penalties include both misdemeanor and felony penalties, including sentences of up to 30 years in prison.  *See* 18 U.S.C. § 924.

29.     In order to obtain a manufacturer's, dealer's, or importer's FFL to avoid criminal penalties under the GCA, an applicant must display business intent – that is, a devotion of "time, attention, and labor … as a regular course of trade or business" with either the "principal objective of livelihood and profit" or to "predominantly earn a profit," depending on the type of business.  18 U.S.C. § 921(a)(21).

30.     Not every person who is eligible to purchase, own, and possess a firearm is eligible to be a FFL.  *See* 18 U.S.C. § 923(d).

31.     The ATF issues FFLs on a shall-issue basis, provided an applicant meets certain statutory criteria.  18 U.S.C. § 923(d)(1).

32.     But what the ATF giveth, the ATF also taketh away.  In addition to issuing FFLs, Congress also authorized the Attorney General, and by delegation the ATF, to revoke FFLs if certain conditions are met.  18 U.S.C. § 923(e) provides that:

> The Attorney General may, after notice and opportunity for hearing, revoke any license issued under this section if the holder of such license has willfully violated any provision of this chapter or any rule or regulation prescribed by the Attorney General under this chapter....

33.     Although Congress did not define the term "willfully" as used in the GCA, Congress added the term to Section 923(e) via the Firearms Owners Protection Act of 1986, 100 Stat. 449, as a protective measure for FFLs, given the ATF's history of capricious FFL revocations and prosecutions, as discussed in greater detail *infra*.

34.     In situations where ATF revokes licenses, firearms businesses cannot survive, livelihoods are lost, and employees are left jobless, as any attempt to conduct further business incurs severe criminal liability under the GCA. *See* 18 U.S.C. § 924.

### III.     Recordkeeping Requirements Under the GCA

35.     FFLs are subject to a litany of state and federal laws and regulations governing the conduct of their business activities.

36.     For example, FFLs must maintain extensive documentary records of the acquisition and disposition of firearms in their inventory.   18 U.S.C. § 923(g)(1)(A).

37.     FFLs must also maintain records of firearm transfers to non-licensees – that is, ordinary customers.  27 C.F.R. § 478.124.  Although these firearms transfer records originally included fewer than 30 information items, such as information that identified a specific purchaser, the DOJ has, by regulation, incrementally and massively increased the data required on modern firearms transaction records to over 100 distinct data points (although Congress has never enacted any requirement that FFLs gather or maintain this information).

38.     Generally, FFLs cannot transfer a firearm to a non-licensee without the completion of a background check through the FBI's National Instant Criminal Background Check System ("NICS"), which was created in 1998 to ensure the non-

licensee transferee is not a "prohibited person."  18 U.S.C. § 922(t)(1).  However, Congress exempted some non-licensee transferees from background checks provided the non-licensee displays a state-issued permit that satisfactorily indicates the non-licensee has already undergone an equivalent background check and is not a "prohibited person."  18 U.S.C. § 922(t)(3).

39.     In Florida, the background check process is performed by the Florida Department of Law Enforcement ("FDLE") which serves as the "Point of Contact" (POC) between FFLs and NICS. *See* https://www.fdle.state.fl.us/FPP/FAQs1.aspx.

40.     FFLs must maintain records of acquisitions and dispositions indefinitely, until the discontinuation of business.  27 C.F.R. § 478.129(b).  When an FFL discontinues business or its license is revoked by ATF, the FFL is required to transfer to ATF *all* of its original records concerning firearms acquisitions, dispositions, and the detailed records concerning citizens who have purchased firearms.

41.     FFLs' records are subject to periodic ATF inspections to ensure compliance and, as needed, in response to a firearm "trace request" during a criminal investigation.  18 U.S.C. § 923(g)(1)(B).

42.     Although these warrantless compliance inspections may occur at most once per year, 18 U.S.C. § 923(g)(1)(B)(ii)(I), the actual rate of compliance inspection is much less frequent than the annual statutory maximum.

43.     Good-faith, clerical, and ultimately harmless errors in FFL recordkeeping are a statistical inevitability.  For example, ATF's published data concerning its compliance inspections in 2020 reflects that it conducted 5,823 and found and reported errors in 43.7% of those inspections.  *See* https://www.atf.gov/firearms/firearms-compliance-inspection-results.  ATF's compliance inspections for 2022 increased over 2020 by 1,156 inspections to 6,979 inspections, and ATF's data reflects that it found and reported errors in 45.5% of the inspected FFLs.  *See* https://www.atf.gov/resource-center/fact-sheet/fact-sheet-facts-and-figures-fiscal-year-2022.  In 2020, ATF reported that, of those FFLs where errors were found and reported, ATF revoked the licenses of 40, while 96 either discontinued business or surrendered their licenses (5.3%).  In contrast, ATF reported that, as a result of its 2022 compliance inspections, it revoked 90 FFLs, while a whopping 1,037 FFLs "discontinued" their operations (36%).  *Id.*

## IV.     The Purpose of the GCA Statutory Scheme

44.     In the wake of several high-profile political assassinations,[2] Congress passed the GCA with the stated intent of preventing the criminal use of firearms.

45.     Congress' statement of legislative intent reads as follows:

> The Congress hereby declares that the purpose of this title is to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence, and it is not the purpose of this

---

[2] *See* https://www.atf.gov/rules-and-regulations/gun-control-act (noting JFK, RFK Sr., and MLK).

title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this title.  [82 Stat. 1213-14.]

46.     Consequently, the claimed overarching purpose of the GCA's licensing scheme is to prevent the use of firearms in primarily intrastate crimes, by prohibiting certain categories of individuals from possessing firearms or ammunition, and establishing record keeping requirements needed solely to facilitate the government's tracing of individuals who used firearms in crimes following a dealer transfer.[3]

47.     The GCA's purpose, as framed by the statement of Congressional intent, was not to destroy American businesses or the "Second Amendment Supply Chain," yet that is what ATF has been using the GCA to accomplish.

---

[3] Whether this statutory scheme comports with the original public understanding of the Second Amendment remains to be seen after *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).  While Plaintiffs do not endorse the constitutionality of the underlying GCA, the constitutionality of the statutory scheme itself is not at issue in this litigation.

**ATF's New "Zero Tolerance" Policy**

48.     On June 23, 2021, the "Biden-Harris Administration" announced a purported "Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety."[4]   Part of that entirely administrative "strategy" was "establishing zero tolerance for rogue gun dealers that willfully violate the law," described as "a new policy to underscore zero tolerance for willful violations of the law by federally licensed firearms dealers that put public safety at risk.   Absent extraordinary circumstances that would need to be justified to the Director, ATF will seek to revoke the licenses of dealers the first time that they violate federal law by willfully 1) transferring a firearm to a prohibited person, 2) failing to run a required background check, 3) falsifying records, such as a firearms transaction form, 4) failing to respond to an ATF tracing request, or 5) refusing to permit ATF to conduct an inspection in violation of the law."

49.     Acting pursuant to the President's politicized "strategy" to put gun dealers out of business, an ATF Acting Assistant Director issued a July 14, 2021 memorandum[5] to ATF field leadership stating that, "effective immediately," ATF personnel should revoke licenses for certain types of recordkeeping violations "absent extraordinary circumstances," and reporting that "ATF will be amending

---

[4] https://tinyurl.com/54rbhu5m.
[5] https://tinyurl.com/5ehf2xa9.

ATF O 5370.1D, Federal Firearms Administrative Policy and Procedures to incorporate these requirements.  This 2021 memorandum stated that, with respect to five categories of violations by FFLs, they "shall result in a revocation recommendation…." *Id*.

50.     Then, as promised, on January 28, 2022, ATF promulgated a heavily revised ATF Order 5370.1E[6] (Exhibit 3), entitled "Federal Firearms Administrative Policy and Procedures," replacing its prior 2019 version 5370.1D (Exhibit 4).[7]

51.     The ATF Administrative Action Policy ("AAP") is the internal ATF document that purports to "provide[] fair and consistent guidelines for administrative remedies for violations disclosed relative to inspections of Federal firearm licensees (FFLs)."

52.     In other words, the AAP is an "if this, then that" set of guidelines for use by ATF personnel to impose adverse action on FFLs for recordkeeping and other errors.

53.     Historically, the AAP has been an internal document that ATF has refused to make publicly available.  Instead, ATF concealed this document, keeping a secret its priorities, and treating FFLs as enemies, rather than sharing ATF's

---

[6] https://tinyurl.com/34hv9w86.
[7] https://tinyurl.com/38kf7f44.

concerns and priorities with FFLs as partners so that they can improve and ensure compliance in key areas of focus by ATF.

54.     The policies advanced in the ATF AAP are not required by any Congressionally enacted statute, but rather are created and implemented entirely by the executive branch, without public or congressional input.

55.     Generally, and with certain exceptions,[8] the AAP lays out three possible scenarios (other than taking no action) for various types of violations found during an inspection of an FFL: (i) a Warning Letter, (ii) a Warning Conference, and (iii) Revocation pursuant to 18 U.S.C. § 923(e).

### ATF's Harsh Change in Policy Between the 2019 AAP and 2022 AAP

56.     The revised 2022 AAP (revision E) adopts a much harsher stance than did the 2019 AAP (revision D).  Significantly, Congress did not enact any new laws during this period which might have established some authority for ATF to create a materially "enhanced" AAP.

57.     For example, whereas the 2019 AAP stated that "ATF **may** revoke a federal firearms license under **appropriate circumstances** based on an initial **set** of violations" (Exhibit 4 at 6), the 2022 AAP states that "ATF **will** revoke a federal

---

[8] In certain situations not relevant here, ATF can issue civil fines or temporarily suspend a license.  *See* Exhibit 3 at 8.

16

firearms license, absent **extraordinary circumstances** on initial violations….”
Exhibit 3 at 6.

58.     And whereas the 2019 AAP stated that “[n]ot every repeat violation is per se a willful violation,” and that “[a] single, or even a few, inadvertent errors … may not amount to ‘willful’ failures, even when the FFL knew of the legal requirement” (Exhibit 4 at 6), the 2022 AAP eliminates this language, harshly declaring that “ATF does not have to establish a history of prior violations to establish willfulness.”  Exhibit 3 at 6.

59.     Indeed, the 2022 AAP makes clear that, with respect to certain categories of violations, “[o]ne instance of a violation … does not constitute extraordinary circumstances and will not be an acceptable reason for an alternate recommendation” other than revocation.  Exhibit 3 at 9, 11.

60.     Additionally, the 2022 AAP makes numerous specific changes, ratcheting up the severity of penalties for various offenses, as compared to the 2019 AAP.  For example, under the 2019 AAP, “failure to conduct a [National Instant Background Check (“NICS”)] check or obtain an alternate permit” merited a Warning Conference (Exhibit 4 at 5), but under the 2022 AAP, the same offense results in an automatic Revocation. Exhibit 3 at 7.

61.     Likewise, for a dealer who even runs a NICS check but merely forgets “to retrieve a … response,” such an unintentional oversight merited only a Warning

Letter in 2019 (Exhibit 4 at 4), yet jumps **two levels** of severity to an automatic Revocation in 2022 (Exhibit 3 at 7) – *even if it turns out that the purchaser was fully eligible to purchase the firearm*.

### The 2022 AAP Removes Virtually All Discretion from ATF Field Personnel

62.     Not only did the 2022 AAP severely increase the penalties associated with various infractions, but also it almost entirely prohibits the exercise of any discretion on the part of ATF field personnel.

63.     Historically, ATF field personnel had significant discretion to consider the totality of any given situation and to craft an appropriate remedy based on a unique set of facts.  For many years the AAP has *required* this very practice, explaining that "[e]ach inspection has unique and sometimes complex circumstances," and that "even in cases where violations appear willful, the field should consider mitigating factors," including (i) willingness and ability to "maintain voluntary compliance," (ii) whether the FFL represents "a threat to public safety" or will "contribute to violent crime and/or other criminal activities," (iii) whether the FFL is "taking responsibility for violations and willing to work with ATF to correct them," (iv) whether the violations "directly impact[] the traceability of firearms," and (v) whether the violations "have a nexus to persons prohibited from possessing firearms."  Exhibit 4 at 7.a.3.

64.     Although the 2022 AAP still contains this mitigating factor language as a carry-over from prior versions, the 2022 AAP in reality enacts a very different regime.  Now, rather than ATF field personnel considering unique cases and crafting appropriate remedies, the 2022 AAP orders that "revocation is the assumed action, unless extraordinary circumstances exist…."  Exhibit 3 at 7.a.4.

65.     In fact, in a case where ATF field personnel believe revocation is inappropriate, they have *no discretion* to take alternative action.  Rather, they first must create a detailed report substantiating their recommendation of alternate action, then have it approved by the "Director of Industry Operations" within their ATF Field Division and, if approved, it is then "submitted to the [Monitored Case Program] for [Deputy Assistant Director for Industry Operations] approval" at ATF headquarters in Washington, D.C.  *See* Exhibit 3 at 7.h.  *See also* ATF July 14, 2021 letter at 2 ("Inspections where the Director, Industry Operations determines an alternate recommendation to revocation is appropriate shall continue to be routed to the Deputy Assistant Director, Industry Operations, Office of Field Operations (DAD(IO)). The DAD(IO) will approve or deny the recommendation and advise the field division, accordingly.").

66.     It is no wonder, then, that last year ATF found "extraordinary circumstances" and provided alternate resolutions in only 4.7 percent of revocation

cases.       *See*       https://www.atf.gov/rules-and-regulations/enhanced-regulatory-enforcement-policy.

67.       Expressing their concern in a letter to ATF Director Restaino, 25 members of the House of Representatives recently noted that, under ATF's new "zero tolerance" policy, "[l]ocal ATF field agents have shared they feel pressured to take actions against individual businesses that they do not feel are appropriate or in the interest of public safety," that "[s]ome have even reported that ATF field divisions are being pitted against each other and being forced to compete on the number of licenses revoked," and that "ATF Directors of Industry Operations, who oversee revocation proceedings, are being told to press forward with this escalating quota system or face professional repercussions."[9]

68.       In fact, ATF administrative investigators no longer are permitted to have any role at all with respect to determining whether an FFL acted willfully or whether its license should be revoked.  Rather, the role of field staff under the 2022 AAP is entirely administrative –cataloging violations and entering them into ATF's computer system, the "Spartan"[10] database.

---

[9] https://tinyurl.com/3wvy67cv.

[10] "Spartan is a system for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), that serves as the case management system and database for creating, tracking, and collecting investigative information and inspections in support of ATF's regulatory, strategic, law enforcement mission, program initiatives, and tactical field activities." *See* https://www.justice.gov/d9/2023-02/atf_spartan_pia_-_final.pdf.

69.     Thus, when asked in a recent revocation hearing whether, "[i]n preparing the report of violations, is the issue of willfulness even a factor?" the ATF inspector responded, "I input data, and Spartan does the figuring."  *See* Exhibit 5, Transcript of Revocation Hearing of Goodlettsville Gun Shop, Mar. 7, 2023, at 70-71.

70.     When asked a clarifying question "in this report of violations that you did … are you … commenting on the question of whether or not the violation … was done willfully?"  the ATF inspector answered "No, sir.  Not my job."  *Id*. at 73.

71.     Later, when asked "[y]ou don't even get into the issue of whether or not the error was intentional or reckless or just a human error?" the ATF inspector answered "no," unless the FFL directly refused to comply with record keeping requirements.  *Id*. at 75-76.

72.     When pressed again why ATF had "charged a single disposition out of roughly 7,000" transactions, the ATF inspector responded "Spartan does the configuring."  *Id*. at 80.

73.     When further pressed "[d]id you have any role in the decision … regarding your compliance inspection?" the ATF inspector said "No. … Spartan does. … It assesses the errors and – and after the adverse action policy apparently that is input into Spartan, it – recommends – makes a recommendation."  *Id*. at 109.

74.     The DOJ Office of Inspector General ("OIG") confirms this state of affairs, stating that "when an IOI enters inspection results into Spartan, the system prompts the IOI with a recommendation consistent with the Administrative Action Policy."[11] *Id.* at 57.

75.     Upon information and belief, under the current AAP, the finding of "willfulness" necessary to initiate revocation of an FFL is made not by any human being, but rather an ATF computer algorithm.

76.     In other words, willfulness is no longer *found* by an individual based on facts, circumstances, and the exercise of human judgment.  Rather, it is *presumed* by computer software, based on nothing more than the category of recordkeeping violations that are discovered and fed into the computer system.

### The 2022 AAP Was Deliberately Designed to Greatly Increase FFL Revocations

77.     The 2022 AAP, then, represents a one-way ratchet in favor of license revocation – designed and intended from the ground up to put as many firearm dealers as possible out of business, not only ruining livelihoods but also impeding Americans' ready access to constitutionally protected firearms in the process.

78.     The 2022 AAP represents a clear redirection of ATF's mission – from *regulating* the firearms industry to seeking to *eliminate* it.  Indeed, prior to the 2022

---

[11] *See* https://oig.justice.gov/sites/default/files/reports/23-062_0.pdf.

AAP, ATF previously described its inspection program as being designed "**to ensure** compliance," "**to educate** licensees on the specific requirements of [] laws and regulations," "**to assist** with business practices designed to improve compliance" and, if violations are discovered, "**to guide** the FFL into correction of such violations and to ensure future compliance…." ATF May 2014 Fact Sheet, https://www.atf.gov/file/11136/download (emphasis added). ATF continued that, only when an FFL "demonstrates a lack of commitment to improving … business practices," this "may require revocation of the FFL." *Id.*

79.     The current AAP, however, is not designed to ensure, educate, assist, or guide. Rather, it pursues revocation as its primary goal and political agenda.

80.     Adding insult to injury, not only has ATF implemented the 2022 AAP with respect to new inspections and revocations of FFLs, but also ATF has *reopened old cases*, revoking the licenses of gun stores to whom ATF previously issued a Warning Letter or held a Warning Conference, and who subsequently have rectified their mistakes.[12]

81.     This policy of reopening closed cases and retroactively imposing new punishments is in direct contradiction of a 2013 DOJ OIG report that raised concerns with that very same, unfair tactic. DOJ Office of Inspector General, "Evaluation and Inspections Division. Review of ATF's Actions in Revoking the Federal Firearms

---

[12] https://tinyurl.com/3wvy67cv.

License          of          Guns          &          Ammo,"          Sept.          2013,
https://www.oversight.gov/sites/default/files/oig-reports/e1308.pdf at 17.

82.     As ATF itself reports, the Biden Administration's "zero tolerance"
policy, as implemented in ATF's revised 2022 AAP, has achieved the desired results
– a massive increase in the number of FFLs who are having their licenses revoked
or otherwise are terminating their licenses.   Indeed, "ATF revoked 92 licenses in
2022, the most since 2008," which "more than triples the number of licenses revoked
in 2021," even though "a similar number of dealers were inspected" both years.  C.
Barton, "New data shows ATF gun store revocations at highest rate in 16 years," *The
Trace*,                    Oct.                    5,                    2022,
https://www.usatoday.com/story/news/investigations/2022/10/05/atf-crackdown-
gun-shops-new-data/8186091001/.

83.     On August 18, 2023, the Wall Street Journal reported that the ATF "has
revoked the licensed of 122 gun dealers in the fiscal year that began in October, up
from 90 for all last fiscal year and 27 in 2021." https://tinyurl.com/mthuvzez.

84.     In addition to revocations, ATF has coerced and intimidated an ever
increasing    number    of    FFLs    into    "voluntarily"    ceasing    operations.
https://tinyurl.com/mrwyhwt4.   In fact, the number of FFLs who discontinued
business following a compliance inspection increased from 96 in 2020 to 789 in

2021 (the year that "zero tolerance" was adopted) to 1,037 in 2022,[13] an overall increase of more than 1,000%.  *See* Exhibit 6.

85.     Moreover, due to the lag in time from inspection to revocation, the astronomical increase in revocations almost certainly will continue to increase.

86.     It is also worth noting that, even while seeking to put as many FFLs as possible out of business, ATF also reportedly is attempting to force all gun sales to occur at FFLs, entirely without statutory authority.

87.     On August 7, 2023, journalist John Crump reported on an impending "rule" to be issued by the ATF to "eliminate private sales."[14]

88.     First reported by the New York Times, and then "verified by AmmoLand News sources, the new rule is expected to be unveiled by the end of the year." *Id*.

89.     Reportedly, this rule will be designed to "close" what anti-gun group Everytown calls the "private sales loophole."  In the vast majority of states, including Florida, intrastate firearm transactions between law-abiding non-licensees need not go through an FFL, and no background check is required.[15]

---

[13] *See* https://tinyurl.com/39t346aj.
[14] *See* https://tinyurl.com/4tdfc7km.
[15] As Justice Scalia noted, "... perhaps Congress drew the line where it did because the Gun Control Act, like many contentious pieces of legislation, was a 'compromise' among 'highly interested parties attempting to pull the provisions in different directions.'... A statute shaped by political tradeoffs in a controversial area

90.     ATF thus has been ordered by its political masters to administratively expand the scope of its statutory authority, to regulate this previously unregulated activity.

91.     Thus, by forcing all transactions to take place at dealers, and then putting as many dealers as possible out of business, ATF seeks to impede and destroy the Second Amendment supply chain and Americans' access to constitutionally protected "arms."

### ATF's Recently Issued 2023 AAP Is Not Materially Different from the 2022 AAP

92.     A recent DOJ OIG report recounts that "ATF stated that in January 2023 it issued a revised FFL Administrative Action Policy (ATF Order 5370.1F), which ATF also provided for [OIG] review."[16] *Id.* at 56.

93.     However, the OIG report explains that the changes from the prior 2022 version predominately involve the process by which FFL revocations are reviewed by ATF headquarter personnel. *Id.*

_____

may appear 'imperfect' from some perspectives, but 'our ability to imagine ways of redesigning the statute to advance one of Congress' ends does not render it irrational.'" *Abramski v. United States*, 573 U.S. 169, 201, 134 S. Ct. 2259, 2280 (2014) (Scalia, J., dissenting) (citations and punctuation omitted).

[16] *See* https://oig.justice.gov/sites/default/files/reports/23-062_0.pdf.

94.    The OIG report notes that "[w]e compared ATF's revised policy with previous policy versions and note that it does not represent a significant departure from ATF's prior policy." *Id*. at 57.

95.    Upon information and belief, ATF's 2022 AAP and its new 2023 AAP are substantially and materially identical as pertains to the standards taking various adverse actions including revocations, and as is pertinent to the Notice of Revocation issued to Kiloton, and generally to Plaintiffs' claims in this case.

96.    If anything, the 2023 AAP may be more extreme than the 2022 AAP, demonstrated by the fact that ATF waited until just last month to deny/revoke Kiloton Tactical's license, more than a year after that inspection that took place in May 2022.

97.    Thus, this Complaint uses the terms "AAP" to refer to the policies announced in the 2022 AAP and, upon information and belief, still represented in the 2023 AAP.  For clarity's sake, however, Plaintiffs challenge the current version.

98.    Of course, ATF's 2023 AAP is not immune from judicial review simply because ATF keeps it close to the vest.  Rather, as the Seventh Circuit has written, "[a] designation by an unnamed official, using unspecified criteria, that is put in a desk drawer, taken out only for use at a criminal trial, and immune from any evaluation by the judiciary, is the sort of tactic usually associated with totalitarian regimes." *United States v. Pulungan*, 569 F.3d 326, 328 (7th Cir. 2009).

27

## Background on the Statutory Requirement of Willfulness

99.    ATF's 2022 AAP notes that "ATF must establish willfulness to proceed with revocation under 18 U.S.C. § 923(e)."  *Id*. at 7.e.1.  *See also* Section 923(e) (emphasis added) ("The Attorney General may, after notice and opportunity for hearing, revoke any license issued under this section if the holder of such license has **willfully** violated any provision of this chapter or any rule or regulation prescribed by the Attorney General under this chapter").

100.    Section 923(e)'s "willful" language was no accident, but rather was a deliberate addition to the statute by Congress as part of the 1986 Firearms Owners' Protection Act ("FOPA"), 100 Stat. 449 – Pub. L. No. 99-308.[17]

101.    Prior to FOPA, there had been a series of congressional hearings into the highly questionable enforcement practices that had been taking place by ATF against FFLs.

102.     For example, in an April 1980 Senate Appropriations hearing, Democratic Senator Dennis DeConcini recounted prior testimony from a series of witnesses, explaining that most "BATF cases … involved defendants who had no criminal intent, but were enticed by Bureau agents into violating technical requirements which the defendants did not know existed."  *See* Exhibit 7 at 7-8.[18]

---

[17] *See* https://tinyurl.com/5n6d8f9w.
[18] *See* https://tinyurl.com/5n7ccbum.

Making matters worse, numerous pieces of testimony also showed ATF moving to revoke licenses after numerous licensees were acquitted of criminal charges in federal court. *Id.* at 8. ("Like Mr. Moorhead, Mr. Phillips was acquitted when the Federal judge directed a verdict of not guilty. The Bureau then proceeded to attempt to revoke his license…."); *see also Id.* at 14.

103.     Senator DeConcini concluded that "the problem appeared far more serious and widespread than I had thought possible," surmising that ATF "had, for all intents and purposes, abandoned any attempt to respect the rights of our citizens." *Id.* at 9.  Senator DeConcini then referenced his statements from July of 1979, where he opined that "I predict that Congressional action of a dire sort will be forthcoming. We are reaching the point with BATF where the wrongs it perpetrates on innocent citizens is beginning to outweigh the good it does in other areas.  The time has come for basic and dramatic changes within BATF.  Also, the time has come to make some revisions in the Gun Control Act of 1968." *Id.* at 10.

104.     A February 1982 Report entitled "The Right to Keep and Bear Arms" from the Senate Subcommittee on the Constitution later noted that, while the Gun Control Act had been enacted to keep certain persons like felons from acquiring arms, most of ATF's prosecutions "involve citizens with no police record

whatsoever," based "upon technical *malum prohibitum* charges[] of individuals who lack all criminal intent and knowledge."[19]  *See* Exhibit 8.

105.     That same report stated that ATF's "amply documented" practices "leave little doubt that the Bureau has disregarded the rights guaranteed by the constitution and laws of the United States."  *Id*. at 27. Specifically, the report found that the ATF "trampled upon the second amendment by chilling the exercise of the right to keep and bear arms," that it "offended the fourth amendment by unreasonably searching and seizing private property," and finally, that it "ignored the Fifth Amendment by taking private property without just compensation and by entrapping honest citizens without regard for their right to due process of law." *Id*.

106.     Further, the Appropriations Subcommittee heard testimony "establishing that approximately 75 percent of BATF gun prosecutions were aimed at ordinary citizens who had neither criminal intent nor knowledge, but were enticed by agents into unknowing technical violations." *Id*.

107.     A later June 1982 Senate Report referenced these earlier hearings and findings, stating that they formed "the mandate for the additional civil liberty guarantees to the Gun Control Act of 1968" that were being proposed in S.1030,

---

[19] *See* https://constitution.org/1-Constitution/2ll/2ndschol/87senrpt.pdf at 25.

which would be enacted as FOPA in a later congressional session.  *See* Exhibit 9 at 14.[20]

108.     When advocating for FOPA's passage four years later, Representative Harold Volkmer (the bill's sponsor in the House) stated that "the Gun Control Act provided the open door to make easy cases against unsuspecting persons. With the **strict liability** provided by the act, even the most **trivial and unintentional misstep** would do.… This potential for abuses continues today."[21]

109.     Representative Volkmer continued, opining that the "intent of the [GCA], not to place undue or unnecessary federal restrictions on law abiding citizens with respect to the acquisition, possession, or use of firearms was clearly violated by the **technical enforcement practices** being utilized … The need [for FOPA] is not based upon hypotheticals, but upon civil rights abuses perpetrated [by ATF] against real people. These abuses were documented in six years of hearings before two different committees, and deserve our attention."  *Id*. at 6481, 6489 (emphasis added).

110.     In response to Congress' repeated and heavy criticism, ATF then-Director G. R. Dickerson wrote a letter to Senator DeConcini, agreeing that it was time for ATF "to reexamine our practices, policies, motivations and techniques,"

---

[20] *See* https://tinyurl.com/5f8xab8v.
[21] 132 Cong. Rec. 6841, https://tinyurl.com/44387b56 (emphasis added).

and that ATF's mission instead should be not to target the "inadvertent violations" by well-intentioned dealers but instead "to prevent the criminal misuse of firearms and illegal criminal trafficking in firearms."  *See* Letter to Senator DeConcini from ATF Director G. R. Dickerson, Sept. 7, 1979, Exhibit 7 at 6.

### ATF's Misuse of "Willfully" to Include Unintentional Paperwork Mistakes

111.    As ATF's 2022 AAP states, "the term willful means a purposeful disregard of, or a plain indifference to, or reckless disregard of a known legal obligation."  Exhibit 3 at 5.c.  *See also Sturdy v. Bentsen*, 1997 U.S. App. LEXIS 27671, *4 (8th Cir. 1997) (unpublished) ("To show a willful violation, the BATF had to prove [the FFL] knew of the legal record-keeping requirements and 'purposefully disregarded' or was 'indifferent to' them.").

112.    Faced with the addition of FOPA's statutory "willfulness" standard, ATF was forced to get creative about how to demonstrate that an FFL had "willfully" committed an unintentional and inadvertent technical, recordkeeping, or paperwork violation.

113.    The 2019 AAP provided **three ways** that "ATF can establish the knowledge element of willfulness" – (i) a history of similar violations brought to the FFL's attention by ATF, (ii) prior "acknowledgement of Federal firearms regulations" in prior inspection reports, and (iii) statements or admissions by the FFL.  Exhibit 4 at 7.3.e.a-c.

114.     The 2022 AAP, however, adds three new categories, now listing **six ways** to demonstrate willfulness: (i) "publications and information provided to the FFL which explain the FFL's legal responsibilities," (ii) a history of past compliance by the FFL with the same regulation, and (iii) by "demonstrate[ing] that the FFL has substantial experience as an FFL."  Exhibit 3 at 7.e.4.d-f.

115.     ATF does not further explain how any of these factors demonstrates any actual "purposeful disregard of, or a plain indifference to, or reckless disregard of a known legal obligation" necessary to prove willfulness.

116.     Nevertheless, based on factors (ii) and (iii), ATF believes that a lengthy history of an FFL *following* the rules should be used to prove that the FFL "willfully" *failed to follow* the rules when a mistake or oversight inevitably occurs.  In other words, the longer and more faithfully an FFL has followed the rules, the more severely it can be punished for an inevitable inadvertent slip up, leading to a perverse incentive structure where a history of good behavior is grounds for more serious punishment.

117.     Likewise, with respect to factor (i), when ATF initially grants a license, ATF personnel are required to provide the new licensee with a website link to the ATF Federal Firearms Regulations Reference Guide, a 237-page document.[22]  The FFL is then made to sign a special form that ATF has created, entitled

---

[22] https://tinyurl.com/pwvjcmep.

"Acknowledgement of Federal Firearms Regulations," attesting that the FFL has received and understands the rules set forth in the manual.[23]

118.    The purpose for ATF requiring formal acknowledgement of receipt of the website link to the Regulations Reference Guide is devious on the part of ATF – nothing more than a way to *manufacture evidence* that can later be used against the FFL to revoke its license – specifically, on the theory that the one-time provision of a reference to this manual represents "publications and information provided to the FFL which explain the FFL's legal responsibilities" (2022 AAP). *See, e.g.*, ATF Warning Letter to Damien Ristaino, August 1, 2016, at 7 ("Mr. Damien Ristaino, indicated that he understood all of the information provided by signing and dating the Acknowledgement of the Federal Firearms Rules and Regulations (Exhibit #03)."); *see also* Exhibit 10, ATF January 13, 2022 Notice of Revocation to MAX, LLC, at 6 ("ATF introduced a signed Acknowledgements [sic] of Federal Firearms Regulations demonstrating that ATF had reviewed the legal requirements applicable to the Federal firearms licensee.").

119.    This ATF tactic – revoking a federal firearms license on the basis that a licensee agreed, often years in the past, to have understood every nuance of a

---

[23] *See* 2019 ATF Industry Operations Manual, Chapter B.  "Firearms Application Inspections," 34.d(8)(b)  https://tinyurl.com/3asev9jr ("The IOI shall thoroughly review the Acknowledgment of Federal Firearms Regulations with the applicant. Have the applicant sign and date the acknowledgement electronically in Spartan.").

regulatory scheme hundreds of pages long – is a bit like revoking a lawyer's admission to a court for failure to use the proper size font in a brief, on the theory that his decades-old admission application attested that he had read and understood the local rules.  It is also like revoking the driver's license of a person who fails to use his turn signal, alleging that he acted in "purposeful disregard of, or a plain indifference to, or reckless disregard of a known legal obligation."  After all, several decades ago, the DMV handed that driver a manual with hundreds of pages of nuanced rules and regulations.

120.    On the contrary, just as no reasonable person would characterize the lawyer's or the driver's honest mistakes as "willful," neither is an FFL's technical or paperwork or recordkeeping violation "willful."

121.    One ATF Director of Industry Operations recently opined that "[a]rguing that errors were the result of human mistakes or harmless misunderstandings … *is irrelevant* to the standard of willfulness."  Exhibit 10, at 6 (emphasis added).  (This is not the only ATF DIO to include this language in revocation documents.)

122.    Yet this is ***precisely*** what FOPA and Section 923(g)'s standard of willfulness were intended by Congress to prevent.  Recall, Representative Harold Volkmer (FOPA's sponsor) stated that FOPA was necessary to avoid "the strict

liability provided by the act," where "even the most trivial and unintentional misstep would do." *See* 132 Cong. Rec. 6841.

123.    "Human mistakes" and "harmless misunderstandings" simply do not, as a matter of law, amount to a "purposeful disregard of, or a plain indifference to, or reckless disregard of a known legal obligation."

124.    In other words, the AAP and ATF's statements directly conflict with both the statutory text and the explicit Congressional purpose of FOPA.

125.    In another instance, the AAP takes the position that repeat paperwork violations are evidence of willfulness, particularly after the ATF has given prior notice to the FFL that the errors are a violation of the law.  Exhibit 3 at 6.  Yet ATF is clearly aware that such human errors happen and are unavoidable, and typically pose no real risk to public safety or ATF's ability to trace firearms.  For example, in the AAP, ATF provides that a warning letter (the lowest form of adverse action) is not appropriate unless an FFL has "5 percent or more errors" on the FFL's acquisition records.  *Id.* at 7.c.(1).  Similarly, the complete failure to record "valid and complete" or even "any" transferee information on the Form 4473 Firearms Transaction Record does not warrant a Warning Letter, so long as Form 4473s with errors constitute less than "10 percent" of the total.  *Id.* at 7.c.(4-5).  Even so, ATF uses a first compliance inspection and warning as a basis to set the trap to

subsequently assert "willfulness" under its non-Congressional "repeat violation" doctrine. *Id*. at 7.e.(4)(a).

126.    Further clarifying ATF's hardline position, the AAP **specifically deletes** language from the 2019 AAP, which previously had stated that "not every repeat violation is per se a willful violation. A single, or even a few inadvertent errors in *failing to complete* forms may not amount to 'willful' failures, even when the FFL knew of the legal requirement to complete the forms." Exhibit 4 at 7.3.1.

127.    This deletion was intentional.  In fact, ATF recently has undertaken to revoke the FFL of one dealer merely for *forgetting to transcribe* the Tennessee Instant Check System ("TICS") Number on an ATF Form 4473, with respect to gun sales that had been approved.  Adding insult to injury, it turns out that the TICS Number actually had been stapled to the very same Form 4473, requiring only that the document be flipped to the next page to obtain the information.  Moreover, an ATF agent testified that the transcription omissions had in no way affected ATF's ability to determine the chain of custody of the firearm.

128.    To sum up:  first, according to ATF, a **history of compliance** indicates an FFL's knowledge of recordkeeping duties, meriting revocation.  Second, a **history of noncompliance** shows an FFL's deliberate intention not to improve its behavior, warranting revocation.  And third, **no history** either way is irrelevant, as even a single violation merits revocation.

129.     In other words, the AAP has created a "heads I win, tails you lose" situation where all roads lead to revocation.

### Unsurprisingly, ATF Does Not Hold Itself to the Same Standards of Perfection

130.     It should come as no surprise, but ATF does not hold itself to the same standards of perfection with respect to firearm recordkeeping.

131.     **Christopher Lee Yates**.  For example, in 2019, Christopher Lee Yates, an ATF contractor, was convicted or stealing *thousands of firearms* from ATF's Martinsburg, West Virginia headquarters, over the course of *several years*.[24]  Even when caught, the theft was not discovered by ATF headquarters, but instead by tracing firearms Yates stole and sold.

132.     As part of the Yates scandal, criminal investigators discovered that ATF personnel had *deliberately falsified* "certif[ied] … reports" stating that countless firearms had been destroyed, even though the same firearms were later were recovered on the streets (clearly not destroyed).[25]

133.     If these same violations had been committed by an FFL, license revocation would be swift for having made "a false or fictitious written statement in the FFL's required records," or "inventory … for which disposition could not be

---

[24] *See* https://tinyurl.com/2437kw59.
[25] *See* https://tinyurl.com/h92yysxm.

accounted for…."  Exhibit 3, 2022 AAP at e.6.d and j.  Yet upon information and belief, not one ATF employee was ever punished for the Yates fiasco.

134.     Even though Gun Owners of America, Inc. submitted a FOIA request to ATF in November of 2019 (more than 3.5 years ago), seeking more information regarding the Yates case (FOIA # 2020-0097), ATF has yet to respond.

135.     **NFRTR**.  Another example of ATF's atrocious firearm recordkeeping is the National Firearms Registration and Transfer Record ("NFRTR"), the registry of all firearms registered pursuant to the National Firearms Act of 1934 (machineguns, silencers, etc.).  In 2007, the DOJ OIG issued a report entitled "The Bureau of Alcohol, Tobacco, Firearms and Explosives' National Firearms Registration and Transfer Record,"[26] summarizing that "NFA Branch staff members do not process applications or enter data uniformly into the NFRTR. The staff's variations in completing these tasks result in *errors in NFRTR records, reports, and queries* as well as inconsistent decisions on NFA weapons registration and transfer applications."  *Id*. at v.

136.     In fact, the OIG reported that, comparing the records from ATF and FFLs, *__it is almost always the FFL with the accurate records, while ATF's records are erroneous__*:  "In our survey of IOIs, 46.5 percent (139 of 299) reported that they found a discrepancy between the NFRTR inventory report and a licensee's inventory

---

[26] *See* https://oig.justice.gov/sites/default/files/legacy/reports/ATF/e0706/final.pdf.

'always' or 'most of the time.'  Further, 44.4 percent of respondents (133 of 299) said that the discrepancy was due to an error in the NFRTR 'always' or 'most of the time.'  In comparison, no respondents reported that the error was 'always' on the part of the licensee, and only 2 percent (6 of 299) reported that the error was on the part of the licensee 'most of the time.'"  *Id*. at vii.

137.    This is not a new phenomenon.  Rather, the magnitude of ATF's recordkeeping errors in the NFRTR cannot be understated.   As far back as 1995, then-NFA Branch Chief Thomas Busey openly conceded that "our error rate was between 49 and 50 percent, so you can imagine what the accuracy of the NFRTR could be, if your error rate's 49 to 50 percent."[27]

138.    Chief Busey then beamed that ATF's error rate, under his watch, had been reduced to "below 8 percent" (*id*. at 3:25) – an error rate that would never be permitted of any FFL.  But Chief Busey then demurred "[t]hat's common errors and critical errors.  *We do a little finagling upstairs* on what we consider.  A common error is an error in the database entry, but it doesn't affect the lookup.  It wouldn't hurt an agent.  It doesn't really have any damage."  *Id*. at 3:27 (emphasis added).

139.    Yet the 2022 AAP, in contrast, requires revocation even in cases of what Chief Busey would categorize as a "common error" – one that does not impede the

---

[27] *See* https://tinyurl.com/5n775nj2;
https://www.youtube.com/watch?v=bO6BQVAZpwU (at 3:14).

tracing of a firearm, lead to a felon obtaining a firearm, or cause any harm to public safety.

140.    In spite of this monumental level of error in the NFRTR (that apparently had not improved as of the 2007 OIG report), Chief Busey stated that ATF's policy was to commit what has been called "institutional perjury":  "when we testify in court, we testify that the [NFRTR] database is 100 percent accurate.  That's what we testify to, and we will always testify to that.  As you probably well know, that may not be 100 percent true." *Id*. at 1:15.

141.    Chief Busey continued that, when tracing lawful firearm ownership under the National Firearms Act, ATF was unable to rely on the NFRTR, stating that "You're basing your warrants on it.  You're basing your entries on it.  And you certainly don't want a Form 4 waved in your face when you go in there, showing that the guy does have a legally registered Type II weapon."  *Id.* at 1:52.

142.    Chief Busey then joked, noting with a smile that ATF has used bad information to kick down the front doors of innocent people: "I've heard that's happened.  I'm not sure."  *Id*. at 2:04.

143.    When later attempting to walk back his statements when they were made public (*i.e.*, expressing remorse only when he got caught), Chief Busey reportedly claimed that "[t]his was a mis-statement of the facts on my part.  What I meant was that the database does contain errors that are contributable [sic] to human

causes (misspelled names, inverted serial numbers), but what we do testify to is the accuracy of the search we perform and the results gained from that search."[28]

144.     Hypocritically, the NFRTR's errors are the very sort of "human cause[]" errors that the AAP penalizes with automatic revocation of licenses.

145.     Yet the AAP would have no sympathy for Chief Busey's NFA Division, and instead ATF's own error-ridden database would actually represent something done willfully, in violation of a known legal duty.  Indeed, as ATF says, "[a]rguing that errors were the result of human mistakes or harmless misunderstandings … is irrelevant to the standard of willfulness," and shows "purposeful disregard of, or a plain indifference to, or reckless disregard of a known legal obligation" on the part of ATF's own personnel.

146.     Again, ATF's inept NFRTR recordkeeping would result in mandatory and immediate revocation, were ATF held to the same standards to which it holds FFLs.  Of course, "rules for thee, but not for me."

147.     **Fast and Furious**.  Perhaps ATF's most spectacular failure (in _recent_ history, that is) was its infamous Operation Fast and Furious, where the agency "allowed illegal gun sales [purportedly] in order to track the sellers and purchasers,

---

[28] _See_ https://www.gunowners.com/ip06.htm.  Plaintiffs have been unable to locate the original source for this later statement, but intend to pursue obtaining it through a FOIA request and/or discovery in this matter.

who were believed to be connected to Mexican drug cartels."[29]  Of course, ATF did not "track" anything, and usually had no idea as to the whereabouts of the trafficked firearms until, for example, one was used on December 14, 2010 to murder U.S. Customs and Border Protections Agent Brian Terry.

148.    If any FFL had been involved in or permitted such willful violations of the Gun Control Act, or kept such shoddy records, license revocation would have been the least of its worries.  Yet, to date, no ATF personnel have faced any serious repercussion for the Fast and Furious debacle.

149.    **ATF Makes the Same Errors for which it Revokes Licenses**.  As with ATF's open admissions about the error-ridden NFRTR, ATF personnel readily admit that they are not immune from committing the *very same clerical errors* for which they revoke licenses.  *See* Exhibit 5, Transcript of Revocation Hearing of Goodlettsville Gun Shop, Mar. 7, 2023, at 85-86 (ATF IOI admitting that she had accidentally misspelled the name of a firearm importer in her Report of Violations and that, *if the FFL had made the same mistake*, it would have been a *"willful" chargeable violation for falsifying records*).

150.    Indeed, as discussed infra, ATF committed the very sort of clerical error in its Notice of Revocation for Kiloton, inaccurately stating the date that a

---

[29] *See* https://tinyurl.com/2zxv6363.

transaction is alleged to have occurred.  *See* Complaint ¶ 239. (used to be around paragraph 240, check when final)

151.     One might respond that ATF does not hold a federal firearms license, and thus technically is not bound by the statutory and regulatory recordkeeping requirements that apply to licensees.  *Au contraire*.  For reasons unknown, the ATF in fact has, in the past, maintained at least four of its very own Federal Firearms Licenses.[30]

152.     In February of 2021, Gun Owners of America, Inc. submitted a FOIA request to ATF, seeking information about these ATF FFLs, including a copy of ATF's "A&D" bound books of acquisitions and dispositions (FOIA # 2022-0169). However, to date, ATF has not responded to that request.

153.     What is more, as of April 2021 (just two months after that FOIA request was filed), ATF's nationwide list of FFLs that it publishes on its website no longer includes those FFLs held by ATF.

154.     In sum, ATF's own horrible history of unaccountable firearm recordkeeping shows that the agency would *never* itself be able to achieve anywhere close to the standard of perfection that the ATF through its unrealistic AAP demands from the nation's FFLs.

---

[30] *See* https://www.atf.gov/firearms/docs/undefined/0920-ffl-list-district-columbiaxlsx/download.

155.     At bottom, the 2022 AAP is a deliberate attempt by ATF to revert to the very same, highly questionable tactics and practices from more than four decades ago – tactics that were repudiated on a bipartisan basis in Congress, and which directly led to enactment of the FOPA in 1986.[31]

156.     Ignoring both the plain text and the unambiguous intent of FOPA's addition of "willfulness" to the statute, ATF's 2022 AAP results in a situation where ***every single*** violation of any statutory or regulatory requirement by an FFL can be characterized by ATF as "willful," potentially leading to the loss of a license and livelihood even for entirely minor, technical, paperwork violations, tempered only by ATF's exercise of unbridled discretion.  *See* Exhibit 3, 2022 AAP at 7.e.2 ("ATF may … revoke for any other willful first-time violation as it deems appropriate.").

157.     Since basic human error inevitably results in paperwork mistakes being made, this means that ATF believes itself to have the authority eventually to revoke every single federal firearms license in the country – regardless of whether merely "inadvertent violations" were involved, and irrespective of whether the revocation is "to prevent the criminal misuse of firearms and illegal criminal trafficking in firearms."

---

[31] Interestingly, notwithstanding President Biden and the ATF implementing the Administration's "zero tolerance" policy, President Biden voted for the 1986 FOPA when he was a Senator. *See* https://tinyurl.com/n4fuvu9a.

158.     ATF has strayed far afield from the "enforcement objective of ATF …
to prevent the criminal misuse of firearms and illegal criminal trafficking in
firearms." *See* Letter to Senator DeConcini from ATF Director G. R. Dickerson,
Sept. 7, 1979, Exhibit 7 at p5. ATF's anti-gun and anti-FFL agenda is reflected by
the foreseeable outcome of its published policies – the slow but certain elimination
of the Second Amendment supply chain.

**ATF's Compliance Inspection of Plaintiff Kiloton Tactical**

159.     Kiloton is a retail gun store in DeFuniak Springs, FL, offering a wide
inventory of hundreds of firearms, along with a variety of ammunition, accessories,
and related merchandise, and also offers a broad range of gunsmithing and
customization services, and a shooting range where instruction and training is
offered.

160.     There are no similar gun stores in the vicinity.  For example, Kiloton
offers some of the only certified, licensed, and insured gunsmiths across multiple
counties in the Florida panhandle.  And aside from one apparent home-based FFL,
Kiloton is the only licensed firearm manufacturer in Walton County, Florida.[32]  Other
licensed dealers in the area are generally small, mom-and-pop shops, or home-based
dealers who do not offer the sort of inventory and services, or regular business hours,
that Kiloton does.  The nearest similar brick and mortar gun stores are quite distant,

---

[32] https://www.atf.gov/firearms/docs/undefined/0723-ffl-list-floridaxlsx/download.

requiring a drive between 30 minutes and one hour.  Even then, none of them offers comprehensive gunsmithing and manufacturing services, as does Kiloton.  And almost without exception, other gun stores in the Florida panhandle do not offer on-site shooting ranges with access to a certified firearms instructor, as does Kiloton.

161.     As noted above, Kiloton Tactical holds a Type 07 Manufacturer FFL with the ATF, a license which was first issued in 2016.  This license also permits Kiloton to "deal" in firearms.

162.     Kevin Smith, the owner of Kiloton, has held several FFLs in the past, at different locations and for different entities, having operated two retail locations in New Mexico and two in Florida (including the current location) (including a Type 01 "dealer's" license during 2010-2011; Type 01 during 2011-2012; Type 01 during 2012-2017).  In all of this time and across all of these licenses at four different locations, ATF has only conducted **one** annual compliance inspection of a Type 01 license held by Mr. Smith – nearly a decade ago in 2015.  Tellingly, that inspection netted *no violations*, and thus there was **no** ATF Report of Violations, **no** Warning Letter, **no** Warning Conference, and certainly **no** revocation.

163.     Since receiving the Kiloton Tactical Type 07 license in 2016, Kiloton *was never inspected* by ATF as part of an annual compliance inspection pursuant to 18 U.S.C. § 923(g)(1)(B)(ii), which provides that "[t]he Attorney General may inspect or examine the inventory and records of a licensed importer, licensed

manufacturer, or licensed dealer without such reasonable cause or warrant for ensuring compliance with the record keeping requirements of this chapter … not more than once during any 12-month period….").

164.     Then, on May 24, 2022, ATF initiated a compliance inspection of Kiloton Tactical, through an Industry Operations Inspector ("IOI") named Nicholas Speranza, Jr.

165.     According to ATF, that inspection lasted "form [sic] May 24, 2022 through June 9, 2022," (a period of sixteen days).  Exhibit 1 at 1.

166.     After his inspection, IOI Speranza issued a "Report of Violations" dated June 9, 2022.  Exhibit 11.  Although the Report of Violations listed a number of categories of violations, most involved technical or recordkeeping requirements, such as a buyer forgetting to provide height or weight on a Form 4473.  *Id.* at 1-2, 4-7.

167.     Fast forwarding to April 26, 2023, Kiloton filed a timely application to renew its license.  Exhibit 1 at 2.

168.     Then, on July 10, 2023, more than an entire year after the ATF had performed Kiloton's compliance inspection in May and June of 2022, ATF issued a Form entitled "Notice to Deny Application for License," Exhibit 1, along with an accompanying letter stating that "(ATF) is contemplating denying your renewal application … and has decided to initiate the denial/revocation process."  Exhibit 2.

169.     In other words, ATF waited 396 days, from June 9, 2022 (the end of the inspection) to July 10, 2023 (the date of denial of renewal).

170.     Based on that spectacular delay alone, there can be no reasonable argument in this case that the violations Kiloton Tactical is alleged to have made caused any harm to anyone, much less had any negative public safety implications. Otherwise, ATF would not have waited over a year to take action.

171.     There is no legitimate reason for the ATF to have waited over a year to let Kiloton Tactical know that the federal government would seek to destroy its business.

172.     Rather, there must be some finality to an ATF administrative compliance inspection, so that a dealer can have some certainty as to its future operations.   Otherwise, FFLs are left in the lurch, wondering when their day is coming to be shut down by an overzealous inspector who may choose to take action weeks, months, or even *years in the future*, based on alleged violations that occurred in distant memory.

173.     In any event, typically, ATF will issue a "Notice of Revocation" to an FFL.  However, since Kiloton had an application for license renewal pending, ATF for whatever reason bundled its Notice of Revocation with its Notice to Deny Application for License (together referred to here as "Notice of Revocation").

174.     The Notice of Revocation was signed by Aaron R. Gerber, Director, Industry Operations, Tampa Field Division.

175.     Whereas IOI Speranza's June 9, 2022 Report of Violations had identified several categories of errors, ATF's July 2023 Notice of Revocation identified **four categories of violations** as the basis for its Notice of Revocation.

176.     **First**, ATF alleges that, on five occasions, Kiloton "willfully" failed to run a background check on a firearm purchaser.  Exhibit 1 at 2.  Yet in each case, ATF notes that Kiloton actually *did* "contact[] NICS" and *did* "receive an approval" for the buyer.  *Id.*  Rather, ATF's objection was that each of the five transfers occurred *more than 30 days after* the background check had been approved (33 days, 77 days, 63 days, 80 days, and 88 days, respectively).

177.     **Second**, ATF alleges that, on five occasions, Kiloton "willfully" "fail[ed] to report on a Report of Multiple Sale or other Disposition of Pistols or Revolvers (ATF E-Form 3310.4).  *Id*. at 3.

178.     **Third**, ATF alleges that, on thirteen occasions, Kiloton transferred pistols (or, in one case, a "receiver") to purchasers, but "failed to follow" Florida's "three (3) day waiting period pursuant to Florida Statute § 790.0655 … in violation of 18 U.S.C. § 922(b)(2)."  *Id*. at 3-6.  In each case, the buyer is alleged to have presented Kiloton with either a "Florida hunting license" (A, B, C, D, J, L), Florida "law enforcement" credentials (E, F), or a military "servicemember" ID (G, H, I, K,

M), each of which exempts the buyer from the waiting period "for the purchase of a rifle or a shotgun," but not a handgun. *Id.* Unlike Kiloton's other alleged violations, ATF does not allege that any of these violations was "willful."

179. **Fourth,** ATF alleges that, on one occasion, Kiloton "willfully" made a false entry in its records, on the grounds that the records for two different sales (one on April 6, 2022 and the other on March 23, 2022) contained the same "FDLE … approval number," and that "[t]he Licensee was unable to reconcile" to which sale the number applied.

180. As discussed below, none of these violations in any way impacted public safety, risked the transfer of a firearm to a prohibited person, or thwarted law enforcement's ability to trace any firearm.

181. As discussed below, none could in any way be characterized as a "willful" violation.

182. Simply put, the violations alleged as the basis for Kiloton's revocation cannot form the basis the revocation of Kiloton's license, as a matter of law.

## VIOLATION #1 – FAILURE TO RUN A BACKGROUND CHECK

183. First, as noted above, five of Kiloton's violations were for alleged failures to run a background check after more than 30 days had elapsed since an approved background check had been completed on the purchaser. Exhibit 1 at 1-2.

184.     Importantly, ATF *does not claim* that no background check was run. Instead, ATF's revocation document acknowledges that Kiloton *did* run a background check on each buyer, and in each case the background check *was approved*. *Id*.

185.     Rather, ATF's only objection is that Kiloton "transferred" the firearm after more than 30 days had elapsed.

186.     This 30-day rule, however, is not found in any federal statute.  Indeed, 18 U.S.C. § 922(t) states only that a "licensed dealer shall not transfer a firearm … unless … the licensee contacts the national instant criminal background check system" and receives an approval (or three business days passes without a denial).

187.     ATF's 30-day rule, then, is entirely a creation of bureaucrats, promulgated (over numerous objecting comments) in 1998 as a regulation (63 Fed. Reg. 58272, Oct. 29, 1998), on the theory that 30 days is a "reasonable period of time…." *Id*. at 58274.  In other words, ATF's own rulemaking admits that 30 days is not *required* by the statute (any more than is 15 days or 45 days), but merely was deemed "reasonable" by administrative fiat.

188.     This regulation today appears in 27 C.F.R. § 478.102, and states that "[a] NICS check conducted in accordance with paragraph (a) of this section may be relied upon by the licensee only for use in a single transaction, and for a period not to exceed 30 calendar days from the date that NICS was initially contacted. If the

transaction is not completed within the 30-day period, the licensee shall initiate a new NICS check prior to completion of the transfer."

189. But even assuming the legitimacy of the 30 day expiration window for a background check, ATF's allegations of any violation still fail, because each of the firearms that ATF alleges were "*transfer[ed]*" without a background check were actually being *returned* to customers after Kiloton performed gunsmithing work. *See* Declaration of Kevin Smith, Exhibit 12 at ¶ 53.

190. In other words, a buyer would purchase a firearm, and Kiloton would receive payment and conduct a background check.  However, the buyer would request that Kiloton perform additional services on the firearm, such as installing a custom trigger, or fitting a scope.  *Id*. at ¶¶ 45-46.  Thus, the transfer of ownership did occur in the 30-day period, but the customer requested that Kiloton keep the firearm at Kiloton, and perform that work for the buyer.

191. Importantly, ATF's own website FAQ asks "[d]oes a licensed gunsmith have to conduct a NICS background check before returning repaired or customized firearms?" and answers "[n]o, if the firearm is being returned to the person from whom it was received."[33]

192. Likewise, 27 C.F.R. § 478.124(a) states that "a firearms transaction record, Form 4473, ***shall not be required*** to record the disposition made of a firearm

---

[33] https://tinyurl.com/yc7emvjj.

delivered to a licensee for the sole purpose of repair or customizing when such firearm or a replacement firearm is returned to the person from whom received." (emphasis added).

193.   In other words, no second, additional background check was required for Kiloton simply to return firearms to customers who purchased them and requested Kiloton perform additional gunsmithing services.

194.   At best, ATF might argue that Kiloton should have written the firearm *off* its A&D books (as a dealer's transfer to the buyer), and then *immediately* written the firearm back *on* its A&D books (as a gunsmithing acquisition from the buyer).

195.   Indeed, ATF recommends – as best practices, not a legal requirement – that a licensee may choose to keep more than one A&D book – one for sales, and another for gunsmithing.  *See* https://tinyurl.com/yc4txtfy.

196.   Plaintiffs are aware of no ATF guidance that *mandates* that this additional paperwork step of writing a firearm out of inventory and then immediately back into inventory when gunsmithing services are to be performed.

197.   Certainly, such a *pro forma* requirement – rules for the sake or rules – cannot form the basis to revoke a federal firearms license.  Rather, that would be precisely what FOPA was designed to prevent.

198.   Either way, no **background check was required** for Kiloton to simply return gunsmithing firearms to their owners.

199.     ATF may not revoke Kiloton's license for failure to run additional, unnecessary background checks that ATF's own publications state are not required.

200.     Nor does ATF allege that any of the buyers in question were ineligible to possess firearms, became ineligible to possess firearms, that ATF's ability to trace the firearms in question was hampered, or that any other nexus to public safety that arose because of these transactions.

### VIOLATION #2 – FAILURE TO REPORT MULTIPLE SALES

201.     Second, as noted above, ATF alleges that, on five occasions, Kiloton failed to timely file a "Report of Multiple Sale or Other Disposition of Pistols or Revolvers."  Exhibit 1 at 3.

202.     This requirement is contained in 18 U.S.C. § 923(g)(3), which states that "[e]ach licensee **shall prepare a report of multiple sales or other dispositions** whenever the licensee sells or otherwise disposes of, at one time or **during any five consecutive business days, two or more pistols**, or revolvers, or any combination of pistols and revolvers totaling two or more, to an unlicensed person. The report shall be prepared on a form specified by the Attorney General and forwarded to the office specified thereon and to the department of State police or State law enforcement agency of the State or local law enforcement agency of the local jurisdiction in which the sale or other disposition took place, **not later than the close**

**of business on the day that the multiple sale or other disposition occurs**.” Emphasis added.

203.     It is worth noting, however, that during his inspection of Kiloton, IOI Speranza initially claimed that Kiloton had failed to make multiple sale reports *on other, additional, occasions as well*, on the grounds that IOI Speranza was unable to find any record of the multiple sale report in ATF's system.  *See* Declaration of Kevin Smith, Exhibit 12 at ¶ 56.

204.     However, with respect to those instances, *Kiloton was able to and did produce email receipts*, proving that Kiloton did in fact submit such reports through ATF's online system.  *Id*.  Significantly, ATF does not require a FFL to keep confirmations or receipts that the FFL has timely submitted the multiple sale reports.

205.     When presented with evidence that it was not Kiloton's records that were deficient, but rather that *ATF's own records were erroneous*, IOI Speranza openly acknowledged that ATF's records of multiple sale reports are often wrong, in that ATF routinely does not bother to properly record and document such reports when they are received from FFLs.  *Id*. at ¶57.

206.     In other words, ATF's claim that Kiloton did not properly make multiple sale reports is questionable at best, based on the fact that ATF's own records of receipt of such reports, by the agency's own admission, are notoriously inaccurate and incomplete.

207.     But more fundamentally, ATF's allegations that Kiloton failed to timely submit multiple sale reports cannot possibly serve as the predicate for ATF's revocation of Kiloton's FFL.

208.     Rather, even the 2022 AAP states that a Warning Letter – the lowest form of punishment – is appropriate for "[f]ailure to file ATF F3310.4, Report of Multiple Sale or Other Disposition of Pistols and Revolvers … when legally required and with a minimum of five instances." *See* Exhibit 3 at 7.c.6.

209.     Thus, even the current AAP treats this low-level offense with low-level repercussions – a Warning Letter – not the revocation of Kiloton's license that ATF proposes.

210.     ATF's desired Revocation of Kiloton's license on this basis thus violates the agency's own policy, making it doubly arbitrary and capricious.

211.     Lastly, ATF does not allege that any of Kiloton's buyers who purchased multiple handguns were straw purchasers, traffickers, or otherwise up to nefarious activity by purchasing multiple firearms, or that these law-abiding gun owners otherwise created any risk to public safety based on alleged violations which ATF cannot even say for certain occurred, due to the bureau's own shoddy recordkeeping of such reports.

## VIOLATION #3 – FAILURE TO FOLLOW FLORIDA'S
## 3-DAY WAITING PERIOD

212.    Third, as noted above, ATF alleges that, on thirteen occasions, Kiloton "failed to follow Florida's mandatory three (3) day waiting period pursuant to Florida Statute § 790.0655 before transferring firearms … in violation of 18 U.S.C. § 922(b)(2)."  Exhibit 1 at 3.

213.    Specifically, 18 U.S.C. § 922(b)(2) provides that it is unlawful for an FFL to make any transfer of "any firearm to any person in any State **where the purchase or possession by such person of such firearm** would be in violation of any State law or any published ordinance applicable at the place of sale, delivery or other disposition…."

214.    The Florida statute, in turn, provides, in relevant part, that it is unlawful "(a) For any retailer, or any employee or agent of a retailer, to deliver a firearm before the expiration of the waiting period, subject to the exceptions provided in subsection (2) …."  Florida Statute § 790.0655.

215.    Thus, the Florida statute, by its very terms, does not place "**the purchase** … **by such person** of such firearm … in violation of any State law…."

216.    Nor does the Florida statute, by its very terms place "**the possession** … **by such person** of such firearm … in violation of any State law…."

217.    Rather, a Floridian ("such person") may lawfully purchase and possess a firearm that is transferred to him, *even if* that transfer is done in advance of the

three-day background check expiration.  The only way for a buyer to violate Florida Statute § 790.0655 is if he "obtain[s] delivery of a firearm by fraud, false pretense, or false representation."  *Id*. at (3)(b).  That did not occur here, and ATF does not even allege it.

218.    What is more, *even if* one accepts not only (i) ATF's factual allegations, but also (ii) its characterization of the interplay between the federal and state statutes, as true, the 2022 AAP *does not provide for revocation* in such a situation.  Rather, transfer of a firearm to a person in violation of state law does not appear in the AAP's list of "zero tolerance" offenses.  *See* Exhibit 3 at 7.a.4 and 7.e.

219.    Instead, the closest offense to the one ATF alleges is "[t]ransfer of a rifle/shotgun … that violates State law," a violation that merits a Warning Letter, the lowest form of punishment.  Exhibit 3 at 7.c.9.

220.    If anything, these allegations by ATF should merit a Warning Letter, not revocation, under the agency's own policy.

221.    Once again, the Kiloton Revocation on this basis violates ATF's own policy, making it doubly arbitrary and capricious.

222.    What is more, unlike ATF's other claims of violation, the Notice of Revocation does not even allege that these purported violations by Kiloton were willful.  In other words, the Notice of Revocation essentially "fails to state a claim,"

as a matter of law, since federal law requires ATF to allege and find that a violation was "willful" in order to revoke a license.

223.     Finally, it is worth noting that Florida's own computer system is confusing on this issue.  Indeed, when submitting a background check through the FDLE online system, a dealer has the option to select "handgun" for the type of firearm, and also to select "hunting permit" or "law enforcement credentials" to be used to bypass the 3-day waiting period.

224.     In other words, the Florida system allows (if not invites) the very alleged errors for which ATF now seeks to revoke Kiloton's license.

225.     Notably, and again, ATF does not claim that any of these firearm transfers was made to a prohibited person, that the transferee used the firearm to commit any crime within the first three days (during the waiting period), or that any other public safety concern was raised by the alleged violations.  ATF does not even allege that any federal interest is at play.

226.     Rather, each of the buyers – in addition to passing a background check – demonstrated their further bona fides by displaying a Florida hunting permit, or military or law enforcement credentials.  At bottom, ATF seeks to revoke Kiloton's federal firearms license *for selling guns to police officers*.

## VIOLATION #4 – FALSIFYING BACKGROUND CHECK ID NUMBER

227.    Fourth, as noted above, ATF alleges that, on one indeterminate occasion (out of two potential transactions), Kiloton "willfully" falsified its records of the "approval number received by FDLE."  Exhibit 1 at 7.

228.    The basis for this claim is ATF's allegation that the same FDLE approval number was entered for two different background checks that had been run on April 6, 2022.  *Id.*

229.    ATF claims that, since Kiloton was "unable to reconcile" its records as to the discrepancy – and determine which sale the control number applied to – Kiloton thus "willfully" falsified its records on "either" one transaction "or" the other.  *Id.*

230.    But that is not how this works.  ATF has failed to allege *which* entry was falsified, but rather believes only that *one of them must have been* falsified.  In the criminal law, this would certainly be insufficient to prove guilt beyond a reasonable doubt.  Here, ATF cannot even say it is more likely than not that either record was falsified.  ATF merely assumes that one was falsified but has no idea which one.

231.    Since ATF cannot plausibly allege *specifically which* record was falsified, it cannot claim a "willful" violation by Kiloton as to either record (and only a 50 percent chance that either record is incorrect).

232.     Moreover, a single mistranscription of a FDLE approval number – out of tens of thousands of pieces of data that Kiloton has been required to record and maintain – cannot possibly establish "willfulness" necessary to revoke a license.

233.     Indeed, there is simply no reason for Kiloton to have "falsified" its records, as ATF claims.

234.     Rather, as their respective declarations show, both of the April 6, 2022 buyers in question had background checks run, and both were approved.   *See* Declaration of Steve Richman, Exhibit 14 at 12; see also Declaration of Cortney Daniels Exhibit 15 at 13.

235.     This is confirmed by Kiloton's receipts issued to both purchasers, each of which charges $5 for a FDLE background check.

236.     Thus, as both buyers were present for their background check, and both were approved (as they are both eligible purchasers), there was no conceivable reason for Kiloton to *intentionally* write down the wrong FDLE approval number for two approved transactions.

237.     Rather, it is evident that this alleged violation was at best an accidental and unintentional human error – the very sort of thing against which FOPA was designed to protect FFLs from ATF.

238.     Providing even further evidence that Kiloton's alleged violation is entirely immaterial, upon information or belief, the purpose of an FDLE approval

number is simply to be used as *confirmation* that a background check *was run* and that it *was approved*.  Indeed, federal law requires that the FBI and Florida both *delete all other information* for approved transactions within 24 hours.  28 CFR § 25.9(b)(1)(iii). Thus, an FDLE approval number is tied to nothing but a date and time, and provides no further information than to demonstrate that a background check was conducted and was approved (something that the buyers' declarations confirm occurred here, and which ATF's Notice of Revocation does not allege did not occur).

239.    What is more telling, ATF's own allegation of Kiloton's violation itself contains error, stating that the second background check occurred "on March 23, **2022**," but then incorrectly claiming that the actual transfer of the firearm occurred "on or about March 23, **2023**" – a full year later.  Exhibit 1 at 7 (emphasis added). On the contrary, the background check and transfer occurred the same day (March 23, 2022), to a person with a concealed carry license.  *See* Declaration of Richman, Exhibit 14 at ¶ 5, 9.

240.    It would appear, then, that DIO Gerber inadvertently made a simple transcription error when drafting this portion of his allegations against Kiloton.  Of course, had Kiloton made the same unintentional transcription error, DIO Gerber might have called it a "willful" falsification of records, and used it as further justification to revoke Kiloton's license.  Luckily for DIO Gerber, he is not held to

the same standard of perfection to which he holds Kiloton.  Rules for thee, but not for me.

241.    Nevertheless, ATF thinks that it can revoke Kiloton's license for a single inadvertent transcription error.  Rather, this Court should reject on its face ATF's Notice of Revocation based on the same type of inadvertent transcription error.  What is good for the goose is good for the government.

242.    In sum, ATF's **first** alleged violations (failure to perform NICS checks) are not actually violations at all, as Kiloton was not required to run a second background check to return firearms to their owners after providing gunsmithing services.  ATF's **second** alleged violations (failure to submit multiple sale reports) may not even have occurred (because ATF's shoddy records system cannot say for sure) but, even so, do not warrant revocation under ATF's own policy.  ATF's **third** alleged violations (failure to wait three days) involve only state law, and did not place any transferee in violation of state law, thus failing the federal test.  Even so, they do not warrant revocation under ATF's own policy.  ATF's **fourth** alleged violations (mistranscribing a single FDLE approval number) cannot even be properly alleged by ATF (since ATF does not allege which number was erroneous).  Even so, a single inadvertent bookkeeping error on an approved transaction cannot, as a matter of law, establish the "willfulness" necessary to revoke a license.

**Kiloton Has No History of Violations**

243.　　As noted *supra*, Kiloton's Type 07 license has never been subject to a prior ATF compliance inspection.

244.　　Thus, Kiloton has never been found previously to have made *any* recordkeeping or administrative errors during the time it has held its licenses. Indeed, Kiloton's owner, Kevin Smith, has had only one ATF inspection across any of his prior licenses, with that inspection netting **zero** recordkeeping violations.

245.　　Nor does any other ATF document or other communication to Kiloton make any reference to any prior similar violations by Kiloton.

246.　　The few isolated transactions that are the subject of ATF's Notice of Revocation thus stand alone out of *thousands* of transfers made by Kiloton over *several years* (a microscopically small error rate, as compared to the NFRTR's 50 percent error rate, and ATF's own errors in its Notice of Revocation).

247.　　The ATF Notice of Revocation does not allege that ATF has any reason to believe that Kiloton will commit the same alleged errors again or that Kiloton would not, if given the opportunity, be able to avoid making similar administrative errors in the future.

248.　　Nor is there any indication from ATF's Notice of Revocation that the agency ever considered any of the "mitigating factors" contained in the AAP. Exhibit 3 at 7.a.3.

249.     Had ATF done so, those factors would have weighed heavily in Kiloton's favor here (willing/able to achieve voluntary compliance, no threat to public safety or contribution to criminal activities, no lack of traceability of the firearm, no nexus to a prohibited person).

250.     Defendant Dettelbach was recently a guest on MSNBC's "Morning Joe" show,[34] where he was asked about a case similar to this one.  At first, the Director stated that "it's pending litigation, so I'm limited in what I can say," but then proceeded to opine about the priorities of ATF in regulating FFLs.

251.     First, Director Dettelbach stated that, while the "vast majority of firearms dealers … are actually following the rules … there are always some that either can't or are unintentionally not following the rules.  Those we try to help and get into compliance."  *Id.*  But ATF has never sought to "help" Kiloton achieve and maintain compliance with federal requirements.

252.     Second, Defendant Dettelbach claimed that there is "a smaller group, who are willfully violating the law," but *only* when an FFL is "willfully violating the law *and* endangering public safety," ATF's response "*can* include revocation.  It can include other things as well."  *Id.*  On the contrary, ATF has sought to revoke Kiloton's (and many others') licenses without any consideration of possible alternative penalties.  Further, ATF has sought to revoke Kiloton's license with

---

[34] *See* https://www.youtube.com/watch?v=4-bniPK5yK0.

absolutely no indication that the alleged violations have any impact on or nexus to "public safety." Indeed, as noted above, ATF waited more than one year to take action to revoke Kiloton's license. Had public safety been in any way impacted, ATF no doubt would have acted with a far greater sense of seriousness.

253.     In other words, the revocation of Kiloton's license *literally checks none of the boxes* the Director identified as ATF's mission and priorities.

254.     The ATF's actions directly contradict the Director's claim that ATF seeks to "help" and "get into compliance" licensees who "unintentionally" make recordkeeping mistakes by seeking to revoke Kiloton's FFL.

255.     Instead of actually "help[ing]" Kiloton comply with its recordkeeping obligations as the Director stated, the agency seeks to eliminate Kiloton, and destroy livelihoods in the process.

256.     In sum, "[o]ther than the violations themselves, there was no evidence that petitioners displayed a disregard for the regulations. In fact, the evidence shows the opposite." *Jim's Pawn Shop, Inc. v. Bowers*, 2008 U.S. Dist. LEXIS 97199 (E.D. N.C. Sept. 16, 2008), *23.

257.     Nor is this case like one recently decided by this Court in *Precision Tactical Arms Co., LLC v. Gerber*, 2023 U.S. Dist. LEXIS 116500 (N.D. Fl. Apr. 7, 2023) (denying a TRO on the basis that "Petitioner was previously cited for committing the same violations in the past"). Indeed, the FFL in that case had been

subject to two prior ATF audits, the first "in 2018 … documenting 17 categories of violations and over 4000 total instances of violations," the second "in 2019 … documenting 13 categories of violations and 327 instances of violations…."  ECF #1 at ¶¶24-29.  No such history of noncompliance exists here.

### Judicial Review Is Appropriate Now, Irrespective of ATF's Inevitable Revocation of Kiloton's License

258.     18 U.S.C. § 923(f)(3) provides that the Unites States District Court for the district of the principal place of business of the petitioner shall have jurisdiction to hear complaints for a *de novo* judicial review of the Attorney General's findings regarding the revocation of a firearms license.

259.     This complaint is being filed in advance of the ATF administrative revocation hearing, and thus obviously in advance of the 60 day deadline contained within 18 U.S.C. § 923(f)(3).

260.     However, due to the nature of the claims asserted in this complaint, Section 923 is not implicated, and judicial review is appropriate now, for several reasons.

261.     First, Plaintiffs in this action are not challenging the likely revocation of Kiloton's license that has not yet occurred, but instead bring a *facial challenge* to ATF's 2022 AAP (and any successor AAP) as being contrary to the statutory text as a matter of law, irrespective of how the AAP might be applied in any particular case. The AAP (an ATF "Order") is "final agency action" under the APA, irrespective of

the particular revocation proceedings in Kiloton's case.  *See Cargill v. BATFE*, No. 1:22-CV-1063-DAE, 2023 U.S. Dist. LEXIS 123249, at *14 (W.D. Tex. July 18, 2023) (finding the AAP is a "final agency action.").

262.   Second, Plaintiffs' claims are also advanced on behalf of the FFL Coalition, representing similarly situated FFLs across the country, in addition to Kiloton, who have, are, and will face ATF compliance inspections, warning letters, warning conferences, and revocations under the legally flawed AAP.

263.   Third, Plaintiffs assert claims independent of any claim under § 923(f)(3), including claims under the Administrative Procedures Act and the Second Amendment.  None of these claims (especially constitutional ones) could be brought in an administrative hearing before ATF, as administrative hearing officers have no authority to resolve APA or constitutional claims.

264.   Fourth, the Supreme Court notes that, "[a]s we have long held, parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of 'serious criminal and civil penalties.'" *United States Army Corps of Eng'rs v. Hawkes Co*., 578 U.S. 590, 600 (2016).  *See also Sackett v. EPA*, 566 U.S. 120, 127 (2012) (plaintiff need not "wait for the Agency to drop the hammer").

265.   Fifth, waiting for ATF's inevitable final revocation of Kiloton's license will result in irreparable harm not only to Kiloton but also to of the members of the

FFL Coalition. Whereas ATF's internal policy traditionally has been to agree to a stay of revocation pending judicial review, ATF now (as part of its "zero tolerance" push to revoke licenses as efficiently as possible) *refuses* to agree to stays, meaning that dealers are left in the untenable position of seeking emergency judicial review. *See, e.g., The Tactical Edge, LLC v. Garland*, No. 3:23-cv-00544 (M.D. TN June 1, 2023) (concluding that "923(f)(2) does not require the Attorney General to stay the revocation of a license during the pendency of district court proceedings," but "wonder[ing] why [ATF] did not voluntarily agree to postpone revocation of Plaintiff's license").

266.    This is why the Plaintiff in *Precision Tactical Arms Co., LLC* was forced to seek a temporary restraining order from this Court. 2023 U.S. Dist. LEXIS 116500. Otherwise, by the time a court considers the matter, the irreparable harm has occurred, as an FFL has been forced to stop doing business, liquidate its inventory, and close up shop.

267.    Sixth, Plaintiffs contend that the few, isolated violations that are the subject of ATF's Notice of Revocation in this case fail – as a matter of law – to establish that Kiloton "willfully" violated any of its recordkeeping requirements. Indeed, another district court in the Eighth Circuit recently rejected ATF's revocation of an FFL based on a similar fact pattern. *Streicher's, Inc. v. Hummel*, No. 23-995 (PAM/ECW), 2023 U.S. Dist. LEXIS 68898, at *10 (D. Minn. Apr. 20,

2023).  As Judge Magnuson noted there, "ATF has cited no court decisions in which a federal firearms license has been revoked for conduct akin to that at issue here: a small number of violations and the licensee's first violations of the particular type." *Id*. at 13 (noting that cases generally are premised on "repeated failure[s]" and a "large number of violations" and "multiple instances").  Finding that "the public interest requires the uniform application of the federal firearms laws," and "the revocation here is contrary to that principle," Judge Magnuson implicitly rejected the 2022 AAP which changes ATF policy and adopts a strict-liability revocation for even single instances of a violation.  *Id*. at 14.

268.   For each of these reasons, neither Kiloton nor the members of the FFL Coalition must wait for ATF to actually revoke their licenses before challenging the AAP.

**DIO Gerber Cannot Legitimately Serve as Kiloton's Hearing Officer**

269.   Upon information and belief, DIO Gerber will be the hearing officer at Kiloton's revocation hearing.  *See Streicher's, Inc. v. Hummel*, No. 23-995 (PAM/ECW), 2023 U.S. Dist. LEXIS 68898, at *5 (D. Minn. Apr. 20, 2023) (DIO "Hans Hummel, director of the ATF's St. Paul field office, served as the hearing officer.").[35]  *See also* Exhibit 2 ("The DIO will preside over the hearing...").

---

[35] Amazingly, and undisclosed to the FFL in *Streicher's*, DIO Hummel's wife, Theresa Hummel, represented the ATF at the hearing.  *Id*.

270.    In the Minnesota case, the DIO was responsible for the underlying revocation decision, yet was allowed to act as his own judge and jury in a hearing challenging the same to revoke Streicher's FFL.

271.    Upon information and belief, this has become common practice for ATF in recent years – having an ATF employee serve as a purportedly impartial hearing officer during revocation proceedings, after the very same employee issued the Notice of Revocation accusing the FFL of wrongdoing in the first place.

272.    Upon information and belief, ATF permits this practice on the theory that APA regulations "do not apply to [revocation] hearings," which "are informal in nature," because "a federal firearms licensing hearing is subject to *de novo* judicial review in district court…."  ATF "Hearing Procedures Relating to Federal Firearms Licensees" (2010R-2T), 75 Fed. Reg. 48632 at 48363.

273.    Nevertheless, ATF's procedures also explain that, before choosing a hearing officer, the "hearing officer's impartiality and/or prior relationship with or knowledge of the applicant or licensee will be considered," including "whether there is reasonable cause to believe that the hearing officer's ability to conduct a fair and impartial inquiry is impaired by the hearing officer's prior knowledge of the case or interactions with the applicant/licensee."  *Id*. at 48363.

274.     Upon information and belief, ATF does not follow that published policy because, by definition, a DIO's impartiality is impaired by the fact that the DIO signed the Notice of Revocation under review.

275.     ATF's policy further states that "[t]o ensure impartiality, the hearing officer will generally be appointed from outside the applicant's/licensee's division." *Id*. at 48363.

276.     Upon information and belief, ATF does not follow that policy.

277.     ATF's policy further states that "[a]n individual should decline to act as a hearing officer in a particular case if he/she is not fully confident that he/she can administer a fair and impartial proceeding.  If, at any time after being designated as hearing officer for a case, the officer determines that he/she cannot administer a fair and impartial proceeding, the hearing officer should immediately recuse himself or herself from the matter." *Id*. at 48364).

278.     Upon information and belief, ATF does not follow that policy.

279.     DIO Gerber is not some small player in the Kiloton proceedings, but instead he is the very same official who made the decision to revoke Kiloton's license.  Yet expectedly he will sit in judgment of his own decision.

280.     This practice will deny Kiloton the benefit of an impartial, neutral, and detached hearing officer.

281.     This Circuit has held that due process requires "notice and a meaningful opportunity to be heard" before "[a] fair hearing requires an impartial arbiter." *Johnson v. United States Dep't of Agric.*, 734 F.2d 774, 782 (11th Cir. 1984).

282.     In *Johnson*, the Eleventh Circuit had "serious reservations about the neutrality of the hearing officers" because the "regulations establish that the hearing officer is a nearby district director ... [who] will be evaluating a decision to foreclose made by a peer and already approved by his boss..." *Id*. at 783.

283.     This case is even worse.  Here, the hearing officer is not just from a "nearby district," but rather is likely to be the same person who made the decision to revoke Kiloton's license.

284.     As the Supreme Court has recognized, "'not only is a biased decisionmaker constitutionally unacceptable but our system of law has always endeavored to prevent even the probability of unfairness.'" *Hakki v. Sec'y, VA*, 2019 U.S. Dist. LEXIS 223768, at *30 (M.D. Fla. Sep. 26, 2019) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).  *See also Valley v. Rapides Par. Sch. Bd*., 118 F.3d 1047, 1052 (5th Cir. 1997) ("decision makers are constitutionally unacceptable … when a judicial or quasi-judicial decision maker has the dual role of investigating and adjudicating disputes and complaints.").

285.     This Circuit has held that an agency may combine investigative, adversarial, and adjudicative functions, as long as no employees serve in dual roles.

*Elliott v. SEC*, 36 F.3d 86, 87 (11th Cir. 1994) (reaching that decision in the context of SEC rules).

286.     DIO Gerber fails that standard, routinely sitting on both sides of the equation, not only as the person who decides to revoke an FFL's license, but also then sitting in judgment of his own decisions.

### IOI Speranza's Inspection of Kiloton Was Chock Full of Illegalities

287.     In addition to Mr. Gerber's lack of neutrality here, IOI Speranza's actions during his compliance inspection of Kiloton are also highly questionable. IOI Speranza has shown a repeated misunderstanding – or perhaps outright disregard – of the very laws of which he charges Kiloton with perfect compliance.

288.     As detailed in the Declaration of Kevin Smith (Exhibit 12), IOI Speranza did not merely engage in an administrative review of Kiloton's records, but also apparently saw fit to take on the role of a law enforcement officer and insert himself into the affairs of private, non-licensed citizens.  Exhibit 12 at ¶¶16-22.

289.     During IOI Speranza's inspection of Kiloton, a father, mother, and daughter, prior customers of Kiloton and known to him, arrived at the shop.  The purpose of the visit was that the parents sought and intended to purchase a handgun as a bona fide gift for their daughter.  The trio discussed the planned purchase with Mr. Smith, and the four proceeded to look at firearms.  *Id*. at ¶ 16.

290.     Apparently operating on a gross misunderstanding of what constitutes a "straw purchase" under federal law, IOI Speranza approached the group and declared the parents' purchase of a handgun for their daughter as a bona fide gift to be illegal, and ordered Mr. Smith not to allow the sale.  *Id*. at ¶¶ 19-20.

291.     When the father and Mr. Smith challenged IOI Speranza's legal position, pointing out that it is perfectly legal for a parent to buy a firearm as a gift for one's adult, law-abiding child, IOI Speranza continued to insist that the sale was unlawful and could not occur.  *Id*. at ¶ 20.  In fact, the planned purchase was perfectly lawful, as ATF's own publications confirm.

292.     Mr. Speranza's actions demonstrated that he apparently is unfamiliar with even the most basic issues under federal law.  Indeed, ATF's own website contains the FAQ asking "May a parent or guardian purchase firearms or ammunition as a gift for a juvenile (less than 18 years of age)?" and answering "Yes."[36]

293.     Certainly, if a customer is allowed to purchase a firearm as a gift for a child *under* 18, the customer can purchase a firearm as a gift for a child *over* 18.

294.     ATF's website contains another FAQ which asks "May an individual between the ages of 18 and 21 years of age acquire a handgun from an unlicensed

---

[36] https://www.atf.gov/firearms/qa/may-parent-or-guardian-purchase-firearms-or-ammunition-gift-juvenile-less-18-years-age.

individual who is also a resident of that same state?" and answers "An individual between 18 and 21 years of age may acquire a handgun from an unlicensed individual who resides in the same state, provided the person acquiring the handgun is not otherwise prohibited from receiving or possessing firearms under federal law."[37]

295.    Thus, ATF's own website explicitly confirms that Kiloton's customer's intended purchase of a handgun to give to his daughter as a bona fide gift was perfectly lawful.

296.    And significantly, the ATF Form 4473, which all gun buyers fill out, and with which IOI Speranza should be intimately familiar (since he deals with them on a daily basis), states in the instructions that "A person is also the actual transferee/buyer if he/she is legitimately purchasing the firearm as a bona fide gift for a third party. A gift is not bona fide if another person offered or gave the person completing this form money, service(s), or item(s) of value to acquire the firearm for him/her, or if the other person is prohibited by law from receiving or possessing the firearm."[38]

---

[37] https://www.atf.gov/firearms/qa/may-individual-between-ages-18-and-21-years-age-acquire-handgun-unlicensed-individual.

[38] https://www.atf.gov/firearms/docs/4473-part-1-firearms-transaction-record-over-counter-atf-form-53009/download.

297.     Ultimately, however, faced with the vociferous accusations and interference from IOI Speranza, the family left Kiloton without a firearm.  *Id.* at ¶ 22.

298.     IOI Speranza's actions, made under color of authority during his inspection of Kiloton, thus infringed the Second Amendment rights not only of Mr. Smith to sell firearms, but also of Kiloton's customers to acquire them.

299.     IOI Speranza's 'confidently incorrect' understanding of the laws, regulations, and policies he was responsible for knowing and enforcing kept resurfacing for the duration of the Kiloton inspection.

300.     For example, IOI Speranza nitpicked and in fact penalized Kiloton's use of the term "handgun" as a firearm description in various records, insisting instead that the correct term was "pistol" and demanding that Kiloton correct its records.  Exhibit 12 at ¶¶ 36-37.  This distinction without a difference has no basis in law or even internal ATF policy.  In fact, ATF's own "Industry Operations Manual," a comprehensive set of standard operating procedures for IOIs like IOI Speranza,[39] clarifies that none of these terms is defined in federal law[40] and, while

---

[39] https://tinyurl.com/3asev9jr.

[40] Federal statutes do not even define the term "pistol."  Only federal regulations provide a definition, *see* 27 C.F.R. § 478.11, whereas both federal statutes *and* regulations define the term "handgun."  *See* 18 U.S.C. § 921(a)(30); 27 C.F.R. § 478.11.

an IOI may *suggest* different firearm descriptors be used in an FFL's records, the IOI has no authority to *demand* recordkeeping changes or to *report* a violation for an FFL's descriptors.  *See* 2019 Industry Operations Manual at 51, 53.

301.     The manual goes on to explain that because "'type' is not defined under Federal law, *there is no violation of Federal firearms laws or regulations* if a licensee elects to abbreviate the type of firearm in the A&D record" or Form 4473.  *Id.* (emphasis added).  Instead, IOIs are instructed that only failures to record any description whatsoever – or the recording of an erroneous description – will constitute violations of federal regulations.  *Id.*

302.     But perhaps IOI Speranza's most egregious misconduct was his *unauthorized seizure and removal of both copied and even original records* from the licensed Kiloton premises for ATF's offsite "inspection."  Such removal raises significant chain-of-custody concerns for all documents involved, some of which ATF now claims as the basis for alleged errors in Kiloton's books, and uses as the basis for its revocation of Kiloton's license.

303.     During his weeks-long inspection, IOI Speranza instructed Kiloton to furnish all original 4473 records (the "who" and "what" of each and every firearm sale a gun store makes), along with a printed copy of the store's computerized acquisition and disposition (A&D) logbook.  Ex. 12 at ¶ 26-27.

304.     After Mr. Smith complied with IOI Speranza's request, Speranza informed him that he (Speranza) would be leaving the store and taking all of the records with him.  *Id.* at ¶ 28.

305.     When Mr. Smith protested that an IOI had no authority to simply seize and remove FFL records from the premises, IOI Speranza purported to overrule him, claiming that he did have such authority.  *Id.* at ¶¶ 28-29.

306.     IOI Speranza then left with Kiloton's records and retained them offsite for approximately one week.  *Id.* at ¶ 31.

307.     At no time did IOI Speranza provide Kiloton with a receipt or copies of the records he seized under color of law.  *Id.* at ¶ 33.

308.     There is no way to determine whether the batch of documents IOI Speranza eventually returned is complete, or whether the handwritten documents have been altered in any way.  *Id.* at ¶ 35.

309.     By seizing these *original documents*, IOI Speranza deprived Kiloton of its records that federal law requires a licensed dealer "maintain … at his place of business."  18 U.S.C. § 923(g)(1)(A).  Moreover, federal law provides that Kiloton "shall not be required to submit to the Attorney General reports and information with respect to such records and the contents thereof, except as expressly required by this section."  *Id.*

310.    Section 923 contains no source of authority for IOI Speranza's unilateral seizure of FFL documents.  *See Id.*

311.    Nor do federal regulations. In fact, 27 C.F.R. § 478.23(d) provides precisely the opposite, stating that "inspections and examinations provided by this section **do not authorize an ATF officer to seize any records** or documents other than those records or documents constituting material evidence of a violation of law. If an ATF officer seizes such records or documents, copies shall be provided the licensee within a reasonable time." (emphasis added).

312.    IOI Speranza's demand for and removal of all original 4473s and a copy of the A&D logbook occurred at the outset of his inspection, before he had any opportunity to believe individual records contained within could "constitut[e] material evidence of a violation of law."  27 C.F.R. § 478.23(d); *See* Ex. 12 at ¶¶ 26-28.

313.    In any case, 27 C.F.R. § 478.23(d) permits only the seizure of individual documents – "**those** records or documents" – that "constitute[e] material evidence of a violation of law," and not *all* 4473s and an A&D logbook *in their entirety*.

314.    Apparently, IOI Speranza knows this, as he has appeared capable of refraining from removing records from FFL premises in the past.  *See* Respondent's Motion for Summary Judgment at 2, *Khorram v. Holder*, No. 3:13-cv-00351 (N.D.

Fla. Dec. 19, 2013), ECF No. 12 ("Industry Operations Investigator (IOI) [Speranza] performed an onsite review of the inventory and records of the business.").

315.    In fact, IOI Speranza *should* know this, as the ATF Industry Operations Manual reminds IOIs that "IOIs **do not have the statutory authority to** affect arrests, **make seizures** or to carry firearms, and any IOI who operates outside the scope of his/her authority would be potentially subject to **disciplinary action, criminal liability, and/or civil liability**."[41]

316.    Moreover, the Industry Operations Manual instructs IOIs to "[p]erform **onsite** work," which includes a "Conduct of Business Review," "Internal Controls Review," "Records Review," "**Review [of] the A&D Records**," and "**Review [of] ATF Fs 4473**." *Id.* at 46, 48, 49, 50, 52 (emphases added).  "Seizure" and "removal" are not synonyms of "review."

317.    If this Court needs any further reason to question the rationale for the Notice of Revocation and the motives underlying ATF's actions here, this would be it.

### Allegations Pertaining to Irreparable Harm

318.    If the 2022 AAP (including any successor AAP) is not enjoined, and Kiloton's license is revoked, Kiloton will be unable to manufacture, sell, or repair firearms, and will be forced to go out of business.

---

[41] *See* https://tinyurl.com/3asev9jr at 10 (emphases added).

319.     In addition to Kiloton, many other FFLs across the country, who are represented by the FFL Coalition, have experienced, are experiencing, and will experience the same "zero tolerance" policy revocation as is occurring to Kiloton, which similarly will drive many of them out of business from the resulting inability to deal in firearms without violating federal law.

320.     The Eleventh "Circuit has recognized that unrecoverable monetary loss is an irreparable harm," and that such harm "includes situations where there is no adequate remedy at law to recover damages for the harm suffered." *Georgia v. President of the United States*, 46 F.4th 1283, 1302 (11th Cir. 2022) (citations and punctuation omitted). *See also Mental Health Network, Inc. v. Marstiller*, 2022 U.S. Dist. LEXIS 240672, at *11 (S.D. Fla. Jan. 14, 2022) (loss of "Provider Agreement would lead Network to cease operations, go out of business, lose revenues and patients, and lose goodwill associated with operation of its business... This showing extends beyond economic harm, and is therefore adequate to establish irreparable harm for Rule 65 purposes.").

321.     Kiloton, like other FFLs represented by the FFL Coalition, has no adequate remedy at law, as "money damages" are not available under the APA. S*ee Dep't of the Army v. Blue Fox*, 525 U.S. 255, 263 (1999) (money damages unavailable under APA). S*ee also E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020) ("economic harm is not generally considered irreparable.

But where parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases—economic harm can be considered irreparable.").

322.     Likewise, Plaintiffs cannot obtain damages for their constitutional claims because "the FTCA does not waive sovereign immunity for general federal constitutional torts, and Congress has not expressly waived sovereign immunity for alleged constitutional violations elsewhere." *Hall v. United States*, 2020 U.S. Dist. LEXIS 250196, at \*12 (N.D. Ala. Oct. 30, 2020) (cleaned up, quoting *McCollum v. Bolger*, 794 F.2d 602, 608 (11th Cir. 1986) and *U.S. v. Timmons*, 672 F.2d 1373, 1380 (11th Cir. 1982) (other citation omitted).

323.     Additionally, Kiloton's customers, represented here by Mr. Hanley, along with the many customers of those FFLs represented by the FFL Coalition, will be irreparably harmed by the loss of the gun stores whose licenses are revoked by ATF under its new "zero tolerance" policy.  Gun owners, including Mr. Hanley, will lose their preferred local gun stores like Kiloton Tactical, and will be forced to drive additional miles, at additional time and expense (often significant), to a different store more distant from their homes.  This infringes the constitutional right to keep and bear arms of Mr. Hanley and others, just as a law banning cell phones and requiring a person to drive to the local library to post a Tweet would violate the First Amendment right to speech.

324.     As time passes, and ATF successfully revokes more and more FFLs, their diminishing numbers will have a real impact on the ability of law-abiding persons such as Mr. Hanley to acquire firearms, as the supply and availability of firearms itself is diminished.

325.     Mr. Hanley explains that, if Kiloton's license were revoked, he would have to travel "approximately 90 minutes from" his home to visit another gunsmith and would be forced to visit a shooting range that does not meet his needs.  *See* Declaration of Hanley, Exhibit 13, ¶¶ 9, 11, 14.

326.     Cortney Daniels states in her declaration that, if Kiloton's license were revoked, she is unaware of "any other FFLs in the vicinity that provides" the gunsmithing services she requires.  *See* Declaration of Cortney Daniels, Exhibit 15, ¶ 17.  She states that, even if she could find these services elsewhere, "it would add significant cost and expense to [her] having gunsmithing work performed … due to the cost (including [her] time) to travel elsewhere."  *Id*. at ¶ 18.

327.     Steve Richman, another one of Kiloton's customers, stated in his declaration that "Kiloton Tactical is the closest reputable gun store with licensed gunsmiths in the immediate area."  *See* Exhibit 14, Declaration of Steve Richman at ¶ 17.

328.     Mr. Richman stated that, if Kiloton were closed, he "would be forced to travel a longer distance, at a significant cost of time and money, to do business elsewhere." *Id*. at ¶ 18.

329.     Additionally, Mr. Richman is "not aware of any other facility in west Florida that offers the wide variety of on-site services that Kiloton Tactical does" and that, if he were forced to go somewhere else for the "same products and services," he would have to travel "more than 90 minutes (each way)" and over "100 miles (each way)" and into a different time zone. *Id*. at ¶¶ 21, 23.

330.     This indisputably represents an infringement of the right to keep and bear arms, based on ATF's planned bottlenecking and destruction of the Second Amendment supply chain.

331.     This Circuit recognizes that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury…." *Royalty Network, Inc. v. Harris*, 756 F.3d 1351, 1357 (11th Cir. 2014) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  Because the Supreme Court does not subject the Second Amendment to "an entirely different body of rules than the other Bill of Rights guarantees that we have held to be incorporated," *McDonald v. City of Chi*., 561 U.S. 742, 780 (2010), a loss of Second Amendment rights also constitutes irreparable injury.

332.     And because the customers of Kiloton, including Ms. Daniels, Mr. Richman, and Mr. Hanley, and customers of the members of the FFL Coalition have a constitutional right to purchase and otherwise acquire firearms, their access to and thus ability to readily purchase a firearm is infringed by the AAP.  And even a "minimal" infringement is still an infringement on a constitutional right.

333.     Specifically with respect to DeFuniak Springs, Florida, where Kiloton is located, the ATF lists roughly a dozen other FFLs.[42]  However, although technically possessing a "DeFuniak Springs" address, Kiloton Tactical is actually located more than 20 miles north of the city, with a travel time of about 30 minutes. Only four of the fourteen other dealers in the area are anywhere close to Kiloton's location and, of those, one is a home-based dealer and the other is an ammunition manufacturer.  Of the two remaining, they are Type 01 licensees, not Type 07 like Kiloton.  Neither offers gunsmithing services.  Neither has a shooting range, and certainly neither offers shooting instruction at the range.

334.     As discussed, *supra*, Mr. Hanley, one of Kiloton's customers, explained how Kiloton has the best selection in the area and that, while there is another gun store, its selection is rather limited.  *See* Declaration of Hanley, Exhibit 13, ¶ 12. Likewise, Ms. Daniels is "not aware of any other FFL in the vicinity that provides"

---

[42] *See* https://www.atf.gov/firearms/docs/undefined/0723-ffl-list-floridaxlsx/download.

the range of services Kiloton provides.  *See* Declaration of Daniels, Exhibit 15, ¶ 17. Finally, Mr. Richman is also "not aware of any other facility in west Florida that offers the wide variety" of services Kiloton provides, and would have to travel over "90 minutes (each way)" and "more than 100 miles (each way)."  *See* Declaration of Richman, Exhibit 14, ¶ 21.

335.    Thus, were Kiloton's license revoked, Mr. Richman, Ms. Daniels, and Mr. Hanley (along with many others like them) would have to expend significant additional resources in time and travel to drive a much further distance in order to acquire constitutionally protected arms.

336.    As the district court in Tactical Edge found, ATF revocation orders result in "very harsh consequences" – *i.e.*, irreparable harm.  *The Tactical Edge, LLC v. Garland*, No. 3:23-cv-00544 (M.D. TN June 1, 2023) at 6.

## FIRST CAUSE OF ACTION
## (VIOLATION OF APA 5 U.S.C. § 706(2)(A))
## ARBITRARY, CAPRICIOUS, ABUSE OF DISCRETION, NOT IN ACCORDANCE
## WITH LAW

337.    All of the foregoing allegations are realleged as if fully set forth herein.

338.    The AAP challenged herein constitutes "agency action" pursuant to 5 U.S.C. § 551(13) for purposes of review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.

339.    Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. §706(2)(A).

340.    A court may hold that an agency action is arbitrary and capricious when the agency has failed to consider relevant evidence or articulate a satisfactory explanation for its action.

341.    Here, ATF has failed to consider Kiloton's long history of compliance with the statutory scheme and regulatory requirements, throughout thousands of transactions.

342.    ATF has failed to consider the mitigating factors from the AAP, which weigh heavily in favor of Kiloton.

343.    ATF has failed to consider that Kiloton's alleged violations have no nexus to public safety, prohibited persons, or impaired tracing.

344.    ATF has failed to consider Kiloton's ability to correct its unintentional mistakes, and to avoid making similar errors in the future.

345.    ATF has failed to have an actual human being consider the merits of Kiloton's case, instead assigning the determination of "willfulness" to a computer program.

346.    An agency's departure from prior practice can serve as an additional basis for finding an agency's action to be arbitrary and capricious.

347.    Here, the current AAP is a stark (and secret) departure from the longstanding policies described in the 2019 AAP, without any notice to Kiloton or the public.  Further, this severe change reflects a policy choice that was not enacted by Congress but rather was a political edict from the Executive Branch.

348.    Additionally, the AAP and ATF's "zero tolerance" policy conflicts with the statute as enacted and intended by Congress.  Imposing a strict liability standard, the 2022 AAP rejects the statutory concept of "willfulness," entirely eliminating the exercise of all discretion by ATF field personnel, putting the decision to revoke into the hands of an ATF computer program, and ultimately circumventing what Congress established as public policy in the 1986 Firearm Owners Protection Act in order to stop ATF's prior abuses that mirror what ATF is doing now.

349.    The AAP takes the position that, regardless of whether there are actually any facts to establish "willfulness," ATF will presume that certain violations establish willfulness and "shall result in a revocation recommendation," and that "revocation is the presumed action" for certain offenses, regardless of the state of mind of a licensee.

350.    The AAP results in a situation where honest mistakes, misunderstandings, and human error can form the basis for license revocation, even though none is in any way "willful."

351.     The AAP creates a weapon that ATF is wielding against the firearm industry (a constitutionally protected community), creating a situation where most (if not all) well-intentioned dealers at some point will commit an inadvertent slip up, subjecting their license to revocation, cabined only by the good graces of ATF field personnel who choose to exercise their discretion not to report certain violations.

352.     The AAP creates standards and policies that expand the basis for FFL adverse actions, including revocations, beyond what Congress provided for in 18 U.S.C. § 923, making those changes *ultra vires* and outside the scope of the authority of an administrative agency.

353.     The AAP permits punishment of unintentional violations that, like those alleged of Kiloton, do not even meet the stated purpose of the Biden-Harris "zero tolerance" policy, at least as presented to the public, to go after FFLs who "put public safety at risk."

354.     The AAP conflicts with the unambiguously stated intent of Congress in enacting FOPA, prior to which "the strict liability provided by the act, even the most trivial and unintentional misstep would do."  In other words, the AAP returns to and re-creates the very state of affairs that FOPA was explicitly designed to prevent.

**SECOND CAUSE OF ACTION**
**(SECOND AMENDMENT)**
<u>**RIGHT TO KEEP AND BEAR ARMS – ACQUISITION OF ARMS**</u>

355.     All of the foregoing allegations are realleged as if fully set forth herein.

356.     Ratified in 1791, the Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

357.     Kiloton has a right to manufacture, acquire, and sell firearms, which are protected "arms."   Correspondingly, Americans who are part of "the people" have the right to acquire, purchase, own, and possess firearms to "keep and bear." Those rights exist independent of and existed prior to their recognition in the United States Constitution. Those rights are protected by the Second Amendment's "shall not be infringed" mandate.

358.     As a vendor, Kiloton is able to bring claims on behalf of its customers. *Craig v. Boren*, 429 U.S. 190, 195 (1976).  But even so, Kiloton's customers wish to purchase firearms from Kiloton, but will be deprived of doing so by the AAP. *See* Declaration of Hanley, Exhibit 13, ¶ 12.  *See* Declaration of Daniels, Exhibit 15, ¶ 20.  *See* Declaration of Richman, Exhibit 14, ¶ 25.

359.     If Kiloton's license is revoked under an unlawful enforcement policy that violates the Second Amendment, it will infringe not only the rights of Kiloton,

its owner, and responsible persons, but also the rights of Kiloton's customers like Mr. Hanley.

360.    Similarly, the AAP is being used to target many other FFLs, some of which are members of the FFL Coalition.  The AAP inevitably will put many of these gun stores out of business, affecting the ability of their customers to acquire firearms.

361.    Whereas a district court in *United States v. Price*, 2022 U.S. Dist. LEXIS 186571, at *6 (S.D. W. Va. Oct. 12, 2022) noted that the placement of a serial number on a firearm is an example of "commercial regulations that apply only to manufacturers and sellers do not implicate an individual's right of possession," ATF's actions under the AAP to put hundreds of American gun stores out of business undoubtedly "implicate[s] an individual's right of possession," raising the cost and increasing the difficulty (and thus infringing) the constitutional right to acquire arms.

362.    The text of the Second Amendment covers the manufacture, purchase and sale of firearms and ammunition.  *See Lynchburg Range & Training, LLC v. Northam*, 2020 Va. Cir. LEXIS 57, *6 (Lynchburg Cir. Ct. 2020) ("the right to keep and bear arms 'inclu[des] the otherwise lawful possession, carrying, transportation, **sale, or transfer** of firearms….'") (emphasis added); *Tony Kole & Ghost Indus., LLC v. Vill. of Norridge*, 2017 U.S. Dist. LEXIS 178248, at *29 (N.D. Ill. Oct. 27,

2017) ("The founding-era sources cited by plaintiffs are more relevant. *E.g.*, Thomas Jefferson, 6 Writings 252-53 (P. Ford ed. 1895) ("Our citizens have always been free to make, vend, and export arms.").

363.    A contrary finding – *i.e.*, that there is a right to acquire and possess arms but not to manufacture or sell them – is akin to a finding that there is a right to *have* a jury trial, but no right to *sit on* a jury.  Or finding that there is a right for a user to post a Tweet, but no right for Twitter to provide the platform.   On the contrary, Second Amendment protected commerce in arms is merely two sides of the same constitutional coin.

364.    Were it not so, the only constitutionally guaranteed way to acquire a firearm would be to make one for one's self – a high bar, to say the least, considering the equipment required, the tolerances involved, and the machining knowledge necessary.  Likewise, were it not for Twitter and other platforms, a person would be reduced to holding up a handwritten sign in public to express his ideas.

365.    The rights protected under the Second Amendment include the right to engage in the commerce and/or business of being a gun dealer, gun manufacturer and/or operating a gun range (businesses that invariably also possess FFLs as part of their operations). *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ("[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much

without the training and practice that make it effective."); *see also Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("As with purchasing ammunition and maintaining proficiency in firearms use, the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms.")[43]

366.    The AAP represents an infringement of individual gun owners' ability to exercise their right to keep and bear arms because they, including Kiloton's customers such as Mr. Hanley, who rely on licensees such as Kiloton in order to purchase firearms.  Indeed, there can be no commercial manufacture of firearms

---

[43] *But see United States v. Kazmende*, 2023 WL 3872209, at *5 (N.D. Ga. May 17, 2023) (Magistrate judge report and recommendation stating that plain text of Second Amendment does not cover commercial sales) adopted by *United States v. Kazmende*, 2023 U.S. Dist. LEXIS 98820 (N.D. Ga. June 7, 2023); *United States v. Flores*, 2023 WL 361868, at *2-6 (S.D. Tex. Jan. 23, 2023) (the Second Amendment does not protect the right to commercially deal firearms).  But these cases, each decided in the criminal context, are simply wrong.  Simply, if there uniformly is no right to sell a firearm, and/or no right to buy one, then there can be no right to keep and bear arms (since there can be no arms to keep and bear in the first place).  In other words, the government cannot demur that a person still has a right to post a Tweet, but Twitter has no right to provide the forum in which to do so.  *See United States v. Hicks*, 2023 U.S. Dist. LEXIS 35485, at *5-6 (W.D. Tex. Jan. 9, 2023) ("what the Government is suggesting is absurd in practice.  If receiving a firearm were illegal, but possessing or carrying one remained a constitutional right, one would first need to break the law to exercise that right.  And if buying (receiving) a gun is not covered by the Second Amendment's plain text, neither would selling one.  So according to the Government, Congress could throttle gun ownership without implicating Second Amendment scrutiny by just banning the buying and selling of firearms.  What a marvelous, Second Amendment loophole!").

without ATF licensure.  And for those firearms that are manufactured commercially (*i.e.*, about 99.9% of them), they cannot be distributed to the American public other than through federally licensed dealers.

367.    Thus, ATF almost entirely controls Americans' access to firearms through the GCA's licensure scheme.  The AAP is deliberately and intentionally designed to bottleneck and ultimately eliminate that constitutionally guaranteed pipeline.

368.    Reducing the availability of firearms, and imposing additional hurdles to lawful gun ownership, infringes citizens' rights under the Second Amendment including the individual right of self-defense. *See New York State Rifle & Pistol Association v. Bruen*, 142 S.Ct. 2111, 2133 (2022).

369.    As the Supreme Court explained in *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2126.

370.    Under *Bruen*, the question of what the Nation's historical tradition of firearms regulation included is generally limited to the historical precedent at the time of the Second Amendment's adoption.  *Id.* at 2136 ("Constitutional rights are

enshrined with the scope they were understood to have when the people adopted them." The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years.").

371.     As of 1791, there was no national historical tradition of government regulation or even licensing of firearms manufacturers, wholesalers, or dealers.

372.     As of 1791, there was no national historical tradition of government regulation of the commercial sales of firearms.

373.     Certainly, there is no historical tradition of revoking licenses, limiting the ability of persons to offer for sale, and thereby restricting Americans' access to arms, based on nothing more than unintentional, technical, or paperwork violations like those at issue here.

374.     As of 1868 (even though that is not a relevant time period here),[44] there was no national historical tradition of government regulation or even licensing of firearms manufacturers, wholesalers, or dealers.

_____

[44] Although *Bruen* references 1868, it does so only because it is the date of ratification of the 14th Amendment. This case, however, involves the federal government, and thus 1791 is unequivocally the correct date of focus. Moreover, with respect to whether post-founding historical sources have any role at all to play in the analysis, the Supreme Court technically left the question open, finding it unnecessary to its decision in *Bruen*. 142 S. Ct. at 2138. Nevertheless, as the Court has repeatedly made clear, even prior to *Bruen*, that Reconstruction-era historical sources are to be used (at most) only as *confirmation* of a historical tradition that was *already* in

375.     Yet absent clear evidence from ATF that firearms licensing schemes for manufacturers and dealers was part of this Nation's historical tradition of firearms regulation as of 1791, the ATF is not authorized to prohibit or deny anyone the right to engage in commerce, manufacturing, retail sales or other commercial activities that are or may be protected by the scope of the Second Amendment.

376.     For that simple reason – that there is no broad and enduring historical tradition supporting the challenged agency action – the AAP is invalid on its face.

377.     But what is more, *Bruen* declared unconstitutional a New York State handgun permit licensing scheme which vested subjective and unbridled discretion and authority in government officials to approve or deny an application for a handgun permit.  *See Bruen* at 2123.

378.     Although the government can be expected to argue as much, *Bruen* categorically ***did not find*** that licensing and permitting statutes are generally

---

existence during the founding.  For example, in *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020), the Court rejected the fact that "more than 30 States" had enacted a certain type of legislation in the mid-to-late 19th century, explaining that even such a pattern "cannot by itself establish an early American tradition." *Id*. at 2258-59; *see also Bruen* at 2137 (using 1800s sources only "as mere confirmation of what the Court thought already had been established"); *id*. at 2163 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights.  On the contrary, the Court is careful to caution 'against giving postenactment history more weight than it can rightly bear.'"); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 (2020).

constitutional.  At least one federal court has called such a reading of *Bruen* "just disingenuous."[45] Rather, *Bruen* explicitly rejected a subset of such regimes that "grant[] open-ended discretion to licensing officials," because that was the only issue before the Court.  *Id*. at 2161.

379.    The AAP defies that principle, asserting ATF authority to revoke a licensee based on any subjective criteria or factors external to the enumerated standard of "willfulness" contained in 18 U.S.C. § 923(e).

380.    ATF's policies write the phrase "willfully violated" out of the statute entirely, making it more difficult for citizens to obtain firearms, train with them, and maintain them for lawful purposes, including self-defense.

381.    Thus, the AAP's assertion of unbridled and "open-ended discretion" to ATF licensing officials (and computer programs), so that they can revoke licenses at will for minor errors that are not covered by the statute, violates *Bruen* on its face.

382.    The Second Amendment does not permit the wholesale elimination (or even at the margin) of commerce in arms, or its concentration in a few large and anti-gun multinational corporations (such as Walmart) that refuse to sell most guns aside

---

[45] *See Antonyuk, et al. v. Hochul*, *et al.,* No. 1:22-cv-00986 (N.D.N.Y.), ECF 73, Hearing Transcript (https://bit.ly/3WPtBwo) at 60:10-15.

from a few shotguns and bolt-action rifles.  On the contrary, the market for firearms – like the marketplace of ideas – should be robust and decentralized.

WHEREFORE, Plaintiffs respectfully request that the Court:

1. Grant a stay to enforcement of the proposed revocation of Plaintiff Kiloton's federal firearms license, pending the final resolution of this action;

2. Issue an injunction halting ATF proceedings to revoke Plaintiff Kiloton's federal firearms license under the AAP;

3. Declare that the Defendants are not authorized under any statute or law to revoke Kiloton's federal firearms license based on the findings and allegations set forth in the ATF Notice of Revocation;

4. Issue an injunction preliminarily and permanently enjoining Defendants' misuse of the "willful" requirement in the Gun Control Act;

5. Issue an injunction preliminarily and permanently enjoining the use of Defendants' "Zero Tolerance" policies regarding FFLs, including ATF Order 5370.1E and 5370.1F (and any more current version of the AAP) as contrary to law and constitutional right;

6. Declare that the Defendants have acted unconstitutionally, arbitrarily, capriciously, and contrary to law, in the establishment of and/or application of standards for revocation of federal firearm licenses;

7.     Grant Plaintiffs an award of their attorneys' fees and expenses in these

proceedings pursuant to applicable federal law; and

8.     Grant Plaintiffs such other additional or alternative relief which this

Court deems just and proper.

Dated: August 29, 2023.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh (MS # 102784)
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
601-852-3440 (T)
stephen@sdslaw.us
*Pro Hac Vice forthcoming*

John I. Harris III (TN # 12099)
Schulman, LeRoy & Bennett PC
3310 West End Avenue, Suite 460
Nashville, Tennessee 37203
(615) 244 6670 Ext. 111
Fax (615) 254-5407
jharris@slblawfirm.com
*Pro Hac Vice forthcoming*

James D. Phillips (FL # 22846)
Katz & Phillips, P.A.
144 W. Crystal Lake Ave. Ste. 1000
Lake Mary, FL  32746
jphillips@thefirearmfirm.com


*Counsel for Plaintiffs*