IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

KILOTON TACTICAL, LLC, ERIC            )
HANLEY, and FIREARMS FOR LIBERTY )
("FFL") COALITION,                     )
                                       )
                                       ) Case No. 3:23-cv-23985-MCR-ZCB
Plaintiffs,                            )
                                       )
        v.                             )
                                       )
BUREAU OF ALCOHOL, TOBACCO,            )
FIREARMS AND EXPLOSIVES; UNITED )
STATES DEPARTMENT OF JUSTICE;          )
STEVEN M. DETTELBACH in his official  )
capacity as THE DIRECTOR OF ATF, and  )
AARON R. GERBER, in his official       )
capacity as THE DIRECTOR OF            )
INDUSTRY OPERATIONS FOR THE            )
TAMPA FIELD DIVISION OF THE ATF,       )
                                       )
Defendants.                            )
_____)

---

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PRELIMINARY AND/OR PERMANENT INJUNCTION

---

## INTRODUCTION

The market for firearms, ammunition, and related items is constitutionally protected.  Under the guise of overseeing that marketplace, federal agencies may not lawfully or constitutionally implement the President's political agenda to drive thousands of licensed gun dealers out of business, reducing the options to acquire

firearms, and thereby bottlenecking and atrophying Americans' constitutionally guaranteed access to arms.  Nor may the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") twist the words of the statute to implement policy goals that are neither constitutional nor expressly established by Congress.

Pursuant to Fed. R. Civ. P. 65(a), Plaintiffs submit this memorandum of law in support of their motion for a preliminary and/or permanent injunction.  Plaintiffs ask this Court to enjoin Defendants from further implementing or enforcing a Department of Justice ("DOJ") "zero-tolerance" policy that was first promulgated in 2021 and, since then, has been wielded as a political weapon by the ATF to revoke the Federal Firearms Licenses ("FFL") of numerous gun dealers across the nation (or intimidate them into "voluntary" surrender).  Unless enjoined, ATF's "zero-tolerance" policy will continue to have widespread and deleterious effects on the firearms community, including causing significant and irreparable harm to Plaintiff Kiloton Tactical, LLC ("Kiloton") and its customers, like Plaintiff Eric Hanley, along with the members and customers of Plaintiff Firearms for Liberty Coalition ("FFL Coalition").

**A.    ATF's New "Zero-Tolerance" Policy.**

On June 23, 2021, the "Biden-Harris Administration" announced a purported "Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public

Safety,"[1] including "establish[ing] zero tolerance for rogue gun dealers that 'willfully' violate the law" and "put public safety at risk," and listing five violations that ATF declares now result in automatic revocation "[a]bsent extraordinary circumstances...." Compl. ¶48. An ATF memorandum[2] soon followed, instructing ATF personnel to begin revoking licenses based on the Administration's new "zero-tolerance" agenda, and promising to update ATF Order 5370.1D, the "Federal Firearms Administrative Policy and Procedures," to incorporate this new standard. *Id.* ¶49. Then, on January 28, 2022, ATF promulgated a heavily revised ATF Order 5370.1E[3] (Compl. Ex. 3), replacing its prior 2019 version 5370.1D (Compl. Ex. 4).[4]

ATF's Administrative Action Policy ("AAP") is the internal ATF document that purports to "provide[] fair and consistent guidelines for administrative remedies for violations disclosed relative to inspections of Federal firearm licensees (FFLs)." Compl. ¶49. In other words, the AAP is an "if this, then that" set of guidelines for use by ATF personnel to impose adverse actions on gun dealers for recordkeeping

---

[1] *See* https://tinyurl.com/54rbhu5m.
[2] https://tinyurl.com/2jx48zk6.
[3] https://tinyurl.com/4env6sf9.
[4] https://tinyurl.com/zb7asnj8.

violations and other errors.[5]  Historically, and with certain exceptions,[6] ATF's AAP lays out three possible scenarios (other than taking no action) for various types of violations found during an FFL inspection: (i) a Warning Letter, (ii) a Warning Conference, and (iii) Revocation pursuant to 18 U.S.C. § 923(e).

In the 2022 AAP, ATF made a series of significant policy changes compared to prior longstanding versions which were not the result of any statutory change enacted by Congress, but rather implemented solely to effectuate the President's political agenda.

First, whereas the 2019 AAP stated that ATF "**may** revoke" an FFL based on "appropriate circumstances," the 2022 AAP removes that discretion and mandates that ATF "**will** revoke" absent "extraordinary circumstances."  Compl. Ex. 3 at 6, Ex. 4 at 6 (emphasis added).  Second, the 2022 AAP specifically deletes language from the 2019 AAP which previously had stated that "not every repeat violation is per se a willful violation.  A single, or even a few inadvertent errors in failing to complete forms may not amount to 'willful' failures, even when the FFL knew of the legal requirement to complete the forms."  Compl. Ex. 4 at 7.3.1.  Third, the 2022

---

[5] Although ATF issued a new 2023 AAP earlier this year (*see* Exhibit A), that recent version does not make any meaningful changes relevant here, *see* Compl. ¶¶92-98, with the possible exception of an incomprehensibly worded paragraph 7.a.4.b.iv, discussed in more detail below.  Plaintiffs thus use the term "AAP" or "2022 AAP" interchangeably to refer to the current version of that document (5370.1F).

[6] In certain situations not relevant here, ATF can issue civil fines or temporarily suspend a license.  *See* Compl. Ex. 3 at 8.

AAP now states that, with respect to certain categories of violations, "[o]ne instance of a violation … does not constitute extraordinary circumstances and will not be an acceptable reason for an alternate recommendation" other than revocation.  Compl. Ex. 3 at 9, 11.  Fourth, parroting the Administration's June 2021 announcement, the 2022 AAP states that, pursuant to the "zero-tolerance" policy, "*revocation is the assumed action*, unless extraordinary circumstances exist...."  Compl. Ex. 3 at 7.a.4 (emphasis added).  Fifth, the 2022 AAP makes numerous specific changes, generally ratcheting up the severity of penalties for various offenses relative to the 2019 AAP.[7]

Sixth and importantly, the 2022 AAP removes virtually all discretion from ATF field personnel.  *See* Compl. ¶¶62-76.  Previously, ATF personnel exercised significant discretion when weighing the facts and circumstances of each case and crafting an appropriate remedial action to ensure an FFL's compliance with its recordkeeping requirements.  However, under the 2022 AAP, even where ATF field personnel believe revocation is inappropriate, they are left with *no discretion* to take alternative action and *must initiate* revocation proceedings.[8]  Indeed, ATF inspectors

---

[7] For example, under the 2019 AAP, "failure to conduct a [National Instant Background Check ("NICS")] check or obtain an alternate permit" merited a Warning Conference (Compl. Ex. 4 at 5), but under the 2022 AAP, the same offense results in an automatic revocation (Compl. Ex. 3 at 7).

[8] In order to deviate from revocation, ATF inspectors first must create a detailed report substantiating their recommendation of alternate action, then have it approved by the "Director of Industry Operations" within their local ATF Field Division. Then, if approved, it is "submitted to the [Monitored Case Program] for [Deputy Assistant Director, Industry Operations] approval" at ATF headquarters in

readily admit that they now have *no role at all to play* in the determination that an FFL has "willfully" violated the law, but instead merely perform an administrative, data-entry function, simply cataloging violations and entering them into ATF's computer system, the "Spartan" (Compl. ¶68 n.10) database, which determines the punishment.   *See* Compl. ¶¶68-74.   In other words, the statutory willfulness necessary to revoke a license is no longer *found* by an individual based on facts, circumstances, and the exercise of human judgment.   Rather, it is *presumed* by computer software, based on nothing more than the category of recordkeeping and other violations that are discovered and fed into the computer system.   To put it simply, <u>a computer program now controls Americans' constitutionally guaranteed access to arms</u>.

**B.     ATF Compliance Inspection of Plaintiff Kiloton Tactical, LLC.**

Kiloton is a retail gun store in DeFuniak Springs, FL, offering a wide inventory of firearms, ammunition, accessories, and related merchandise. Kiloton also offers a broad range of gunsmithing and customization services, and an on-site shooting range offering instruction and training. *See* Compl. Ex. 12.   There are no similar gun stores in the vicinity.   *See id.* ¶¶5-7; Compl. ¶160. Kiloton holds a Type 07 Manufacturer FFL, first issued in 2016, which also allows Kiloton to "deal" in

---

Washington, D.C.  *See* Compl. Ex. 3 at 7.h; *see also* ATF July 14, 2021 Letter at 2. Very few of these requests for alternate action have been granted by ATF headquarters.

firearms.  *See* Compl. ¶161.  Although federal law permits ATF to conduct an annual warrantless administrative compliance inspection (18 U.S.C. § 923(g)(1)(B)), ATF never inspected or audited Kiloton's Type 07 FFL prior to 2022.

On May 24, 2022, ATF Industry Operations Investigator ("IOI") Nicholas Speranza, Jr. arrived at Kiloton to conduct ATF's first compliance inspection which lasted until June 9, 2022. *See* Compl. Ex. 12 ¶11; *see also* Ex. 1 at 1.  As detailed in Plaintiffs' Complaint, over the weeks-long inspection, IOI Speranza generally treated Kiloton's customers with contempt and disrespect.  *See, e.g.*, Compl. Ex. 12 ¶15 (disdainfully referring to one regular customer as a "frequent flyer"); *see also* at ¶¶16-22 (declaring the attempted lawful purchase of a firearm by a father as a gift for his daughter to be a crime, and insisting the transaction not occur).  IOI Speranza issued a "Report of Violations" dated June 9, 2022 (Compl. Ex. 11), which he declared would be more than enough to revoke Kiloton's license (Compl. Ex. 12 ¶¶39-40).  When Kiloton's proprietor expressed dismay at losing his livelihood, IOI Speranza laughed and left.  *Id.* at ¶42.  Although IOI Speranza's Report of Violations listed a number of categories of violations, most involved technical or recordkeeping requirements, such as a buyer forgetting to provide height or weight on a Form 4473. *Id.* at 1-2, 4-7.

Then, on April 26, 2023, Kiloton filed a timely application to renew its license.  Compl. Ex. 1 at 2.  Soon after, on July 10, 2023, more than an entire year

(396 days) after the ATF had performed Kiloton's compliance inspection in May and June of 2022, ATF issued a "Notice to Deny Application for License," with an accompanying letter stating that "(ATF) is contemplating denying your renewal application … and has decided to initiate the denial/revocation process."  Compl. Ex. 2.  This was signed by Aaron R. Gerber, Director, Industry Operations, Tampa Field Division.

ATF's Notice of Revocation identified only four categories of violations as the basis for its Notice of Revocation.  First, ATF alleges that, on five occasions, Kiloton "willfully" failed to run a background check on a firearm purchaser.  Compl. Ex. 1 at 2. Second, that on five occasions, Kiloton "willfully" "fail[ed] to report on a Report of Multiple Sale or other Disposition of Pistols or Revolvers (ATF E-Form 3310.4)."  *Id.* at 3.  Third, that on thirteen occasions, Kiloton transferred pistols (or, in one case, a "receiver") to purchasers, but "failed to follow" Florida's "three (3) day waiting period pursuant to Florida Statute § 790.0655 … in violation of 18 U.S.C. § 922(b)(2)."  *Id.* at 3-6.  Fourth, ATF alleges that, on one occasion, Kiloton "willfully" made a false entry in its records, on the grounds that the records for two different sales contained the same "FDLE … approval number," and that "[t]he Licensee was unable to reconcile" to which sale the number applied.

# ARGUMENT

## I.      PRELIMINARY INJUNCTION STANDARD.

Consideration of a motion for a preliminary injunction requires a plaintiff to "clearly establish" four requirements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest." *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018). "A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success." *United States v. Alabama*, 443 F. App'x 411, 419 (11th Cir. 2011). "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Ne. Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Id.*. As is pertinent here, "money damages" are not available under the APA. *See Dep't of the Army v. Blue Fox*, 525 U.S. 255 (1999). In this Circuit, "[l]ikelihood of success on the merits 'is generally the most important' factor." *NetChoice, LLC v. AG, Fla.*, 34 F.4th 1196, 1209 (11th Cir. 2022). Finally, when the "government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020). Each factor weighs heavily in Plaintiffs' favor.

## II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR APA CLAIMS.

The AAP challenged herein constitutes "agency action" pursuant to 5 U.S.C. §551(13) for purposes of review under the Administrative Procedure Act ("APA"), 5 U.S.C. §702.[9]  Under the APA, a court shall "set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. §706(2)(A).  A court may hold that an agency action is arbitrary and capricious when the agency has failed to consider relevant evidence or articulate a satisfactory explanation for its action.  Certainly, agency action is unlawful when it facially conflicts not only with the text of, but also with the intent behind, the statute it purportedly is designed to implement.[10]

### A. ATF's "Zero-Tolerance" Policy Violates the APA and the Gun Control Act.

Under 18 U.S.C. § 923(e), ATF has no authority to revoke a license unless it can prove that the licensee has (i) "violated any provision of" the GCA or its regulations and (ii) that such violation was done "willfully."  Congress did not define

---

[9] *See Cargill v. BATFE*, 2023 U.S. Dist. LEXIS 123249, at *13-14 (W.D. Tex. July 18, 2023).

[10] This action is _not_ brought under Section 923(f), which grants courts the authority to review ATF revocations of licenses.  *See* Compl. ¶¶258-268.  Even so, it is worth noting that, unlike judicial review of other types of administrative actions, Congress requires *de novo* reviews in § 923(f)(3):  "the ATF's decision is entitled to no presumption of correctness."  *Wilborn v. BATFE*, 2014 WL 5502495, at *3 (N.D. Ala. Oct. 30, 2014); *see also Willingham Sports, Inc. v. BATFE*, 348 F.Supp.2d 1299, 1306 (S.D. Ala. 2004), *aff'd*, 415 F.3d 1274 (11th Cir. 2005) (*per curiam*).

the term "willfully" in Section 923(e).  In that void, courts have held that a licensee willfully violates the GCA when it intentionally, knowingly, or recklessly violates known legal requirements.[11]  This "willful" language in Section 923(e) was no accident, but rather a deliberate addition to the statute by Congress as part of the 1986 Firearms Owners' Protection Act ("FOPA"), which Congress intended to protect gun dealers from the very sort of abuses to which ATF has recently returned in the APA.  *See Bryan v. Harris*, 524 U.S. 184, 195 (1998) ("[FOPA] was enacted to protect law-abiding citizens who might <u>inadvertently violate the law</u>.") (emphasis added); *see also* Compl. ¶¶100-10 (detailing the history of ATF abuses that led to FOPA's enactment).  Licensee errors that are accidental, inadvertent, unintentional, or perhaps even negligent simply do not rise to the level of willfulness under the GCA, and thus cannot support a license revocation.  *See* Compl. ¶110 (a prior ATF director agreeing that "inadvertent violations" should not be used to target licensees); *see also RSM, Inc. v. Herbert*, 466 F.3d 316, 320-22 (4th Cir. 2006) ("a single, or even a few, inadvertent errors in failing to complete forms may not amount

---

[11] *See Sturdy v. Bentsen*, 1997 U.S. App. LEXIS 27671, at *4 (8th Cir. Oct. 6, 1997) (unpublished) ("To show a willful violation, the BATF had to prove [the FFL] knew of the legal record-keeping requirements and 'purposefully disregarded' or was 'indifferent to' them."); *see also Armalite, Inc. v. Lambert*, 544 F.3d 644, 649 (6th Cir. 2008) (citation omitted) ("we interpret the phrase 'willfully violated' to … reach only deliberate, knowing or reckless statutory violations"); *Weaver v. Harris*, 486 F. App'x 503, 505 (5th Cir. 2012).

to 'willful' failures, even when the legal requirement … was known."); *Willingham Sports,* 415 F.3d at 1277; *Prino v. Simon*, 606 F.2d 449, 451 (4th Cir. 1979).

Unfortunately, the ATF is not an agency that seeks faithfully to enforce the policies through statutes that Congress actually enacted.  Rather, ATF has a lengthy history of using expansive regulatory enactments, non-public classification letters, and even implicit threats and intimation to expand the scope of its authority and to target, harm, and even destroy the very industry that it regulates.  Thus, when faced with Congress' decision to add a "willfulness" requirement to the statute to stop ATF's abuses, ATF was forced to get creative about how to demonstrate that unintentional and inadvertent technical, recordkeeping, or paperwork mistakes constitute "willful" violations.

For example, without any change by Congress in policy or the statutes, the current AAP doubles the number of ways in which ATF presumes "willfulness," to now include "publications and information [previously] provided to the FFL which explain the FFL's legal responsibilities."  *See* Compl. ¶¶114-18.  Indeed, when an FFL is first licensed, ATF provides a copy (or now simply a website link) of a 237-page manual of rules and regulations for dealers, requiring the FFL to sign an acknowledgement form that it received the manual.  *Id.* at ¶117.  That form has only one purpose – to later be used as evidence that the FFL allegedly knew of its obligations when it inevitably commits an inadvertent error (as all humans do, when

engaging in thousands of sales and manually entering tens of thousands of unique data points).  But this is like revoking the driver's license of a person who fails to use his turn signal, on the theory that he was given a driver's manual by the DMV when he was 15 years old, and thus he must have acted in "purposeful disregard of, or a plain indifference to, or reckless disregard of a known legal obligation" years later when forgetting to follow one of those rules.

Likewise, the AAP paradoxically takes the position that an FFL that *either* has "a history of prior violations" *or* "a history of past compliance" and "substantial experience as an FFL" must have acted "willfully."  Compl. Ex. 3 at 7.e.4.d-f.  In other words, ATF has created the sort of "heads I win, tails you lose" scenario that "has a necrotizing effect on the rule of law."  *Saunders v. Thies*, 2022 U.S. App. LEXIS 25527, at *4 (8th Cir. Sept. 12, 2022) (Grasz, J., and Smith, C.J., dissenting from denial of rehearing).  But ATF is not permitted to regulate the firearms industry – which facilitates the exercise of a constitutionally enumerated right – such that "the only winning move is not to play" (War Games, 1983).  The DIO for the ATF's St. Paul Field Division confirms this no-win situation for FFLs, having opined in a recent 2022 revocation letter that "[a]rguing that errors were the result of human mistakes or harmless misunderstandings … *is irrelevant* to the standard of willfulness."  Compl. Ex. 10 at 6 (emphasis added).

As noted above, no longer do ATF personnel use judgment to decide, based on unique facts and circumstances, whether an FFL's violations are willful. *See Cargill*, 2023 U.S. Dist. LEXIS 123249, at \*14 ("the [AAP] language regarding enforcement changed from 'may' to 'shall,' negating any discretion as to certain willful violations."). Rather, an ATF computer software – the "Spartan" system – decides "willfulness" based on its algorithmic programming. But this is ___**precisely**___ what Congress intended to prevent by enacting FOPA and Section 923(g)'s "willfulness" mandate. Representative Harold Volkmer (FOPA's sponsor) stated that his bill was necessary to avoid "the strict liability provided by the act," where "even the most trivial and unintentional misstep would do." *See* 132 Cong. Rec. 6841. "Human mistakes" and "harmless misunderstandings" simply do not, as a matter of law, amount to a "purposeful disregard of, or a plain indifference to, or reckless disregard of a known legal obligation." In other words, the AAP directly conflicts with both the statutory text and the explicit congressional purpose of FOPA.[12] Expectedly, ATF will claim it has always been free to revoke licenses for

---

[12]  Luckily for ATF, the agency itself has not been required to live up to the same unrealistic expectations the AAP imposes on FFLs. For example, unbeknownst to ATF until the firearms were already long gone, a former ATF contractor managed to steal *thousands* of firearms from ATF custody, for illicit resale. Compl. ¶131. Making matters worse, ATF personnel had *falsified reports* stating that many of the very same firearms had been destroyed. *Id.* ¶132. But ATF's records are rife with errors even when there is nothing to cover up. Data contained in the National Firearms Registration and Transfer Record is notoriously unreliable; the OIG has reported that FFL data is *almost always* more accurate than ATF's. *Id.* ¶136.

willful violations, and that this is all the AAP does.  But the *Cargill* court rejected those arguments as "without merit," finding instead that "the array of consequences of 'willful' conduct has narrowed with the implementation" of the AAP.  2023 U.S. Dist. LEXIS 123249, at *15.  The AAP reads "willfulness" out of the statute entirely, imposing the same form of strict liability that drew Congress's ire when it enacted FOPA – "strict liability[, where] even the most trivial and unintentional misstep would do."[13]

## B. Kiloton's Alleged Violations Cannot, as a Matter of Law, Be Found to Be Willful.

Although this case does not involve a Section 923(f) *de novo* review of any eventual (if not likely) revocation of Kiloton's license, it nevertheless is important to discuss the patent absurdity of the "violations" that ATF has leveled against Kiloton, none of which could be said to be "willful."  As stated *supra*, ATF alleges four categories of violations.

First, ATF alleges that, on five occasions, Kiloton "willfully" failed to run a background check on a firearm purchaser.  Compl. Ex. 1 at 2.  Yet ATF noted that

---

Finally, ATF personnel admit to making the same clerical errors as FFLs – *including when documenting FFL revocations* – errors that would be "willful" violations under the new policy if the tables were turned.  *Id.* ¶143.  The fact that ATF cannot live up to its own unrealistic recordkeeping standards shows those standards for what they are – arbitrary and capricious.

[13] *See* https://armsandthelaw.com/gunlaw/FOPA/house_floor_debates.html (by Representative Volkmer).

Kiloton actually *did* "contact[] NICS" and *did* "receive an approval" for each buyer. *Id.* Rather, ATF's objection was that each of the five transfers occurred *more than 30 days after* its respective background checks had been approved (33 days, 77 days, 63 days, 80 days, and 88 days, respectively). But even assuming the legitimacy[14] of ATF's 30-day rule for a background check, ATF's allegations of any violation still fail, because each of the firearms that ATF alleges were "*transfer[ed]*" without a background check were actually being *returned* to customers after Kiloton performed gunsmithing work. *See* Compl. Ex. 12 ¶53. ATF's own website FAQ asks "[d]oes a licensed gunsmith have to conduct a NICS background check before returning repaired or customized firearms?" and answers "[n]o, if the firearm is being returned to the person from whom it was received."[15] According to 27 C.F.R. § 478.124(a), "a firearms transaction record, Form 4473, ***shall not be required*** to

---

[14] This 30-day rule is not found in any federal statute. Indeed, 18 U.S.C. § 922(t) states only that a "licensed dealer shall not transfer a firearm … unless … the licensee contacts the national instant criminal background check system" and receives an approval (or three business days pass without a denial). ATF's 30-day rule, then, is entirely a creation of bureaucrats, promulgated (over numerous objecting comments) in 1998 as a regulation (63 Fed. Reg. 58272, Oct. 29, 1998), on the theory that 30 days is a "reasonable period of time...." *Id.* at 58274. This regulation today appears in 27 C.F.R. § 478.102 and states that "[a] NICS check conducted in accordance with paragraph (a) of this section may be relied upon by the licensee only for use in a single transaction, and for a period not to exceed 30 calendar days from the date that NICS was initially contacted. If the transaction is not completed within the 30-day period, the licensee shall initiate a new NICS check prior to completion of the transfer."

[15] https://tinyurl.com/yc7emvjj.

record the disposition made of a firearm delivered to a licensee for the sole purpose of repair or customizing when such firearm or a replacement firearm is returned to the person from whom received" (emphasis added).  In other words, no second, additional background check was required for Kiloton simply to return firearms to customers who purchased them and requested Kiloton perform additional gunsmithing services.[16]

Second, ATF alleges that, on five occasions, Kiloton "willfully" "fail[ed] to report on a Report of Multiple Sale or other Disposition of Pistols or Revolvers (ATF E-Form 3310.4).  Compl. Ex. 1 at 3.  Yet during his inspection of Kiloton, IOI Speranza initially claimed that Kiloton had failed to make multiple sale reports *on*

---

[16] Interestingly enough, the revised January 2023 AAP (Exhibit A) arguably creates additional reasons why the Kiloton revocation is inappropriate, adding new language to the AAP's Section 7.a.4.b.iv.  These revisions now provide that revocation is the default for transfer of a firearm more than 30 days after a background check "***unless*** [i] the purchaser is found not to be a prohibited person, [ii] such transactions occur on three (3) or more occasions, [iii] the FFL has a significant history of noncompliance with the GCA, [iv] there are independent objective indicia that the violation was willful, ***or*** [v] the same violation has been cited in prior inspections within the previous 5 years."  *Id*. at 3.

Of course, there is some question whether ATF actually meant what its inartfully drafted language actually says.  First, it would appear that items [ii] through [v] state *the opposite* of what ATF actually meant, otherwise the AAP would militate *against* revocation for repeat offenders who act "willfully."  Second, ATF's five part test on its face is disjunctive – using the word "***or***" – meaning that only one of the five criteria need be met in order to avoid revocation.  If that is the case, then the ATF's notice of revocation here would conflict with the 2023 AAP, as none of Kiloton's gunsmithing customers is a prohibited person.  At bottom, any ambiguity in the 2023 AAP should be read in favor of Plaintiffs, and against ATF.

*other, additional, occasions as well*, on the grounds that he was unable to find any record of such report in ATF's system. *See* Compl. Ex. 12 ¶56. However, with respect to those instances, *Kiloton did produce email receipts*, proving that it did in fact submit such reports through ATF's online system. *Id.* When presented with evidence that it was not Kiloton's records that were deficient, but rather that *ATF's own records were erroneous*, IOI Speranza openly acknowledged that ATF's records of multiple sale reports are often wrong, in that ATF routinely does not bother to properly record and document such reports when they are received from FFLs. *Id.* ¶57. In other words, ATF's claim that Kiloton did not properly make multiple sale reports is questionable at best because ATF's own records of receipt of such reports are notoriously inaccurate and incomplete. Even so, failure to timely file multiple sales reports cannot be a predicate for revocation of Kiloton's FFL. Even the current AAP states that a Warning Letter – the lowest form of punishment – is appropriate for "[f]ailure to file ATF F3310.4, Report of Multiple Sale or Other Disposition of Pistols and Revolvers … when legally required and with a minimum of five instances." Compl. Ex. 3 at 7.c.6. Thus, even the current AAP treats this low-level offense with low-level repercussions – a Warning Letter – not the revocation of Kiloton's license that ATF proposes.

Third, ATF alleges[17] that, on thirteen occasions, Kiloton "failed to follow Florida's mandatory three (3) day waiting period pursuant to Florida Statute § 790.0655 before transferring firearms … in violation of 18 U.S.C. § 922(b)(2)." Compl. Ex. 1 at 3.  Specifically, 18 U.S.C. § 922(b)(2) provides that it is unlawful for an FFL to make any transfer of "any firearm to any person in any State **where the purchase or possession by such person of such firearm** would be in violation of any State law or any published ordinance applicable at the place of sale, delivery or other disposition...."  The Florida statute, in turn, provides, in relevant part, that it is unlawful "(a) For any retailer … to deliver a firearm before the expiration of the waiting period...."  Florida Statute § 790.0655.  Thus, the Florida statute, by its very terms, does not place "**the purchase** … **by such person** … in violation of any State law...."  Nor does the Florida statute, by its very terms place "**the possession** … **by such person** … in violation of any State law...."  Rather, a Floridian ("such person") may lawfully purchase and possess a firearm that is transferred to him, *even if* that transfer occurs in advance of the three-day background check expiration.

But *even if* one accepts not only (i) ATF's factual allegations, but also (ii) its characterization of the interplay between the federal and state statutes, as true, the

---

[17] As a preliminary matter, unlike Kiloton's other alleged violations, ATF's Notice of Revocation does not allege that any of this third category of violations was "willful," which seems to mean that ATF's allegations fail as a matter of law (since the statute requires a finding of "willfulness").

AAP *does not provide for revocation* in such a situation.  Rather, transfer of a firearm to a person in violation of state law does not appear in the AAP's list of "zero-tolerance" offenses.  *See* Compl. Ex. 3 at 7.a.4, 7.e.  Instead, the closest offense to the one ATF alleges is "[t]ransfer of a rifle/shotgun … that violates State law," a violation that merits a Warning Letter, the lowest form of punishment.  *Id.* at 7.c.9.

Fourth, ATF alleges that, on one indeterminate occasion (out of two potential transactions), Kiloton "willfully" falsified its records of the "approval number received by FDLE."  Compl. Ex. 1 at 7.  The basis for this claim is ATF's allegation that the same FDLE approval number was entered for two different background checks that had been run on April 6, 2022.  *Id.*  ATF claims that, since Kiloton was "unable to reconcile" its records as to the discrepancy – and determine which sale the control number applied to – Kiloton thus "willfully" falsified its records on "either" one transaction "or" the other.  *Id.*  Here, ATF cannot even say it is more likely than not that either record was falsified.  ATF merely assumes that one was falsified but has no idea which one.

In any event, both of the April 6, 2022 buyers in question had background checks run, and both were approved.  *See* Declaration of Steve Richman, Compl. Ex. 14 at 12; *see also* Declaration of Cortney Daniels, Compl. Ex. 15 at 13.  This is confirmed by Kiloton's receipts issued to both purchasers, each of which charges $5 for an FDLE background check.  Thus, as both buyers were present for their

background check, and both were approved (as they are both eligible purchasers),

there was no conceivable reason for Kiloton to *willfully* write down the wrong FDLE

approval number for an approved transaction.[18]

Importantly, ***none*** of Kiloton's alleged violations involved a firearm transfer

to a prohibited person.  ***None*** hampered ATF's ability to trace any firearm.  ***None*** *in*

*any way* endangered public safety.[19]  In other words, the allegations against Kiloton

---

[18] Adding insult to injury, ATF's own allegation of Kiloton's violation itself contains
error, stating that the second background check occurred "on March 23, **2022**," but
then incorrectly claiming that the actual transfer of the firearm occurred "on or about
March 23, **2023**" – a full year later.  Compl. Ex. 1 at 7 (emphasis added).  *Clearly* a
"willful" falsification of records as the term is applied by ATF

[19] Defendant Dettelbach was recently a guest on MSNBC's "Morning Joe" show,[19]
where he was asked about a similar case, *Morehouse Enterprises, LLC et al. v. ATF
et al.*, pending in the District Court of North Dakota, Civil Action No. 3:23-00129-
PDW-ARS, where he  opined about the priorities of ATF in revoking licenses.  First,
Director Dettelbach stated that, while the "vast majority of firearms dealers … are
actually following the rules … there are always some that either can't or are
unintentionally not following the rules.  Those we try to help and get into
compliance."  *Id.*  On the contrary, ATF has never sought to "help" Kiloton achieve
and maintain compliance with federal requirements.  Second, Defendant Dettelbach
claimed that there is "a smaller group, who are willfully violating the law," but *only*
when an FFL is "willfully violating the law *and* endangering public safety," ATF's
response "*can* include revocation.  It can include other things as well."  *Id.*  On the
contrary, ATF has sought to revoke Kiloton's (and many others') licenses without
any consideration of possible alternative penalties.  Further, ATF has sought to
revoke Kiloton's license with absolutely no indication that the alleged violations
have any impact on or nexus to "public safety."  Indeed, as noted above, ATF waited
more than one year to take action to revoke Kiloton's license.  Had public safety
been in any way impacted, ATF no doubt would have acted with far greater urgency.
In other words, revocation of Kiloton's license *literally checks none of the boxes* the
Director identified as ATF's mission and priorities.  The ATF's actions directly
contradict the Director's claim that ATF seeks to "help" and "get into compliance"
licensees who "unintentionally" make recordkeeping mistakes by seeking to revoke

are, at best, for technical, paperwork, and recordkeeping violations.    In    sum,

"[o]ther than the violations themselves, there is no evidence that petitioners

displayed a disregard for the regulations.  In fact, the evidence shows the opposite."

*Jim's Pawn Shop, Inc. v. Bowers*, 2008 U.S. Dist. LEXIS 97199, at *23 (E.D.N.C.

Sept. 16, 2008).

Contrary to ATF's treatment of Kiloton and others under the AAP, the totality

of the circumstances and all mitigating factors must be taken into consideration in

determining whether a licensee's violation of the GCA is "willful."  Willfulness

cannot be presumed by a computer algorithm.  Yet, instead of considering Kiloton's

long history of compliance with the statutory scheme and regulatory requirements

across thousands of transactions, ATF seeks to weaponize past compliance against

Kiloton.  Likewise, ATF has (i) failed to consider the mitigating factors discussed in

its AAP, which weigh heavily in favor of Plaintiff Kiloton, (ii) failed to consider that

Kiloton's alleged violations have no nexus to public safety, prohibited persons, or

impaired tracing, (iii) failed to consider Kiloton's ability to correct its unintentional

mistakes and to avoid making similar errors in the future, (iv) failed to have an actual

human being consider the merits of Kiloton's case, instead assigning the initial

determination of "willfulness" to a computer program, and (v) failed to consider IOI

---

Kiloton's FFL.    Instead of actually "help[ing]" Kiloton comply with its
recordkeeping obligations as the Director stated, the agency seeks to eliminate
Kiloton and destroy livelihoods in the process.

Speranza's motivations in his inspection, including his apparent disdain for FFLs and gun owners.  *See* Compl. Ex. 12, ¶¶24, 38 (IOI Speranza "openly critical of the fact that Kiloton has been a successful business" and appearing "gleeful at the prospect of ATF revoking Kiloton's license and shutting" down business).

Tellingly, ATF's intended punishment of Kiloton does not reflect its Director's priorities or the stated purpose of the Biden-Harris "zero-tolerance" policy, at least as presented to the public, to target only FFLs who "put public safety at risk."  Rather, the revised AAP is a weapon that ATF is wielding against the firearm industry (a constitutionally protected community), creating a situation where most (if not all) well-intentioned dealers at some point will commit an inadvertent slipup, inevitably subjecting their license to revocation, cabined only by the good graces of ATF field personnel (if any) who choose to exercise their discretion not to report certain violations.

Thus, not only does the AAP on its face conflict with the statutory requirement of willfulness and Congressional policy, but also ATF's implementation of the AAP against Kiloton here provides further evidence of that conflict.[20]

---

[20] In stark contrast to the AAP's presumption that Kiloton acted willfully here, a federal district court in Idaho found that, "on the record before this Court, *it is unclear* whether [the FFL's] actions and/or omissions raise to the level of indifference to the regulations [*i.e.*, willfulness]" – even though that court was faced with (i) *far more serious* violations than Kiloton's, (ii) *far more numerous* violations than Kiloton's, and (iii) *repeated* violations that continued to occur after repeated ATF warnings.  *See Red's Trading Post, Inc. v. Van Loan*, 2007 U.S. Dist. LEXIS

### C. ATF's "Zero-Tolerance" Policy Violates the Second Amendment.

Ratified in 1791, the Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  These natural rights exist independent of, and existed prior to, their recognition in the United States Constitution, and are protected by the inflexible and unyielding mandate "shall not be infringed."

In order to "keep and bear" firearms, Americans who are part of "the people" necessarily have the right to acquire, purchase, own, and possess firearms.  This includes the members of the FFL Coalition who, in turn, include customers of the Coalition and of Kiloton, like Plaintiff Eric Hanley.  Kiloton has a corresponding right to manufacture, acquire, and sell firearms to those persons.[21]  These rights are

---

31786, at *11 (D. Idaho Apr. 30, 2007); *see also* 07-cv-90, ECF #68 (ATF pretrial memorandum summarizing "*hundreds*" of violations, including sales to *illegal aliens* and persons *under indictment*, which had continued to occur despite *three* prior inspections and warnings).

[21] As a vendor, Kiloton is able to bring claims on behalf of its customers.  *Craig v. Boren*, 429 U.S. 190, 195 (1976).  Even so, at least one customer of Kiloton wishes to purchase firearms from Kiloton, but will be deprived of doing so by the AAP and revocation thereunder.   Plaintiff Eric Hanley advised that he uses Kiloton "exclusively" because Kiloton "employs some of the best gunsmiths in the area" and is the only store he "allow[s] to work on" his collection of WWI and WWII firearms (Compl. Ex. 13 ¶¶6-8); that Kiloton has reasonable transfer prices (*id.* ¶10); and that Kiloton has a shooting range that is "second to none" (*id.* ¶11).
If ATF is successful at revoking Kiloton's FFL, Mr. Hanley would be "forced to spend more time, more money, and travel greater distances in order to piece together the combination of products and services" he receives from Kiloton.  *Id.* ¶14.

two sides of the same coin.  Indeed, the right to acquire arms to "keep and bear" becomes meaningless if there is no right to acquire them in the first place, and the right to acquire arms becomes meaningless if ATF is able to control Americans' access to firearms, first by heavily regulating the Second Amendment supply chain, and second by deliberately and intentionally driving gun stores out of business (whether through revocation or "voluntary" surrender),[22] thereby reducing the total supply of available arms.

Indeed, under the GCA, there can be no commercial manufacture of firearms without ATF licensure.  And for those firearms that are manufactured commercially (*i.e.*, probably 99.9% of them), they cannot be distributed to the American public but through federally licensed dealers.  Thus, ATF almost entirely controls Americans' access to firearms through the GCA's licensure scheme.  The AAP is deliberately and intentionally designed to bottleneck that constitutionally protected and guaranteed pipeline.

---

[22] For example, under Defendants' new "zero-tolerance" policy, ATF coerced the surrender of Pendergrass Supply & Rentals' Type 01 FFL, a former firearms dealer in Fayetteville, TN. *See* Declaration of Justin Pendergrass, Exhibit B. After discovering clerical violations during Pendergrass' first-ever compliance inspection in 2022, ATF initiated revocation. *Id.* ¶ 6. Pendergrass voluntarily surrendered his FFL only because he could not afford an administrative hearing or judicial review. *Id.* ¶¶ 16-17.

Numerous courts have found that the text of the Second Amendment covers the manufacture, purchase, and/or sale of firearms and ammunition. *See Lynchburg Range & Training, LLC v. Northam*, 2020 Va. Cir. LEXIS 57, at *6 (Lynchburg Cir. Ct. Apr. 27, 2020) ("the right to keep and bear arms 'inclu[des] the otherwise lawful … sale, or transfer of firearms....'"); *Tony Kole & Ghost Indus., LLC v. Village of Norridge*, 2017 U.S. Dist. LEXIS 178248, at *29 (N.D. Ill. Oct. 27, 2017) (referencing "Thomas Jefferson … 'Our citizens have always been free to make, vend, and export arms.'"). The rights protected under the Second Amendment include the right to engage in the commerce and/or business of being a gun dealer, gun manufacturer, and/or operating a gun range (businesses that invariably also possess FFLs as part of their operations). *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."); *see also Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms."); *Andrews v. State*, 50 Tenn. 165, 178

(1871) ("The right to keep arms, necessarily involves the right to purchase them …

and to purchase and provide ammunition suitable for such arms....").[23]

Reducing the number of FFL dealers, thereby reducing the availability of

firearms and thus imposing additional hurdles to lawful gun ownership, infringes

Second Amendment rights including the individual right of self-defense.  *See N.Y.*

*State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111, 2133 (2022).  As the U.S.

Supreme Court explained in *Bruen*, "when the Second Amendment's plain text

covers an individual's conduct, the Constitution presumptively protects that

conduct.  To justify its regulation, the government may not simply posit that the

regulation promotes an important governmental interest.  Rather, the government

---

[23] *But see United States v. Kazmende*, 2023 WL 3872209, at *5 (N.D. Ga. May 17, 2023) (plain text of Second Amendment does not cover commercial sales); *United States v. Flores*, 2023 WL 361868, at *2-6 (S.D. Tex. Jan. 23, 2023) (the Second Amendment does not protect the right to commercially deal firearms).  But these unpersuasive opinions are flat wrong.  If there is no right to sell a firearm, and/or no right to buy one, then there can be no right to keep and bear arms (since there can be no arms to keep and bear in the first place).  In other words, the government cannot demur that a person has a right to post a Tweet, but Twitter can be prohibited from providing the forum in which to do so.  *See United States v. Hicks*, 2023 U.S. Dist. LEXIS 35485, at *5-6 (W.D. Tex. Jan. 9, 2023) ("what the Government is suggesting is absurd in practice.  If receiving a firearm were illegal, but possessing or carrying one remained a constitutional right, one would first need to break the law to exercise that right.  And if buying (receiving) a gun is not covered by the Second Amendment's plain text, neither would selling one.  So according to the Government, Congress could throttle gun ownership without implicating Second Amendment scrutiny by just banning the buying and selling of firearms.  What a marvelous, Second Amendment loophole!").

must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Id.* at 2126.  Under *Bruen*, that inquiry is generally limited to the historical precedent at the time of the Second Amendment's adoption. *Id.* at 2136 (citation omitted) ("'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'").

As of 1791, there was no broad and enduring historical tradition of government regulation or even licensing of firearms manufacturers, wholesalers, or dealers.  As of 1791, there was no historical tradition of government regulation of the commercial sales of firearms at all.  Certainly, there is no historical tradition of government bureaucrats revoking licenses, limiting the ability of persons to offer "arms" for sale, and thereby restricting Americans' access to arms based on nothing more than unintentional, technical, or paperwork violations like those at issue here. Likewise, as of 1868 (even though that is not a relevant time period here), there was no historical tradition of government regulation or even licensing of firearms manufacturers, wholesalers, or dealers.

Yet absent clear evidence that firearms licensing schemes (and revocations of licenses) for manufacturers and dealers are part of a broad and enduring historical tradition of firearms regulation as of 1791, ATF is not authorized to prohibit, deny, or revoke the ability of anyone to engage in commerce, manufacturing, retail sales, or other commercial activities that are protected by the Second Amendment.  At a

minimum, the historical tradition certainly does not support the government ending the livelihood of a firearm dealer for simple inadvertent bookkeeping errors or unintentional misunderstandings of highly complex technical requirements in the course of business. For that simple reason – that there is no broad and enduring historical tradition supporting the challenged agency action – the AAP is constitutionally invalid.

Quite to the contrary of the AAP's attempt to shut down gun stores and reduce the overall availability of firearms, during the Founding Era, manufacturers and dealers in firearms (usually called "gunsmiths") were ubiquitous. In fact, gunsmiths were practically as widespread in the decades following the Founding as FFLs are today, evincing a widespread early (and now modern) American tradition of domestic production and sale with "vast numbers of gunsmiths in this country's first three centuries." Frank M. Sellers, American Gunsmiths 4 (2d ed. 2008). In the year 1850, the first official industrial census of its kind recorded over 3,800 active gunsmiths across the country, relative to a free population of just shy of 20 million,[24] yielding a rate of approximately one per 5,260 persons. *Id.* at 6. In comparison, ATF reported 66,853 dealer and manufacturer FFLs as of 2020,[25] relative to a

---

[24] *See* https://tinyurl.com/44vz97kf (reporting 19,553,068 "Whites" and 434,495 freed slaves who ostensibly could access firearms in 1850).

[25] *See* https://tinyurl.com/22fv63u3 at 21 (reporting 52,799 dealers and 14,054 manufacturers in 2020).

population of about 334 million,[26] yielding a remarkably similar proportion of 5,007

persons per each modern equivalent of "gunsmith."[27]

In other words, widespread closures of today's FFLs would offend our

Founders' expectations of citizens' ready access to arms.  Rather, this nation's

Founders especially recognized the necessity of the domestic manufacture and

supply of arms, as they had just fought a Revolution where military operations had

been hamstrung by the constant shortage of gunpowder[28] and firearms as well.[29]  In

---

[26] *See*  https://tinyurl.com/2rvpcycx  (reporting  a  total  resident  population  of 334,735,155 in 2020).

[27] It is likely that, during the Founding Era, the per capita rate of "gunsmiths" was even greater than in 1850 as, prior to the Industrial Revolution, the production of firearms  was  a  laborious  and  time-consuming  process.   *See,  e.g.*, https://tinyurl.com/ycyaxx5w  (describing  the  painstaking  process  of  forging  rifle barrels by hand and the individual fitment of other components).   One source contains a list of many thousands of such gunsmiths during that era, in a time that the  population  numbered  fewer  than  4  million.   *See generally* Sellers,  back cover, *infra* (containing  "[o]ver  20,000  listings  of  individual  manufacturers, trademarks, gunsmiths, and other trade names" from early American history and onwards); *see  also* https://tinyurl.com/4zwxnxy4  (reporting  a  population  of  3.9 million in 1790).

[28] *See* https://revolutionarywarjournal.com/gunpowder/ ("The supply of gunpowder haunted George Washington and the Continental Congress throughout the entire Revolutionary War.   The vast quantity of powder came from sources overseas, around 90% from French Colonies in the West Indies.  The other 10% was produced domestically.   With dwindling powder supplies and only three powder mills in operation in all of the colonies, Washington's army around Cambridge was i[n] [sic] serious danger at the start of the war.").

[29] During the Founding Era, civilians as well as domestic and foreign armies relied extensively, if not almost entirely, on commercial manufacturing and distribution of firearms, ammunition, and most other items.  Washington's forces certainly did not set about with each soldier making from scratch his own musket, any more than they

fact, the early battles of the Revolutionary War had been precipitated not by "taxation without representation," but without exception by the Crown's <u>efforts to control and restrict the colonists' access to arms</u>.[30]  In that sense, then, *perhaps there is* a historical tradition for ATF's actions here, but definitively ***not*** the sort of which our Founders would have approved.  Rather, should ATF have attempted to shut down famed colonial gunsmith William Henry for recordkeeping violations, it is likely that the colonists would have reacted quite differently.

### III.   Plaintiffs Will Suffer Irreparable Harm if the AAP Is Not Enjoined.

As stated throughout the Complaint, if enforcement and implementation of the AAP is not enjoined, Plaintiffs (including not only Kiloton and its customers but also the members of the FFL Coalition) will suffer irreparable harm in a variety of specified ways.  *See* Compl. ¶318 (unable to manufacture or sell firearms and forced to go out of business); ¶319 (FFL Coalition members will be driven out of business by "zero-tolerance" policy); ¶323 (customers will be forced to travel further to exercise Second Amendment rights when FFL licenses are revoked); ¶324 (as licenses of more gun stores are revoked, diminished number of firearms stores will lead to diminished supply of firearms); ¶34 (loss of employment, livelihoods lost,

---

made their own field artillery, tents, saddles, canteens, or battle flags.  *See* https://tinyurl.com/mryjswws.

[30] *See* Brief Amicus Curiae of Gun Owners of America, Inc., et al. in *District of Columbia v. Heller*, https://tinyurl.com/mvdwnpsz (at 22-27).

criminal liability).  Each of these is a serious and irreparable harm, involving not only unrecoverable[31] and permanent business, reputational, and monetary losses, but also the loss of constitutional rights.

This Circuit recognizes that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury...." *Royalty Network, Inc. v. Harris*, 756 F.3d 1351, 1357 (11th Cir. 2014) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  And because Kiloton's customers have a constitutional right to purchase and otherwise acquire firearms, and the FFL Coalition's members and their customers have a right to engage in constitutionally protected commerce, these parties' ability to engage in commerce in arms is infringed by the AAP.

The AAP callously turns unavoidable, non-willful, human error into revocation of the licenses to do business on which tens of millions of Americans rely – not only for a livelihood, but also for their exercise of the constitutional right to acquire protected "arms."  As Defendant Dettelbach stated on Morning Joe, the "vast majority of firearms dealers … are following the rules."  However, rather than

---

[31] As noted above, "money damages" are not available under the APA.  Likewise, Plaintiffs cannot obtain damages for their constitutional claims because Congress has not waived sovereign immunity for constitutional claims against the United States.  *See Caldwell v. Klinker*, 646 F. App'x 842, 847 (11th Cir. 2016).

educating the industry in order to help well-intentioned dealers like Kiloton achieve and maintain compliance, the AAP seeks to punish and destroy FFLs on the theory that every minor technical and recordkeeping violation is willful.

In a recent, similar case in the Eighth Circuit, Judge Magnuson found that an FFL "established that it will suffer irreparable harm without" an injunction because, among other things, if the FFL lost its license, it would be put out of business and "will cause its 40 employees to lose their jobs." *Streicher's, Inc. v. Hummel*, 2023 U.S. Dist. LEXIS 68898, at *15 (D. Minn. Apr. 20, 2023); *see also* Compl. Ex. 12 ¶40 (IOI Speranza stated his opinion that there was "no way Kiloton would not be shut down" after his inspection). *Cf.* Compl. Ex. 12, *with Streicher's*, 2023 U.S. Dist. LEXIS 68898, at *15 ("Harm to a company's good will, or the loss of customers and business, may, if corroborated, constitute irreparable harm sufficient to support the 'extraordinary remedy' of injunctive relief.").

## IV. The Balance of Equites and the Public Interest Factors Favor Plaintiffs.

The question here is whether the "balance of equities so heavily favors the movant that justice requires the court to intervene to preserve the status until the merits are determined." *Kelada v. Hillsborough County*, No. 94-1787-CIV-T-17C, 1995 U.S. Dist. LEXIS 19486, at *1 (M.D. Fla. Nov. 9, 1995). Moreover, "the public interest is served when administrative agencies comply with their obligations under the APA." *Northern Mariana Islands v. United States*, 686 F.Supp.2d 7, 21

(D.D.C. 2009).  Indeed, "[t]here is an overriding public interest … in the general importance of an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58-59 (D.C. Cir. 1997).  Finally, "[i]t is in the public interest for … an agency to implement properly the statute it administers." *Mylan Pharms., Inc. v. Shalala*, 81 F.Supp.2d 30, 45 (D.D.C. 2000).

As Judge Magnuson found in a similar case, "[t]he balance of harms clearly favors [Plaintiffs], as there is no harm to ATF in maintaining the status quo." *Streicher's*, 2023 U.S. Dist. LEXIS 68898, at *17.  Indeed, as noted above, none of the violations alleged against Kiloton involved transfer of a firearm to a prohibited person, none impeded ATF's ability to trace any firearm, nor does any otherwise cause any negative effect on public safety.  Rather, ATF's only interest here is *enforcing rules for the sake of rules*, a slender reed when balanced against the certainty of continued substantial irreparable harm to the firearms industry and Second Amendment community if the 2022 AAP is not enjoined.  Indeed, revocations of FFLs will result in less access to firearms for the customers of the FFL Coalition, who (even if at the margin) will find it more expensive and difficult to acquire firearms, thereby infringing the Second Amendment by limiting access to protected "arms."  For example, FFLs including Kiloton are under threat of being revoked and shut down for human errors and mistakes that did not, prior to the 2022 AAP, merit revocation, but rather merited either warning letters, warning

conferences, or no action at all.  ATF cannot seriously contend that these very same violations – which would have merited only a warning conference for Kiloton – suddenly are so severe that an injunction should not be issued to prevent ATF from revoking Kiloton's licenses and implementing the AAP.  Temporarily maintaining the status quo, and deferring the AAP's substantial and radical changes until the Court can properly consider the merits of Plaintiffs' claims, will cause no risk to the public (or to the agency).

## III.   Conclusion.

For the foregoing reasons, Plaintiffs respectfully request that this Court enjoin the current ATF Administrative Action Policy (versions 5370.1E and 5370.1F) and ATF's pending revocation of Kiloton's Federal Firearms License, until such time as a decision on the merits can be reached.

Respectfully submitted,

September 26th, 2023

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh (MS # 102784)
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
601-852-3440 (T)
stephen@sdslaw.us
*Admitted Pro Hac Vice*

John I. Harris III (TN # 12099)
Schulman, LeRoy & Bennett PC
3310 West End Avenue, Suite 460

Nashville, Tennessee 37203
(615) 244 6670 Ext. 111
Fax (615) 254-5407
jharris@slblawfirm.com
*Admitted Pro Hac Vice*

James D. Phillips (FL # 22846)
Katz & Phillips, P.A.
144 W. Crystal Lake Ave. Ste. 1000
Lake Mary, FL  32746
jphillips@thefirearmfirm.com

*Counsel for Plaintiffs*

## CERTIFICATE OF WORD LIMIT Rule 7.1(F)

I certify that this memorandum includes 9,000 words as calculated by Microsoft Word 365, and that counsel has previously moved for and was granted an increase of the word limit by 1,000 words (ECF 14).

## ATTORNEY CONFERENCE Rule 7.1(C)

I certify that counsel for Plaintiffs conferred with counsel for Defendants regarding the relief requested in this Motion.   Counsel for Defendants stated that they oppose the relief requested in this Motion.

## CERTIFICATE OF SERVICE

I, Stephen D. Stamboulieh, hereby certify that on the 26th of September 2023, I have caused the foregoing document or pleading to be mailed by United States Postal Service first-class mail, postage pre-paid, to the following non-ECF participants:

Department of Justice
Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530

US Attorneys' Office for the Northern District of Florida
CIVIL PROCESS CLERK
111 North Adams Street
4th Floor US Courthouse
Tallahassee, FL 32301

Aaron R. Gerber
400 North Tampa Street, Suite 2100
Tampa, FL 33602

ATF Director Dettelbach
Bureau of Alcohol, Tobacco, Firearms and Explosives
99 New York Avenue, NE
Washington, DC 20226

And by electronic mail to the following counsel who are believed to represent

the above-named Defendants in this action:

Michael Drezner
Taylor Pitz
Trial Attorney
Federal Programs Branch, Civil Division
U.S. Department of Justice
Work: 202.514.4505
Michael.L.Drezner@usdoj.gov
Taylor.n.pitz@usdoj.gov

*By: Stephen D. Stamboulieh*
Stephen D. Stamboulieh