**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA**

KILOTON TACTICAL, *et al.*,

      *Plaintiffs*,

   v.

BUREAU OF ALCOHOL,
TOBACCO, FIREARMS AND
EXPLOSIVES, *et al.*,

      *Defendants*.

No. 3:23-cv-23985-MCR-ZCB

## <u>DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 3

I.      Statutory and Regulatory Background ............................................................ 3

II.     Defendants' Enhanced Regulatory Enforcement Policy ................................ 5

III.    This Lawsuit .................................................................................................... 6

ARGUMENT .............................................................................................................. 9

I.      Plaintiffs Fail to Show Irreparable Harm ....................................................... 9

II.     Plaintiffs are Not Likely to Succeed on the Merits ...................................... 14

        A.      Plaintiffs Lack Standing ...................................................................... 14

        B.      Plaintiffs are Not Likely to Succeed on their APA Claims ................ 23

                1.      *Plaintiffs Cannot Prevail on Their Facial Challenge to the AAP* ............ 23

                2.      *Plaintiffs Cannot Assert an As-Applied Challenge to the AAP* .............. 32

        C.      Plaintiffs are Not Likely to Succeed on their Second Amendment
                Claims .................................................................................................. 35

                1.      *The AAP Does Not Violate Any Second Amendment Right of
                        Kiloton* ............................................................................................ 36

                2.      *ATF Policy Does Not Violate Individual Second Amendment
                        Rights* .............................................................................................. 39

                3.      *A Robust Historical Tradition Supports Regulation of Firearm
                        Dealers* ............................................................................................ 40

III.    The Balance of the Equities and Public Interest Favor Defendants ............. 43

CONCLUSION ......................................................................................................... 46

# TABLE OF AUTHORITIES

## CASES

*Alachua Cty. Educ. Ass'n v. Rubottom,*
  No. 1:23cv111-MW/HTC, 2023 WL 4188197 (N.D. Fla. June 26, 2023) ............... 14

*Am. Arms Int'l v. Herbert,*
  563 F.3d 78 (4th Cir. 2009) ................................................................................. 27, 45

*Anzio Ironworks, Corp. v. Gerber,*
  No. 8:20-cv-2132-KKM-AAS, 2022 WL 1500856 (M.D. Fla. May 12, 2022) .......... 29

*Arizona v. Biden,*
  40 F.4th 375 (6th Cir. 2022) ...................................................................................... 46

*Armalite, Inc. v. Lambert,*
  544 F.3d 644 (6th Cir. 2008) ...................................................................................... 30

*Arnold v. Commodity Futures Trading Comm'n,*
  987 F. Supp. 1463 (S.D. Fla. 1997) ............................................................................ 23

*Athens Pawn Shop Inc. v. Bennett,*
  364 F. App'x 58 (5th Cir. 2010) ................................................................................. 30

*Best Loan Co. v. Herbert,*
  601 F. Supp. 2d 749 (E.D. Va. 2009) ......................................................................... 28

*Blue-Grace Logistics LLC v. Fahey,*
  340 F.R.D. 460 (M.D. Fla. 2022) ............................................................................... 12

*Boardwalk Bros. Inc. v. Satz,*
  949 F. Supp. 2d 1221 (S.D. Fla. 2013) ....................................................................... 16

*Brakebill v. Jaeger,*
  905 F.3d 553 (8th Cir. 2018) ...................................................................................... 37

*Cargill v. ATF,*
  No. 1:22-CV-1063-DAE, 2023 WL 6141595 (W.D. Tex. Sept. 20, 2023) .......... 25, 32

*CEW Props., Inc. v. U.S. Dept. of Just.*,
   979 F.3d 1271 (10th Cir. 2020) ...................................................................... 28

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ............................................................................... 15, 22

*Conservancy of Sw. Fla. v. U.S. Fish & Wildlife Serv.*,
   677 F.3d 1073 (11th Cir. 2012) ...................................................................... 24

*Consol. Edison Co. of N.Y. v. United States*,
   221 F.3d 364 (2d Cir. 2000) .......................................................................... 29

*Creager v. ATF*,
   No. ELH-15-1518, 2016 WL 1077123 (D. Md. Mar. 18, 2016). ............................. 29

*Ctr. for Env't Sci., Accuracy & Reliability v. U.S. Dep't of Interior*,
   No. 17-2313 (JDB), 2019 WL 2870131 (D.D.C. July 3, 2019) ................................ 19

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ................................................................................... 38

*Doe v. Gwinnett Cty. Sch. Dist.*,
   No. 1:18-CV-05278-SCJ, 2020 WL 9809987 (N.D. Ga. Nov. 2, 2020) ..................... 10

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) ......................................................................... 37

*Fairmont Cash Mgmt., LLC v. James*,
   208 F. Supp. 3d 830 (S.D. Tex. 2016) .......................................................... 30, 31

*Fairmont Cash Mgmt., LLC v. James*,
   858 F.3d 356 (5th Cir. 2017) ......................................................................... 28

*Fraga v. UKG, Inc.*,
   No. 22-20105-CIV, 2022 WL 19486310 (S.D. Fla. May 10, 2022) ...................... 22, 25

*Ga. Republican Party v. Sec. & Exch. Comm'n*,
   888 F.3d 1198 (11th Cir. 2018) ................................................................. 20, 21

*Haitian Refugee Ctr., Inc. v. Baker*,
   953 F.2d 1498 (11th Cir. 1992) ...................................................................... 25

*Heckler v. Chaney,*
   470 U.S. 821 (1985) ................................................................................23, 24

*Huyer v. Van de Voorde,*
   847 F.3d 983 (8th Cir. 2017) ......................................................... 33

*In re Checking Acct. Overdraft Litig.,*
   780 F.3d 1031 (11th Cir. 2015) ..................................................... 16

*In re Gateway Radiology Consultants, P.A.,*
   983 F.3d 1239 (11th Cir. 2020) ..................................................... 26

*Jacobson v. Fla. Sec'y of State,*
   974 F.3d 1236 (11th Cir. 2020) ..................................................... 15

*Jarkesy v. SEC,*
   803 F.3d 9 (D.C. Cir. 2015) .......................................................... 33

*Johnson v. Bd. of Regents of the Univ. of Ga.,*
   263 F.3d 1234 (11th Cir.2001) ..................................................... 15

*Keener v. Convergys Corp.,*
   342 F.3d 1264 (11th Cir. 2003) ..................................................... 46

*Knight v. Alabama,*
   14 F.3d 1534 (11th Cir. 1994) ....................................................... 17

*Kole v. Village of Norridge,*
   No. 11 C 3871, 2017 WL 5128989 (N.D. Ill. Nov. 6, 2017) ......................................... 36

*Lynchburg Range & Training, LLC v. Northam,*
   105 Va. Cir. 159 (2020) ................................................................. 36

*MC3 Invs. LLC v. Loc. Brand, Inc.,*
   No. 5:22-CV-260-MJF, 2023 WL 2947437 (N.D. Fla. Mar. 13, 2023) ..................... 13

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) ...................................................................... 38

*McRorey v. Garland,*
   No. 7:23-cv-00047-O, 2023 WL 5200670 (N.D. Tex. Aug. 14, 2023)...................... 40

*Meester v. Bowers*,
No. 8:12cv86, 2013 WL 3872946 (D. Neb. July 25, 2014) ........................................ 29

*Morehouse Enters., LLC v. ATF*,
No. 3:22-cv-116, 2022 WL 3597299 (D.N.D. Aug. 23, 2022) ................................. 38

*Mountaineer Gun Sales, LLC v. ATF*,
No. 1:11CV200, 2012 WL 194079 (N.D. W. Va. Jan. 23, 2012 .......................... 34, 35

*Movimiento Democracia, Inc. v. Chertoff*,
417 F. Supp. 2d 1350 (S.D. Fla. 2006) ...................................................... 17

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022) ........................................................................ *passim*

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) ........................................................................ 37

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................................ 44

*Oconee Sporting Sales, Inc. v. Compton*,
No. CV 309-090, 2010 WL 11610613 (S.D. Ga. June 23, 2010) ................. 27, 28, 44

*Ortiz-Rivera v. Lingold*,
No. 3:22-CV-490-BJD-LLL, 2022 WL 1321148 (M.D. Fla. May 3, 2022) ............... 14

*Parker v. Haer*,
No. 1:21-CV-04808-LMM, 2022 WL 1694285 (N.D. Ga. Feb. 25, 2022) ............... 10

*Paylan v. Fla. Bd. of Med.*,
No. 8:15-cv-2817-T-33MAP, 2015 WL 8265595 (M.D. Fla. Dec. 9, 2015) ............. 44

*Precision Tactical Arms Co., LLC v. Gerber*,
No. 3:23cv7752-TKW-HTC, 2023 WL 4353165 (N.D. Fla. Apr. 7, 2023) ............. 44

*Religious Sisters of Mercy v. Becerra*,
55 F.4th 583 (8th Cir. 2022) .............................................................. 20

*RSM, Inc. v. Herbert*,
466 F.3d 316 (4th Cir. 2006) .............................................................. 45

*S. River Watershed All., Inc. v. Dekalb Cty.*,
   69 F.4th 809 (11th Cir. 2023) ...................................... 18

*Seafoodlicious, Inc. v. United States*,
   No. CV419-116, 2023 WL 5672193 (S.D. Ga. Sept. 1, 2023) .................................... 11

*Second Amend. Arms v. City of Chicago*,
   135 F. Supp. 3d 743 (N.D. Ill. 2015) ...................................... 39

*Shawano Gun & Loan, LLC v. Hughes*,
   No. 09-C-150, 2010 WL 3062847 (E.D. Wis. Aug. 2, 2010),
   *aff'd*, 650 F.3d 1070 (7th Cir. 2011) ...................................... 45

*Spencer v. Kemna*,
   523 U.S. 1 (1998) ...................................... 32

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
   600 U.S. 181 (2023) ...................................... 19

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ...................................... 20, 21

*Swain v. Junior*,
   961 F.3d 1276 (11th Cir. 2020) ...................................... 9

*Swisher Int'l, Inc. v. U.S. Food & Drug Admin.*,
   No. 21-13088, 2022 WL 320889 (11th Cir. Feb. 3, 2022) ...................................... 9

*Taylor v. Hughes*,
   No. 1:12-CV-138, 2012 WL 4327035 n.3 (M.D. Pa. Sept. 20, 2012) ...................................... 33

*Teixeira v. Cty. of Alameda*,
   873 F.3d 670 (9th Cir. 2017) ...................................... 36, 39, 41

*Townson v. Garland*,
   No. 1:22-00251-KD-N, 2022 WL 17587259 (S.D. Ala. Nov. 17, 2022),
   *adopting report & recommendation*, 2022 WL 17586288 (S.D. Ala. Dec. 12, 2022) ...................................... 33

*Trichell v. Midland Credit Mgmt. Inc.*,
   964 F.3d 990 (11th Cir. 2020) ...................................... 14

*U.S. Army Corp. of Eng'rs v. Hawkes Co.,*
  578 U.S. 590 (2016) ..........................................................................25, 34

*United Healthcare Ins. Co. v. AdvancePCS,*
  316 F.3d 737 (8th Cir. 2002) ................................................................ 10

*United States v. Bena,*
  664 F.3d 1180 (8th Cir. 2011) .............................................................. 37

*United States v. El Libertad,*
  --- F. Supp. 3d ---, 2023 WL 4378863 (S.D.N.Y. July 7, 2023) ................. 42

*United States v. Hicks,*
  649 F. Supp. 3d 357 (W.D. Tex. 2023) ................................................. 37

*United States v. Kazmende,*
  No. 1:22-CR-236-SDG-CCB, 2023 WL 3872209 (N.D. Ga. May 17, 2023),
  *report and recommendation adopted,*
  No. 1:22-CR-00236-SDG, 2023 WL 3867792 (N.D. Ga. June 7, 2023) ................. 36

*United States v. Texas,*
  599 U.S. 670 (2023) ........................................................................... 23

*Viasat, Inc. v. FCC,*
  47 F.4th 769 (D.C. Cir. 2022)................................................................ 20

*Willingham Sports, Inc. v. ATF,*
  415 F.3d 1274 (11th Cir. 2005) ............................................... 27, 28, 30, 45

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ...........................................................................9, 27

*Wreal, LLC v. Amazon.com, Inc.,*
  840 F.3d 1244 (11th Cir. 2016) ............................................................. 12

*Zen Grp., Inc. v. State of Fla. Agency for Health Care Admin.,*
  80 F. 4th 1319 (11th Cir. 2023)............................................................. 16

## STATUTES

5 U.S.C. § 701(a)(2) ..................................................................................... 23

5 U.S.C. § 702 ............................................................................................... 8

5 U.S.C. § 704 ............................................................................................... 33

5 U.S.C. § 706(2)(A) ..................................................................................... 26

18 U.S.C. § 921 ............................................................................................. 3

18 U.S.C. § 922(b)(2) .................................................................................... 7

18 U.S.C. § 922(m) ....................................................................................... 7

18 U.S.C. § 922(t)(1) ..................................................................................... 7

18 U.S.C. § 923(a) ......................................................................................... 3

18 U.S.C. § 923(d)(1)(C) ............................................................................... 5

18 U.S.C. § 923(e) ............................................................................ 4, 24, 26, 27

18 U.S.C. § 923(f) ...................................................................................... 5, 6

18 U.S.C. § 923(f)(2) ..................................................................................... 4

18 U.S.C. § 923(f)(3) .............................................................................. *passim*

18 U.S.C. § 92(g)(1)(B)(ii)(I) ........................................................................ 3

18 U.S.C. § 923(g)(3)(A) ............................................................................... 7

Act of May 22, 1794, 1 Stat. 369, ch. 33, § 1 ............................................. 41

## STATE STATUTES

Act of Feb. 13, 1879, Act No. 314, 1878–1879 Ala. Acts 434 ..................... 43

An Act for the Inspection of Gunpowder, 1776–1777 N.J. Laws 6 (1776) ............... 43

An Act to Amend the Criminal Laws of This State,
1855–1856 Tenn. Laws 92 (1856) .................................................................. 42

An Act to Establish Revenue Laws for the State of Alabama,
Act No. 1, 1874–1875 Ala. Acts 1 (1875) ...................................................... 43

An Act to Provide for the Revenue of the State, ch. 1, 1841 Miss. Laws 52 ............... 42

An Act to Suppress the Use of Bowie Knives,
Act No. 11, 1837 Ala. Acts Called Sess. 7 ..................................................... 42

An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks
in this State, 1837–1838 Tenn. Pub. Acts 200 ............................................. 42

Florida Statute § 790.0655 .................................................................................. 7

Ordinances of the City of Chicago, Ill. (1851) ................................................. 43

Ordinances of the City of St. Paul, Minn. (1863) ............................................ 43

## REGULATIONS

27 C.F.R. § 478.73(a) ......................................................................................... 4

27 C.F.R. § 478.73(b) ......................................................................................... 4

27 C.F.R. § 478.74 .............................................................................................. 4

27 C.F.R. § 478.76 .............................................................................................. 4

27 C.F.R. § 478.102(a) ....................................................................................... 7

27 C.F.R. § 478.102(c) ....................................................................................... 7

27 C.F.R. § 478.126a ........................................................................................... 7

27 C.F.R. § 478.128(c) ..................................................................................... 7, 8

28 C.F.R. § 0.130(a) ........................................................................................... 3

**OTHER AUTHORITIES**

2 General Laws of Massachusetts from the Adoption of the Constitution
   to February 1822 (1823) ..................................................................... 42

15 The Public Records of the Colony of Connecticut (1890) ...................... 43

ATF, *Enhanced Regulatory Enforcement Policy*,
   https://perma.cc/G48A-J6ER ....................................................... 15, 34

ATF, *Fact Sheet – Facts and Figures for Fiscal Year 2022*,
   https://perma.cc/MC5R-EEQY ................................................ 6, 12, 22

ATF, *Firearms Compliance Inspections*,
   https://perma.cc/PMC5-RUJG ............................................................. 3

ATF, *Revocation of Firearms Licenses*,
   https://perma.cc/9FTZ-JG48 .......................................................... 4, 34

Colonial Laws of Massachusetts Reprinted from the Edition of 1672 (1890) ............. 42

Department of Justice, *Justice Department: Violent Crime Reduction Efforts*,
   https://perma.cc/QVN5-JG8D ............................................................ 5

Google, https://perma.cc/UMN7-ERUR ....................................................... 19

Iraveteran8888, State of the 2A With Erich Pratt: "Weaponized FFL Revocations,
   We Are SUING The ATF!",
   https://perma.cc/649L-MYW4 (Aug. 24, 2023) .................................. 19, 20

Laws of the Commonwealth of Massachusetts from November 28, 1780
   to February 28, 1807 (1807) ............................................................. 42

Laws of the State of Maine (1830) ............................................................. 42

Laws of the State of New Hampshire; with the Constitutions of the United States and
   of the State Prefixed (1830) ............................................................. 43

White House, *Fact Sheet: Biden-Harris Administration Announces Comprehensive
   Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety*,
   https://perma.cc/ZFK7-8RRN ............................................................ 5

## INTRODUCTION

The Gun Control Act of 1968 ("GCA") imposes certain regulatory controls on federal firearms licensees ("FFLs"), a category that includes individuals and businesses licensed to sell and manufacture firearms.  Specifically, because of the dangers posed by the sale of weapons to criminals and other prohibited individuals, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") is obligated by law to periodically inspect the premises and records of FFLs.  If ATF finds that an FFL willfully violated federal laws and regulations, such as by failing to run a background check or by falsifying records, then the agency may notify the FFL of the agency's intent to revoke the license at issue, or to deny an application for renewal.  Following such a notice, the FFL may request an administrative hearing before an ATF official and may present any evidence or testimony they believe is relevant.  After such a hearing, ATF may issue a final determination to revoke a license or deny its renewal only if the hearing official finds both that the violations alleged took place and that the violations were willful.

Only around ten percent of FFLs are subject to inspection each year, and ATF revokes the licenses of only a small fraction of those FFLs upon a finding of significant, willful violations.  Put more concretely, in 2022 ATF recorded a total of 71,969 manufacturer and dealer FFLs in in the United States; the agency conducted 6,979 inspections that year, and only 90 of those inspections eventually resulted in license revocation.  The agency's inspection and enforcement process serves a vital role in

preventing gun violence by revoking the licenses of the worst-offending FFLs and deterring violations of the laws and regulations governing the sale of firearms.

Plaintiffs here seek to undermine ATF's established inspection and enforcement processes in two ways. First, Plaintiffs seek to preliminarily enjoin the potential license revocation/non-renewal of Plaintiff Kiloton Tactical, LLC ("Kiloton"). But the proper way to challenge a threatened license revocation is through established administrative procedures and subsequent judicial review. Here ATF determined *not* to issue a Final Notice of Denial as to Kiloton. In other words, Kiloton's license was renewed for a standard three-year period. There is accordingly no license revocation to enjoin, nor any other imminent, irreparable harm to Kiloton that could justify a preliminary injunction.

Second, Plaintiffs ask the Court to broadly enjoin ATF's operative guidance governing FFL inspection and enforcement. But Plaintiffs fail to show that they, or their members, will likely be harmed by this guidance in any way. Plaintiffs accordingly lack standing to sue, and similarly cannot show that they will imminently suffer irreparable harm from the guidance. Their claims are non-justiciable for similar reasons. Moreover, Plaintiffs are unlikely to succeed on the merits of their claims, since the challenged ATF guidance reasonably implements relevant statutory directives and does not run afoul of the Second Amendment.

The Court should therefore deny Plaintiffs' Motion for a Preliminary Injunction.[1]

## BACKGROUND

### I.    Statutory and Regulatory Background

The GCA, codified at 18 U.S.C. §§ 921 *et seq.*, gives the Attorney General the authority to approve, renew or deny the renewal of, and revoke federal firearm licenses and provides that "[n]o person shall engage in the business of importing, manufacturing, or dealing in firearms . . . until he has filed an application with and received a license to do so from the Attorney General." 18 U.S.C. § 923(a). The Attorney General has delegated authority to enforce the GCA to ATF. *See* 28 C.F.R. § 0.130(a).

Pursuant to that authority, ATF periodically inspects FFLs for compliance with the GCA's requirements. 18 U.S.C. § 923(g)(1)(B)(ii)(I). "ATF's industry operations investigators ("IOIs") conduct inspections of FFLs to ensure compliance with applicable federal, state and local laws and regulations," and to "educate licensees on the specific requirements of those laws and regulations." ATF, *Firearms Compliance Inspections*, https://perma.cc/PMC5-RUJG. Typically, an inspecting IOI will arrive at an FFL's premises during business hours and will review operations, evaluate internal controls, verify the FFL's compliance with state and local laws, review the FFL's

---

[1] Defendants inadvertently did not have the instant brief finalized by the Court's 12pm filing deadline. Defendants apologize for the delay, and respectfully request that this brief be considered filed *nunc pro tunc*.

records, and inventory the firearms, among other things.  *Id.*  If the IOI detects violations, they will create a final report of violations and discuss that report with the FFL.

As relevant here, under the GCA, ATF "may, after notice and opportunity for hearing, revoke any license . . . if the holder of such license has willfully violated any provision of this chapter or any rule or regulation prescribed by the Attorney General." 18 U.S.C. § 923(e).  Therefore, following an inspection, "[w]henever the Director has reason to believe that a licensee has willfully violated any provision of the Act . . . a notice of revocation of the license, ATF Form 4500, may be issued."  27 C.F.R. § 478.73(a).  This is the first step of the revocation process, and ATF "shall afford the licensee 15 days from the date of receipt of the notice in which to request a hearing prior to suspension or revocation of the license" with the Director of Industry Operations ("DIO") in their ATF field division.  *Id.* § 478.73(b); *see also* 18 U.S.C. § 923(f)(2).

"During the hearing the licensee will have the opportunity to submit facts and arguments for review and consideration."  27 C.F.R. § 478.74; *see also* ATF, *Revocation of Firearms Licenses*, https://perma.cc/9FTZ-JG48 ("At the hearing, the licensee can be represented by an attorney and may bring employees and documentation to address the violations cited in the notice."); 27 C.F.R. § 478.76.  "If the DIO decides that the violations were willful and revocation is justified, . . . ATF sends a final notice of revocation (ATF Form 5300.13) to the licensee with a summary of the findings and

legal conclusions that warrant revocation." ATF, *Revocation of Firearms Licenses*, https://perma.cc/9FTZ-JG48; 27 C.F.R. § 478.74; 18 U.S.C. § 923(f)(3).

If ATF sends a final notice of revocation, the license holder may "file a petition with the United States district court for the district in which he resides or has his principal place of business for a de novo judicial review of such . . . revocation." 18 U.S.C. § 923(f)(3). "If the court decides that [ATF] was not authorized to . . . revoke the license, the court shall order [ATF] to take such action as may be necessary to comply with the judgment of the court." *Id.*[2]

## II.   Defendants' Enhanced Regulatory Enforcement Policy

In summer 2021, President Biden and the Department of Justice announced a new policy which would establish "zero tolerance for rogue gun dealers that willfully violate the law." White House, *Fact Sheet: Biden-Harris Administration Announces Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety*, at 2, https://perma.cc/ZFK7-8RRN ("Fact Sheet"); *see also* Department of Justice, *Justice Department: Violent Crime Reduction Efforts*, https://perma.cc/QVN5-JG8D. Pursuant to the policy, "[a]bsent extraordinary circumstances," ATF will seek

> to revoke the licenses of dealers the first time that they violate federal law by willfully 1) transferring a firearm to a prohibited person, 2) failing to run a required background check, 3) falsifying records, such as a firearms

---

[2] ATF may deny an application for a license, whether an initial application or renewal application, if the applicant "willfully violated any of the provisions of this chapter or regulations issued thereunder[.]" *See* 18 U.S.C. § 923(d)(1)(C). The process following an initial Notice of Denial is the same as that following an initial Notice of Revocation: a hearing if requested, a final determination, and if applicable the opportunity for de novo judicial review. *See* 18 U.S.C. § 923(f).

transaction form, 4) failing to respond to an ATF tracing request, or 5) refusing to permit ATF to conduct an inspection in violation of the law.

Fact Sheet.  Thus, ATF will seek revocation of the federal firearms license of any FFL who willfully commits any of these five serious violations of the GCA.  ATF employs an internal guidance document to assist ATF personnel as they conduct compliance inspections and take appropriate administrative actions.  (For consistency with Plaintiffs' briefing, Defendants will refer to this document as ATF's Administrative Action Policy or "AAP.")  ATF amended the AAP first in 2022 and again in 2023 to reflect the agency's implementation of the Enhanced Regulatory Enforcement policy. The currently operative guidance, ATF-O-5370.1F, is attached as Exhibit A.[3]

Plaintiffs note in their Motion that in 2020, there were "66,853 dealer and manufacturer FFLS," Pls.' Mem. ISO Mot. for Prelim. Inj. at 29, ECF No. 15-1 ("Mot."), and according to ATF's most recent figures, as of 2022 there were 136,563 total active federal firearms licensees, with 71,969 dealer and manufacturer licensees. ATF, *Fact Sheet – Facts and Figures for Fiscal Year 2022*, https://perma.cc/MC5R-EEQY. In 2022, ATF conducted 6,979 firearm compliance inspections, 90 of which resulted in revocation.  *Id.*

## III.   This Lawsuit

Plaintiffs are Kiloton, a Florida limited liability company that holds an active

---

[3] Portions of the AAP are redacted because those portions are protected by the law enforcement privilege and/or are law enforcement sensitive.  *See also* Declaration of Curtis Gilbert ("ATF Decl.") ¶ 4, attached as Exhibit C.

Type 07 Manufacturer FFL issued in 2016, Compl. ¶ 4, and Firearms for Liberty Coalition ("FFL Coalition"), claiming to be an association that represents gun dealers, *id.* ¶ 9, and Eric Hanley, an alleged customer of Kiloton, *id.* ¶ 13. Defendants are the U.S. Department of Justice; ATF; Steven M. Dettelbach, the Director of ATF; and Aaron R. Gerber, the DIO for the Tampa Field Division of the ATF. *Id.* ¶¶ 17–20.

In May and June 2022, ATF conducted a compliance inspection at Kiloton. *See* Compl. Ex. 1, ECF No. 1-1. That inspection revealed evidence of twenty-four willful violations of Federal statutes and regulations in 2021 and 2022:

(1) On five occasions, Kiloton failed to conduct proper background checks in violation of 18 U.S.C. § 922(t)(1) and 27 C.F.R. §§ 478.102(a) and 478.102(c).

(2) On five occasions, Kiloton failed to report sales of multiple handguns to ATF in violation of 18 U.S.C. § 923(g)(3)(A) and 27 C.F.R. § 478.126a.

(3) On thirteen occasions, Kiloton sold handguns without abiding by Florida's three-day waiting period, in violation of Florida Statute § 790.0655 and 18 U.S.C. § 922(b)(2).

(4) On one occasion, Kiloton recorded the same Florida Department of Law Enforcement background check approval number on two separate ATF Forms 4473 related to handgun sales to two different individuals, and was "unable to reconcile" which sale the background check had applied to, in violation of 18 U.S.C. § 922(m) and 27 C.F.R. § 478.128(c).

*Id.*

After that inspection, in April 2023, Kiloton filed an application to renew its license. *See* Compl. Ex. 2, ECF No. 1-2. In July 2023, ATF provided notice to Kiloton that it was "contemplating denying [its] renewal application" in light of the violations noted during the 2022 inspection, and had "decided to initiate the denial/revocation

7

process." *Id.*  ATF informed Kiloton that it could request a hearing to "contest" the decision, which would be scheduled at a "mutually convenient" time.  *Id.*  ATF explained that Kiloton would be able to present its "explanation/argument in response to the proposed licensing action[,]" present its own evidence and witness testimony, and "question any ATF witnesses about their findings." *Id.*  ATF stated that, "[i]f after review of the entire record, the DIO concludes that [Kiloton] committed one or more willful violations, the DIO *may* issue a Final Notice of Denial of Renewal Application" for Kiloton's FFL, and informed Kiloton that it could appeal that potential decision to a federal district court.  *Id.* (emphasis added).

On November 8, 2023, ATF conducted an administrative hearing and the DIO for ATF's Tampa Field Division reviewed evidence concerning the potential non-renewal of Kiloton's license.  On November 28, 2023, the DIO determined "not to issue a Final Notice of Denial" as to Kiloton's license renewal.  *See* Notice of Administrative Decision at 1, ECF No. 28; *see also* ATF Letter to Kiloton, attached as Exhibit B.  Kiloton's license was accordingly renewed until July 2026.

Before the hearing occurred, Plaintiffs filed the present action on August 29, 2023.  *See* Compl.  The Complaint brings two purported claims.  The first claim alleges that the AAP is an arbitrary and capricious action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, and that ATF's actions against Kiloton are otherwise arbitrary and capricious.  *Id.* ¶¶ 337–54.  The second claim rests on the Second Amendment.  *Id.* ¶¶ 355–82.  Plaintiffs filed the instant Motion for Preliminary

Injunction on September 26, 2023.  ECF No. 15.  Plaintiffs request that the Court enjoin enforcement of the AAP and enjoin "ATF's pending revocation of Kiloton's [FFL]."  Mot. at 35.

## ARGUMENT

## I.    Plaintiffs Fail to Show Irreparable Harm

The Court should deny Plaintiffs' Motion for myriad reasons; perhaps the most glaring failure is that Plaintiffs fail to demonstrate irreparable harm.  A party seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  The Eleventh Circuit has "emphasized on many occasions [that] the asserted irreparable injury must be neither remote nor speculative, but actual and imminent."  *Swain v. Junior*, 961 F.3d 1276, 1292 (11th Cir. 2020) (citation omitted).  Thus, "'[a] possibility of irreparable harm' is not enough."  *Swisher Int'l, Inc. v. U.S. Food & Drug Admin.*, No. 21-13088, 2022 WL 320889, at *4 (11th Cir. Feb. 3, 2022) (citation omitted).

Here, Plaintiffs fail to demonstrate that irreparable harm is likely to result if the AAP is not enjoined.  Plaintiffs vaguely allege a "variety" of harms, Mot. at 31, but fail to point to a single specific injury that will imminently occur absent preliminary relief.  Each of their "variety" of purported injuries fails to pass muster to demonstrate irreparable harm.

*The potential denial/revocation of Kiloton's Federal Firearms License.*  Plaintiffs first aver that "[i]f . . . Kiloton's license is revoked" then Kiloton "will be forced to go out of

9

business." Compl. ¶ 318. However, following an administrative hearing on November 8, 2023, ATF issued a final decision not to deny the renewal of Kiloton's license. There is accordingly no imminent agency action to enjoin, much less any that will cause Kiloton irreparable harm. *See, e.g., Doe v. Gwinnett Cty. Sch. Dist.*, No. 1:18-CV-05278-SCJ, 2020 WL 9809987, at *5 n. 14 (N.D. Ga. Nov. 2, 2020) ("A court should not sustain the extraordinary remedy of an injunction when the party's prospective claim relates to past harm."); *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) ("[T]he irreparable injury inquiry must concentrate on current threats, not past ones.").

  *Other hypothetical revocations.* Plaintiffs also appear to argue that ATF's enforcement policy will cause the revocation of licenses held by other businesses, and thereby result in the closure of other gun stores. *See* Mot. at 31 (citing Compl. ¶¶ 319, 324, 34). Yet, even though they purport to challenge a policy that has been in place for more than two years, Plaintiffs fail to identify a single gun store that will imminently lose its licenses. *See* Compl. ¶ 319 (asserting only that "many" FFLs "across the country . . . have experienced, are experiencing, and will experience . . . revocation"). Speculation that unnamed businesses could have their licenses revoked at some unknown time in the future is not likely irreparable injury.[4] *Accord Parker v. Haer*, No. 1:21-CV-04808-LMM, 2022 WL 1694285, at *2 (N.D. Ga. Feb. 25, 2022) ("In other

---

[4] The same speculation dooms plaintiffs' allegation that unnamed "members and their customers" are harmed by an "infringe[ment]" on their "ability to engage in commerce in arms[.]" Mot. at 32.

words, Plaintiffs' argument on this point is entirely speculative, and speculative allegations regarding future harm are insufficient for demonstrating irreparable harm.").

     *Hypothetical harms to would-be firearms purchasers.*  Plaintiffs' allegations as to potential injury to firearm purchasers are similarly unsupported.   Specifically, Plaintiffs hypothesize that more gun stores will be forced to close, and when that happens, "customers will be forced to travel further" to purchase firearms, and a "diminished number of firearms stores will lead to [a] diminished supply of firearms."  Mot. at 31. To the extent this argument pertains to the potential closure of Kiloton, ATF's recent administrative decision to renew Kiloton's license refutes any allegation that Kiloton's customers will be imminently harmed, *see* Compl. Ex. 2, ECF No. 1-2.

     Plaintiffs again decline to specify any other gun store that is at risk of revocation, and whose closure could cause any customers to travel farther to purchase firearms.[5] Nor do Plaintiffs provide any support for the bare assertion that, after more than two years of the policy being in place, gun stores are being forced to close in such numbers that the overall supply of firearms is being diminished, and to such an extent that the diminution harms a specific Plaintiff here.  *See Seafoodlicious, Inc. v. United States*, No. CV419-116, 2023 WL 5672193, at *4 (S.D. Ga. Sept. 1, 2023) ("[C]onclusory, speculative claims of business loss without support in the record are insufficient to

---

[5] Plaintiffs reference, in a footnote, the declaration of Justin Pendergrass.  *See* Mot. at 25 n.22.  But neither Mr. Pendergrass nor his former business is a Plaintiff or a purported member of Plaintiff organizations.   Accordingly, any statements concerning Mr. Pendergrass and his alleged license revocation have no bearing on Plaintiffs' claims.

establish irreparable harm."). And ATF's own publicly available data undermines this bare assertion. *See* ATF, *Fact Sheet – Facts and Figures for Fiscal Year 2022*, https://perma.cc/MC5R-EEQY (noting that 90 FFLs were revoked in 2022, out of over 130,000 FFLs).

If more were needed, Plaintiffs' delay in seeking preliminary relief further compounds their failure to show irreparable injury. Indeed because "[a] preliminary injunction requires showing 'imminent' irreparable harm," a delay "of even only a few months . . . militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (five-month delay "fatally undermined any showing of irreparable injury"). Plaintiffs' Motion seeks two different forms of preliminary relief: (1) an injunction of "ATF's pending revocation of Kiloton's Federal Firearms License," and (2) an injunction of the AAP. Mot. at 35.

Plaintiffs' challenge to the potential denial/revocation of Kiloton's license, however, was significantly delayed. ATF issued an initial notice of denial of renewal application on July 10, 2023, Compl. ¶ 169, but Plaintiffs waited over two months, until September 26, 2023, to seek any preliminary relief. Plaintiffs thus failed to act diligently, and in a manner that would suggest imminent, irreparable injury. *See Wreal, LLC*, 840 F.3d at 1248 ("[F]ailure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm."); *Blue-Grace Logistics LLC v. Fahey*, 340 F.R.D. 460, 467 (M.D. Fla. 2022) ("[M]any courts 'typically decline

to grant preliminary injunctions in the face of unexplained delays of more than two months.'" (citation omitted)).

Plaintiffs' delay in challenging ATF's purported enforcement policy is even lengthier. In Plaintiffs' own words, they "ask this Court to enjoin . . . [a] policy that was first promulgated in 2021[.]" Mot. at 2. In support of their request, Plaintiffs cite a public "announce[ment]" from the White House from June 23, 2021, outlining certain violations which, when committed willfully, would result in the pursuit of license revocation by ATF. *Id.* at 2–3.

Yet Plaintiffs waited well over two years to challenge this 2021 "zero tolerance" policy, which purportedly caused harm to "many" FFLs purportedly represented by Plaintiffs. Compl. ¶ 319.[6] Aside from Plaintiffs' failure to substantiate any evidence of dramatic shifts in the gun store market in the two years since the "zero tolerance policy" was announced, Plaintiffs provide no justification for such a lengthy delay in challenging it.[7] At bottom, the over two-year time lag between the policy's announcement and Plaintiffs' instant challenge "refute[s] their allegations of irreparable harm." *See MC3*

---

[6] Even if Plaintiffs' challenge is directed solely at the AAP cited in the Complaint, that document was first amended to incorporate guidance regarding the Enhanced Regulatory Enforcement Policy on January 28, 2022, over eighteen months ago. Compl. ¶ 50. And even the most recently amended version of that document was issued on January 13, 2023, six months before Plaintiffs filed their Complaint. *See* AAP at 1, Ex. A.

[7] Plaintiffs may contend that they could only file suit once Kiloton received a notice of denial. But this argument is in tension with Plaintiffs' allegation that multiple FFLs, represented by FFL Coalition, already "have experienced" revocation pursuant to the AAP. Compl. ¶ 319. Thus, Plaintiffs either have suffered prior injury and inexplicably delayed in filing suit, or such claimed past harm is illusory.

*Invs. LLC v. Loc. Brand, Inc.*, No. 5:22-CV-260-MJF, 2023 WL 2947437, at *11 (N.D. Fla. Mar. 13, 2023) (holding that delay of three months weighed against preliminary injunction since "a belated motion for a preliminary injunction 'militates against a finding of irreparable harm'" (citation omitted)).

For these myriad reasons, Plaintiffs have failed to identify any certain and imminent irreparable injury that would justify the extraordinary remedy of a preliminary injunction. The Court can and should deny Plaintiffs' Motion for this reason alone, and need go no further. *See Ortiz-Rivera v. Lingold*, No. 3:22-CV-490-BJD-LLL, 2022 WL 1321148, at *1 (M.D. Fla. May 3, 2022) ("[W]ithout a showing of irreparable harm, a request for injunctive relief fails.").

## II.    Plaintiffs are Not Likely to Succeed on the Merits

### A. Plaintiffs Lack Standing

Were the Court to look beyond the lack of irreparable harm, Plaintiffs' demand for an injunction would fail for multiple reasons. First, and fundamentally, Plaintiffs lack standing to bring suit. *See Alachua Cty. Educ. Ass'n v. Rubottom*, No. 1:23cv111-MW/HTC, 2023 WL 4188197, at *1 (N.D. Fla. June 26, 2023) (explaining that likelihood of success "depends on a likelihood that a plaintiff has standing" (quotations omitted)).

The "irreducible constitutional minimum of standing," requires that Plaintiffs show an injury in fact, which is traceable to Defendants, and likely to be redressed by the relief requested. *See Trichell v. Midland Credit Mgmt. Inc.*, 964 F.3d 990, 996 (11th Cir.

2020) (citation omitted).  Where, as here, "plaintiffs seek prospective relief to prevent future injuries, they must prove that their threatened injuries are 'certainly impending.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)).  Plaintiffs fail to demonstrate any certainly impending injury, and thereby fail to demonstrate standing to bring suit.

 *Standing of Kiloton.*  Plaintiffs' allegations on standing appear to overlap entirely with their claims of irreparable harm, and accordingly fail for similar reasons.  *See* Compl. ¶¶ 318–36 (alleging only "[a]llegations [p]ertaining to [i]rreparable [h]arm").  Kiloton, for instance, fails to point to a certainly impending injury that would give it standing.  While the Complaint claims that revocation of Kiloton's license is "inevitable," Compl. ¶ 265, that assertion has now been refuted by ATF's administrative decision to *renew* Kiloton's license for a three-year period.

 Nor was revocation likely at the time the Complaint was filed.  *Accord Johnson v. Bd. of Regents of the Univ. of Ga.*, 263 F.3d 1234, 1267 (11th Cir.2001) ("[A] party's standing to sue is generally measured at the time of the complaint[.]").  With regard to the five serious violations specified under the AAP, publicly available data shows that since 2021, ATF has revoked licenses 98 times, but in 58 of those instances no hearing was timely requested.  *See* ATF, *Enhanced Regulatory Enforcement Policy*, https://perma.cc/G48A-J6ER (whether a hearing was requested can be determined by examining each final notice of revocation).  Put another way, where ATF had issued an initial notice of revocation based on one of the specified violations, ATF decided not

to revoke FFLs in 84 out of the 124 administrative hearings held since 2021, or about 68% of the time. *Id.* Plaintiffs thus cannot show that the loss of Kiloton's license was certainly impending at the time the Complaint was filed. *See also Zen Grp., Inc. v. State of Fla. Agency for Health Care Admin.*, 80 F. 4th 1319, 1334 (11th Cir. 2023) (no standing to seek injunctive relief where allegations showed only "a speculative risk of future injury").

To the extent Kiloton separately attempts to claim standing on behalf of its customers, it falls short. Plaintiffs do not satisfy the prudential requirements to assert third-party standing: (1) an injury to the plaintiff; (2) a "close relationship" between the plaintiff and the third party; and (3) the third party is "hindered in his ability to protect his own interests[.]" *In re Checking Acct. Overdraft Litig.*, 780 F.3d 1031, 1038 (11th Cir. 2015). As explained above, Kiloton has not shown an imminent injury, and in addition, Plaintiffs make no allegations that Kiloton has a "close relationship" with its customers that is sufficient to represent them in federal court. Finally, Plaintiffs do not contend that Kiloton customers are hindered in some way from bringing their own claims, dooming any allegation of third-party standing by Kiloton. *See Boardwalk Bros. Inc. v. Satz*, 949 F. Supp. 2d 1221, 1229 n. 6 (S.D. Fla. 2013) (noting no third-party standing in part because "[t]here is no evidence before the Court that Plaintiffs' senior citizen customers are unable to bring suit on their own behalf, if they so desire").

Indeed, Kiloton customers are not hindered from bringing their own claims— they are participating in this very case. One purported customer is a named Plaintiff

and others are allegedly represented through organizational Plaintiff FFL Coalition.  *See* Mot. at 24 (asserting that "Plaintiff Eric Hanley" is a customer of Kiloton, and "members of the FFL Coalition . . . include customers of . . . Kiloton").  The Eleventh Circuit has held that there are "no obstacles [facing third parties] asserting their rights for themselves" when "they [are] already doing so."  *Knight v. Alabama*, 14 F.3d 1534, 1554 (11th Cir. 1994); *see also Movimiento Democracia, Inc. v. Chertoff*, 417 F. Supp. 2d 1350, 1354 (S.D. Fla. 2006) ("In this case, the relatives cannot sue on behalf of the repatriated Cubans because the repatriated Cubans are already included in the suit.").  Plaintiff Hanley's participation in the case thus demonstrates that there is no obstacle to Kiloton customers asserting claims on their own behalf.  And because the interests of Kiloton's customers are further represented by Plaintiff FFL Coalition, Kiloton cannot effectively claim duplicative standing to bring the same customers' legal claims again.

*Standing of Eric Hanley*.  Mr. Hanley also fails to show an imminent injury supporting his standing.  He avers that "if" ATF issues a final decision to revoke Kiloton's license, and causes Kiloton to go "out of business," then he would have to expend "more time, more money, and travel greater distances" to obtain certain firearm "products and services."  Declaration of Eric Hanley ¶¶ 14, 18, ECF No. 1-13 ("Hanley Decl.").  But because ATF decided to renew Kiloton's license, and because any future revocation was speculative at the time the Complaint was filed, Mr. Hanley cannot show that Kiloton's closure and its possible follow-on effects are likely, let alone "certainly impending."

*Standing of FFL Coalition.* Finally, organizational Plaintiff FFL Coalition similarly lacks standing. FFL Coalition does not allege harm to itself as an organization, and instead claims standing solely on behalf of its purported members. Compl. ¶ 319. To demonstrate such "associational standing," an organizational plaintiff must show that "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *S. River Watershed All., Inc. v. Dekalb Cty.*, 69 F.4th 809, 819 (11th Cir. 2023) (quotations omitted). FFL Coalition fails this basic test.

As a threshold matter, Plaintiffs do not squarely allege that FFL Coalition is a membership organization at all. *See* Compl. ¶ 9 (alleging only that the group is a "nationwide association of federal firearm licensees across the country"). While Plaintiffs vaguely reference "members and supporters" of FFL Coalition, Plaintiffs fail to explain whether FFL Coalition is an incorporated organization of any kind, how "members" or "supporters" are defined, how purported members join, and their role in the organization, if any. *Cf.* Declaration of Eric Blandford ¶ 7, ECF No. 1-16 ("Blandford Decl.") ("FFL Coalition is capable of fully and faithfully representing the interests of its members and supporters without participation by each of these individuals and entities.").

Where an organizational plaintiff does not point to formal members, it may assert associational standing only if it possesses the "indicia" of a traditional membership

organization, namely where constituents elect and serve in group leadership, and finance its activities.[8]  *See, e.g., Ctr. for Env't Sci., Accuracy & Reliability v. U.S. Dep't of Interior*, No. 17-2313 (JDB), 2019 WL 2870131, at *3 (D.D.C. July 3, 2019) (holding that plaintiff group "failed to establish that its 'informal members' . . . are true members at all" pursuant to "indicia" test).

Plaintiffs fail to provide any substantive allegations as to the role of "members" in FFL Coalition and this deficiency is unsurprising.  The group maintains no webpage, and internet searches for the group return only a handful of results about the instant litigation.[9]  The only other apparent public mention of the group indicates that it was created less than a week before this litigation commenced.  Specifically, Mr. Eric Blandford, the cited "founding member" of the group, posted a YouTube video on August 24, 2023.  In that video, Mr. Blandford stated that he "ha[d] an antidote for [ATF's] arrogance," specifically that "we are gonna sue them too, I have an FFL coalition that I'm putting together."  *See* Iraveteran8888, State of the 2A With Erich Pratt: "Weaponized FFL Revocations, We Are SUING The ATF!" at 7:20,

---

[8] The Supreme Court recently explained that the "indicia" of membership test is inapplicable to organizations that have "identified members and represent[] them in good faith," particularly where the group is "indisputably a voluntary membership organization with identifiable members[.]"  *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023).  The plaintiff group in that case was a "validly incorporated 501(c)(3) nonprofit with forty-seven members who joined voluntarily to support its mission," and in other litigation the group represented "four members in particular" who filed declarations explaining their relationship with the group.  *Id.* at 201.  That is not the case here, where Plaintiffs provide no information about whether FFL Coalition has formal, identifiable "members" at all, let alone the basis for such identification.

[9] *See* Google, https://perma.cc/UMN7-ERUR (showing results of a web-search for "firearms for liberty coalition," only three hits that link to this Court's docket).

https://perma.cc/649L-MYW4 (Aug. 24, 2023) ("State of the 2A").  He further declared that any licensee that "want[ed] to sign on to our coalition, all you have to do is contact me and we will add you to the lawsuit." *Id.* at 8:15.  Six days after the video was posted, Plaintiffs filed the instant lawsuit.  The public statements of Mr. Blandford refute any argument that FFL Coalition is a traditional, voluntary membership organization, as opposed to an ad hoc collection of would-be plaintiffs.  *See also Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022) ("[I]t is not enough for putative members simply to read a group's publications, subscribe to its e-mail list, or follow its Facebook page.").

Even if FFL Coalition qualifies as a membership organization, it nonetheless lacks standing because it fails to identify a member with standing to sue in his or her own right.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009) ("[P]laintiffs claiming an organizational standing [must] identify members who have suffered the requisite harm."); *Ga. Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1204 (11th Cir. 2018) (explaining that to show standing, "an organization [must] *name at least one member* who can establish an actual or imminent injury." (emphasis added)).

While Plaintiffs allege that Plaintiff Kiloton is an FFL Coalition member, this does not provide FFL Coalition with standing to represent unnamed members not independently participating in the litigation.  The Eighth Circuit, for instance, recently held that where an organizational plaintiff fails to identify members with standing, "[o]ther than the [ ] named plaintiffs," the group "lacks associational standing to sue on

20

behalf of unnamed members." *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 602 (8th Cir. 2022). This is especially so here, where there is no information as to what even constitutes a "member" in the FFL Coalition group.

Mr. Blandford is the only other identified member of FFL Coalition. Blandford Decl. ¶ 4 (describing himself as "a founding member" of the group). Yet Mr. Blandford does not claim that he is specifically injured by the AAP at all, and thus fails to establish standing to sue in his own right.

To be sure, Mr. Blandford claims that "some" unnamed members of the FFL Coalition "have had ATF's zero tolerance policy applied against them," or are "currently undergoing the revocation process." *Id.* ¶ 13. But the unspecified "application" of ATF policy and "undergoing" the revocation process, without any explanation, cannot amount to a concrete and particularized injury-in-fact. Further, Plaintiffs' vague mention of "some" unspecified affected members plainly fails to identify an actual individual with standing to sue.[10]

Mr. Blandford finally avers that every one of the group's members "risks having their business shut down by ATF" pursuant to the AAP. *Id.* ¶ 11; *see also id.* ¶ 14

---

[10] Nor can Plaintiffs show associational standing by alleging that an unknown number of unidentified FFL Coalition members may be injured in the future. *Compare* Compl. ¶ 319 (alleging that "many" FFLs "represented by the FFL Coalition, have experienced, are experiencing, and will experience . . . revocation"), *with Summers*, 555 U.S. at 497 (rejecting argument that standing may be demonstrated through "a statistical probability that some of those members are threatened with concrete injury"); *see also Ga. Republican Party*, 888 F.3d at 1204 (noting that in *Summers* the Supreme Court "rejected probabilistic analysis as a basis for conferring standing").

(claiming that "all" group members face a "real and credible threat of . . . revo[cation]"). Even assuming Mr. Blandford intends to include himself in this category (despite not alleging that he has a business at risk of closure due to the AAP), the speculative chance that ATF will revoke a given FFL, much less due to the AAP, comes nowhere near a certainly impending injury.

As noted above, in 2022 ATF recorded 71,969 active dealer and manufacturer FFLs and conducted 6,979 firearm compliance inspections.  ATF, *Fact Sheet – Facts and Figures for Fiscal Year 2022*, https://perma.cc/MC5R-EEQY.  Thus, a given dealer and manufacturer FFL has at most a ten percent chance of being inspected per year.  Of the 6,979 inspections, only approximately 45% uncovered any violations at all, and even those predominantly resulted in warning letters and warning conferences, and other dispositions short of revocation.  *See id.* (noting that 3,806 inspections found no violations and listing other dispositions).  In the end, ATF only issued 90 final revocation orders in 2022, less than 0.1% of all active dealer and manufacturer FFLs. *Id.*  Accordingly, the possibility that any purported member of FFL Coalition will be "shut down" by ATF "relies on a highly attenuated chain of possibilities," and therefore "does not satisfy the requirement that threatened injury must be certainly impending." *See Clapper*, 568 U.S. at 410; *see also Fraga v. UKG, Inc.*, No. 22-20105-CIV, 2022 WL 19486310, at *8 (S.D. Fla. May 10, 2022) ("Plaintiffs' allegations of future injury thus depend on a 'highly attenuated chain of possibilities,' . . . and neither Article III nor federal pleading rules permit the Court to fill in the blanks." (citations omitted)).

22

At bottom, not one identified member of Plaintiff FFL Coalition can show standing, and the same is true for the remaining Plaintiffs. Without standing to bring their claims, Plaintiffs cannot show a likelihood of success on the merits.

## B. Plaintiffs are Not Likely to Succeed on their APA Claims

Again, because Plaintiffs fail to demonstrate standing and irreparable injury, the Court need not reach the merits. But even if the Court were to entertain Plaintiffs' arguments on the merits, Plaintiffs are not likely to succeed on their claims.

### 1. *Plaintiffs Cannot Prevail on Their Facial Challenge to the AAP*

Plaintiffs challenge the AAP on its face, primarily because it purportedly abrogates the GCA's willfulness requirement. *See* Mot. at 10–15. But, as explained below, the AAP does no such thing, and Plaintiffs' critiques of the AAP fall flat.

As a threshold matter, ATF's internal enforcement guidelines regarding licensing actions are committed to agency discretion and thus not reviewable under the APA. *See* 5 U.S.C. § 701(a)(2) (stating that agency actions "committed to agency discretion by law" are not reviewable). Courts have regularly recognized that APA review is barred for precisely the type of agency action Plaintiffs challenge here, concerning whether and how to "take enforcement action." *See Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985). This is because "[a]dministrative agencies have significant discretion, analogous to that of a criminal prosecutor, in choosing their targets in administrative enforcement proceedings." *Arnold v. Commodity Futures Trading Comm'n*, 987 F. Supp. 1463, 1468 (S.D. Fla. 1997); *see also United States v. Texas*, 599 U.S. 670, 678 (2023) ("Under Article II, the

Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." (citations omitted)); *see also Heckler*, 470 U.S. at 831 (finding agencies "far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities" because such decisions require "a complicated balancing of a number of factors which are peculiarly within [the Executive's] expertise" (citation omitted)).  While a licensee is certainly able to challenge an actual license revocation in administrative proceedings and subsequent judicial review, the AAP itself an internal document which guides ATF personnel nationwide as to how the agency intends to exercise its enforcement discretion overall.  The AAP thus reflects the agency's careful balancing as to how its "resources are best spent on [one] violation or another" and which enforcement actions "best fit[] the agency's overall policies." *Id.* at 831–32.  It is thus not subject to APA review.

APA review is also barred for the related reason that the Court has no "'meaningful standard'—or, indeed, any standard—'against which to judge the agency's exercise of discretion' in this case." *Conservancy of Sw. Fla. v. U.S. Fish & Wildlife Serv.*, 677 F.3d 1073, 1082 (11th Cir. 2012) (quoting *Heckler*, 470 U.S. at 830).  Here, Plaintiffs have not identified any relevant statutory or other legal constraints on ATF's enforcement discretion, and there is no law which provides any meaningful standards to review the reasonableness of the challenged AAP enforcement procedures.  The only statute cited by Plaintiff governing ATF revocation proceedings is 18 U.S.C. § 923(e),

which in relevant part permits license revocation for "willful" violations of certain laws and regulations. Mot. at 10. However, at most, the AAP describes *how* ATF may determine if this willfulness requirement is satisfied, and which kinds of violations are prioritized for enforcement accordingly, a question which is never answered or even addressed in § 923(e). *See Haitian Refugee Ctr., Inc. v. Baker,* 953 F.2d 1498, 1508 (11th Cir. 1992) (agency was given no "specific factors to be considered or "suggest[ion]" of "how competing interests must be balanced"); *see also* Mot. at 10–11 (conceding that "Congress did not define the term 'willfully'"). Plaintiffs do not assert and cannot show that there are meaningful statutory standards guiding the ATF in terms of the specific evidence to consider when evaluating willfulness, for instance, or otherwise cabining the agency's discretion as to the procedures set forth in the AAP.

Nor is the AAP final agency action, as it does not determine rights or obligations for any licensees, and it merely guides ATF personnel in conducting inspections and licensing proceedings. *See U.S. Army Corp. of Eng'rs v. Hawkes Co.,* 578 U.S. 590, 597 (2016) (explaining that the APA permits review only of final agency action, "mark[s] the consummation of the agency's decisionmaking process," and determines "rights or obligations" or produce "legal consequences").[11] Moreover, as set forth in greater detail

---

[11] This is contrary to *Cargill v. ATF,* No. 1:22-CV-1063-DAE, 2023 WL 6141595 (W.D. Tex. Sept. 20, 2023), cited by Plaintiff. In that case, the court stated that "legal consequences will flow" from the AAP, without elaboration, and therefore concluded that the AAP constitutes final agency action. *Id.* at *4. This is incorrect. As explained above, the AAP sets forth general considerations and procedures for ATF's regulatory enforcement, it does not and indeed cannot determine the outcome of any particular enforcement proceeding. There are no "legal consequences" that directly flow from the AAP itself.

below, Plaintiffs cannot assert a facial APA challenge where they have an adequate, alternate remedy and they have not exhausted their administrative remedies.

Even assuming that the AAP is susceptible to challenge, courts may set aside agency action under the APA only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A)).  Courts' review under this standard must be "exceedingly deferential."  *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1262 (11th Cir. 2020) (citation omitted).  Plaintiffs appear to argue that the AAP is contrary to law, and specifically, contrary to 18 U.S.C. § 923(e), which permits revocation of licenses only where FFLs "willfully violate[d]" a relevant law or regulation.  Mot. at 11.

But the AAP does not displace the willfulness requirement.  Instead, the AAP repeatedly emphasizes that ATF will, and indeed must, determine that any alleged violations are willful before the agency can revoke a federal firearms license—in step with both the GCA and relevant precedent.  For instance, the AAP reiterates that "ATF *must establish willfulness* to proceed with revocation under 18 U.S.C. § 923(e)."  AAP at 6 (emphasis added); *see also id.* at 2 ("Pursuant to 18 U.S.C. § 923(e), ATF may revoke a federal firearms license for willful violations of the GCA and its implementing regulations.").  This alone disposes of Plaintiffs' argument that the AAP is somehow contrary to any requirement of willfulness.

If more were needed, the AAP specifies that "[t]he term willful means a purposeful disregard of, or a plain indifference to, or reckless disregard of a known legal

obligation," in line with how the Eleventh Circuit has defined that term.  *Id.* at 2; *see Willingham Sports, Inc. v. ATF*, 415 F.3d 1274, 1276-77 (11th Cir. 2005) ("the firearms dealer is considered to have acted willfully under § 923 if, with knowledge of what the regulations require, the dealer repeatedly violates those regulations" and "a dealer's repeated violations after it has been informed of the regulations and warned of violations does show purposeful disregard or plain indifference"); *Oconee Sporting Sales, Inc. v. Compton*, No. CV 309-090, 2010 WL 11610613, at *8 (S.D. Ga. June 23, 2010) (rejecting claim that a "intentional, knowing or 'reckless' violation of a known legal obligation is somehow different from 'plain indifference' used in the *Willingham* standard"); *see also Am. Arms Int'l v. Herbert*, 563 F.3d 78, 85–86 (4th Cir. 2009).  The document is otherwise replete with references to the willfulness requirement[12] and nowhere does it permit revocation for "unintentional and inadvertent technical, recordkeeping, or paperwork violations," as Plaintiffs suggest.  *See* Mot. at 10.  And the AAP otherwise accords with the GCA, as courts have consistently held that "[a] single willful violation authorizes the ATF to revoke the violator's FFL, regardless how

---

[12] The term "willful," and its derivatives, appear over 20 times in the AAP.  *See, e.g., id.* at 3 ("ATF has zero tolerance for willful violations that can directly affect public safety and ATF's ability to trace firearms recovered in violent crimes."); *id.* at 6 ("In instances in which it is determined that the violations were not willful and/or the FFL is likely to come into compliance, the [Warning Conference] shall be the final administrative action."); *id.* (explaining how ATF "can establish the knowledge element of willfulness"); *id.* at 7 ("Consistent with section 7(a)(4), the below five items merit revocation of the license if committed willfully unless extraordinary circumstances exist."); *id.* at 12 ("[T]he IOI will obtain and preserve all available evidence and document the violations to show if the violations were willful[.]"); *id.* at 12–13 ("If the DIO believes such elements have not been proven, including the willfulness required to sustain a . . . revocation under 18 U.S.C. § 923(e), the DIO must fully brief the DAD (IO) as to the basis for this determination.").

severe." *Fairmont Cash Mgmt., LLC v. James*, 858 F.3d 356, 362 (5th Cir. 2017); *Oconee Sporting Sales, Inc.*, 2010 WL 11610613, at *4 ("[T]he ATF may revoke a license for a single violation.").

Plaintiffs' other critiques of the AAP fare no better.  For instance, Plaintiffs argue that the AAP "doubles the number of ways in which ATF presumes willfulness, now to include publications and information [previously] provided to the FFL which explain the FFL's legal responsibilities."  Mot. at 12 (quotation marks omitted).  But the section of the AAP that Plaintiffs reference does not state that ATF will "presume" anything; instead, it merely clarifies the types of evidence which may establish the first element of willfulness in administrative proceedings—whether a dealer has "knowledge of what the regulations require."  *Willingham Sports, Inc.*, 415 F.3d at 1276–77; *see* AAP at 6–7.

ATF's consideration of these types of evidence fully accords with the GCA. Again, a finding of willfulness requires two elements: (1) knowledge of a legal obligation, and (2) "purposeful disregard of, or a plain indifference to, or [a] reckless disregard" of that obligation.  AAP at 2.  While Plaintiffs take issue with ATF considering an FFL's signed acknowledgment form indicating that it received ATF's manual of rules and regulations, it is well established that signed acknowledgment forms may demonstrate that an FFL understood its legal obligations.  *See CEW Props., Inc. v. U.S. Dept. of Just.*, 979 F.3d 1271, 1279 (10th Cir. 2020) ("The training Mr. Wilson received and his acknowledgments of this training not only showed knowledge of his legal obligations but also his indifference to them."); *Best Loan Co. v. Herbert*, 601 F. Supp. 2d 749, 754–

28

55 (E.D. Va. 2009) ("Best Loan signed an Acknowledgment of Federal Firearms Regulations, demonstrating that the company understood the regulatory requirements applicable to firearms dealing."); *Meester v. Bowers*, No. 8:12cv86, 2013 WL 3872946, at *6 (D. Neb. July 25, 2014) (finding that licensee "signed acknowledgments on two occasions certifying that the relevant laws had been explained to him" demonstrated "awareness of the legal requirements").   Even outside of this specific context, individuals are frequently "charged with knowledge of the contents of documents they sign[.]" *Consol. Edison Co. of N.Y. v. United States*, 221 F.3d 364, 371 (2d Cir. 2000).

Similarly, under the AAP, ATF can also establish the requisite knowledge of legal obligations by (1) "[d]emonstrat[ing] that the FFL has complied with the specific regulation on other occasions," or (2) "[d]emonstrat[ing] that the FFL has substantial experience as an FFL." AAP at 7.  These considerations plainly are relevant to whether an FFL had knowledge of its legal obligations.  Indeed, federal courts conducting de novo review of license revocations have repeatedly explained that an FFL's "extensive experience with the regulations that bind FFL holders" bears on knowledge.  *Anzio Ironworks, Corp. v. Gerber*, No. 8:20-cv-2132-KKM-AAS, 2022 WL 1500856, at *5 (M.D. Fla. May 12, 2022).  Likewise, courts have concluded that an FFL's "fail[ure] to keep adequate records for a substantial period of time, despite having previously complied with ATF regulations for more than a decade" weighs in favor of willfulness. *Creager v. ATF*, No. ELH-15-1518, 2016 WL 1077123, at *13 (D. Md. Mar. 18, 2016).

Plaintiffs next argue that the AAP "paradoxically" looks either to a history of prior violations or a history of past compliance and substantial experience in determining whether a license knew of its legal obligation.  Mot. at 13.  But as explained above, an FFL's history of compliance and experience is relevant to whether it has knowledge of its legal obligations.   And, as courts have repeatedly found, where a licensee has been notified as to prior violations, such infractions can likewise establish knowledge as to relevant legal obligations.  *See Willingham Sports, Inc.*, 415 F.3d at 1277–78 (finding willfulness where violations were found four times after four different inspections); *Athens Pawn Shop Inc. v. Bennett*, 364 F. App'x 58, 59–60 (5th Cir. 2010) (same, after three prior violations); *Armalite, Inc. v. Lambert*, 544 F.3d 644, 649 (6th Cir. 2008) (same, after two prior violations).  Indeed, it would make little sense to prohibit ATF from considering an FFL's past behavior, since in many instances an FFL may rely on their history of regulatory compliance in arguing that a cited violation is not willful.  *See, e.g., Fairmont Cash Mgmt., LLC v. James*, 208 F. Supp. 3d 830, 837 (S.D. Tex. 2016) (FFL "contend[ed] it did not 'willfully' violate the GCA'" in part by "[r]elying on its own past history of 'years of exemplary compliance'").  In sum, ATF's consideration of an FFL's past compliance or non-compliance is plainly reasonable.

Lastly, Plaintiffs erroneously argue that ATF personnel "no longer . . . use judgment" to decide "whether an FFL's violations are willful," and rather, that determination is left to the "Spartan" computer system.  Mot. at 14.  This assertion

fundamentally misunderstands both how ATF determines willfulness and how it uses the Spartan system.

To start, Spartan is a case management system used by ATF to track the status of a given inspection process.  ATF Decl. ¶ 10.  For instance, when an IOI conducts an inspection, he or she records violations and pertinent details in Spartan, and at the inspection's conclusion, Spartan will generate a report of violations that is given to the FFL.  *Id.*  Additionally, the guidance contained in the AAP is incorporated within the Spartan system, such that once information regarding identified violations is put into Spartan, the system will generate a suggested administrative action.  *Id.*  Still, the inspecting IOI, not Spartan, makes the ultimate recommendation as to further action, and that recommendation is subject to multiple layers of supervisory review.  *Id.* ¶ 11. And, once the IOI makes a recommendation, Spartan's sole use going forward is to track correspondence and the status of further proceedings.  *Id.*

If an IOI recommends sending an initial notice of revocation to an FFL, and that course of action is approved through the supervisory chain, that notice offers the license holder the chance to request a hearing with the DIO of their ATF field division office. *Id.* ¶ 12.  If the license holder requests a hearing, the DIO serves as the hearing officer and provides the licensee with an opportunity to give testimony and submit documentation as to why the license should not be revoked.  *Id.*  The DIO then makes the final determination as to the willfulness of any violation and whether revocation is authorized.  *Id.*  As set forth in the AAP, in order to sustain a final revocation decision,

the DIO must conclude that the administrative record establishes by a preponderance of the evidence that one or more violations were willful. *Id.*; AAP at 12.[13]  Thus, ATF's use of the Spartan case management system is not contrary to the GCA or arbitrary.

### 2. *Plaintiffs Cannot Assert an As-Applied Challenge to the AAP*

Plaintiffs also appear to challenge the AAP as it applies to the threatened denial of Kiloton's license, *see* Mot. at 12–16, but as Defendants recently notified the Court, ATF has made a final determination to renew Kiloton's license, and further, Plaintiffs bring this claim pursuant to the APA without having satisfied several prerequisites to APA review.

First, Plaintiffs' as-applied challenge is not justiciable.  "[M]ootness, however it may come about, simply deprives [the court] of [its] power to act; there is nothing for [it] to remedy." *Spencer v. Kemna*, 523 U.S. 1, 18 (1998). As ATF has concluded its administrative proceedings against Kiloton, there is nothing for the Court to remedy, and no live controversy exists.  *See* Mot. at 35 (asking the Court to "enjoin . . . ATF's pending revocation of Kiloton's Federal Firearms License").  Further, although Kiloton must continue to comply with the GCA, and like all FFLs, remains subject to ATF compliance inspections and potential administrative action, currently, Kiloton is not faced with "actual or imminent" and "concrete and particularized" injury sufficient for

---

[13] The need for the DIO to determine willfulness accordingly refutes Plaintiffs' claim that ATF personnel no longer "use judgment to decide, based on unique facts and circumstances, whether an FFL's violations are willful." *See* Mot at 14 (citing *Cargill*, 2023 WL 6141595, at *4).

Article III standing.  *Huyer v. Van de Voorde*, 847 F.3d 983, 986 (8th Cir. 2017) (citation omitted).

Even if Kiloton had a claim that was ripe for review, it could not be adjudicated under the APA.  Review under the APA is available only when the plaintiff has no other adequate remedy.  *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and *final agency action for which there is no other adequate remedy in a court* are subject to judicial review." (emphasis added)); *Jarkesy v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015) ("If a special statutory review scheme exists, however, it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review in those cases to which it applies." (citation omitted)).  Here, 18 U.S.C. § 923(f)(3) provides for "de novo judicial review of" any license revocation or denial, and "[i]f the court decides that the [ATF] was not authorized to deny the application or to revoke the license, the court shall order [ATF] to take such action as may be necessary to comply with the judgment of the court."  Thus, Plaintiffs cannot circumvent § 923(f)(3)'s adequate procedure for judicial review by bringing an as-applied APA challenge.  *See, e.g., Townson v. Garland*, No. 1:22-00251-KD-N, 2022 WL 17587259 at *9 (S.D. Ala. Nov. 17, 2022) ("[B]ecause [revocation] hearings are subject to *de novo* judicial review by the relevant district court, they are exempted from the APA by its own terms.") *adopting report & recommendation*, 2022 WL 17586288 (S.D. Ala. Dec. 12, 2022); *see also Taylor v. Hughes*, No. 1:12-CV-138, 2012 WL 4327035, at *7 n.3 (M.D. Pa. Sept. 20, 2012) ("[C]ourts considering similar arguments have found that the revocation decisions conducted

33

pursuant to the GCA are not subject to the [APA], 5 U.S.C. § 706(2)(A)." (collecting cases)).

Additionally, the APA permits courts to review only final agency action, which must "mark the consummation of the agency's decisionmaking process," and determine "rights or obligations" or produce "legal consequences." *Hawkes Co.*, 578 U.S. at 597 (citation omitted). As noted above, Plaintiffs' challenge to ATF's revocation proceedings against Kiloton is moot, but insofar as Plaintiffs challenge the AAP as applied to future inspections or hypothetical future proceedings against Kiloton, their challenge lacks a final agency action. There would be no reviewable final agency action until ATF had conducted an inspection, found violations, held a hearing where Kiloton could present evidence, testimony, and exhibits, and the DIO made a final determination as to the willfulness of any violation and as to revocation. *See* ATF, *Revocation of Firearms Licenses*, https://perma.cc/9FTZ-JG48; *see also* ATF, *Enhanced Regulatory Enforcement Policy*, https://perma.cc/G48A-J6ER (indicating that 68% of hearings following a notice of revocation result in a decision by ATF *not* to revoke). Thus, any as-applied challenge to how ATF might apply the AAP to Kiloton would not be suitable for APA review—if at all—until there has been a consummation of the agency's decisionmaking process.

For many of the same reasons, any challenge to future proceedings is barred for failure to exhaust administrative remedies, as Plaintiffs must first seek relief through the administrative hearing process. *See Mountaineer Gun Sales, LLC v. ATF*, No. 1:11CV200,

2012 WL 194079, at *4 (N.D. W. Va. Jan. 23, 2012) (granting motion to dismiss for lack of subject matter jurisdiction when FFL withdrew its request for an administrative hearing and thus "failed to exhaust its administrative remedies as required by 18 U.S.C. § 923(f)(3) prior to seeking judicial review"). "To afford [Kiloton] judicial review" before it "proceed[s] with" a hypothetical, future "administrative hearing would render the statutorily required agency hearing process meaningless and would invite licensees to bypass that process altogether." *Id.* at *3.

### C. Plaintiffs are Not Likely to Succeed on their Second Amendment Claims

Plaintiffs also appear to raise two separate Second Amendment arguments, but both are in error. First, Plaintiffs aver that the AAP violates Kiloton's Second Amendment right to "engage in the commerce and/or business of being a gun dealer[.]" Mot. at 26. But the Second Amendment does not protect the ability of corporations, such as Kiloton, to sell firearms for the purpose of making a profit. Moreover, Plaintiffs cannot show that the AAP, as a presumptively lawful policy, violates the Second Amendment in every circumstance. Second, Plaintiffs contend that the AAP violates the Second Amendment rights of individuals by reducing the number of gun stores and thereby making the purchase of firearms more difficult. Yet Plaintiffs fail to show that the AAP has meaningfully affected the ability of any individual before the Court to keep and bear arms. In any event, ATF's licensure and inspection of firearms dealers is supported by a robust historical tradition and thus is constitutional.

35

1.  *The AAP Does Not Violate Any Second Amendment Right of Kiloton*

As a threshold issue, the Second Amendment does not create a right of for-profit businesses, such as Kiloton, to engage in the business of selling firearms.  The Second Amendment protects the right of *individuals* to keep and bear arms.  As the Supreme Court recently held in *Bruen*, "when the Second Amendment's plain text covers an *individual's* conduct, the Constitution presumptively protects that conduct."  *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 2 (2022) (emphasis added).  But both before and after *Bruen*, courts have agreed that *businesses* may not claim a Second Amendment right to sell firearms for profit.  *See, e.g., Teixeira v. Cty. of Alameda*, 873 F.3d 670, 690 (9th Cir. 2017) (en banc) (footnote omitted) ("[T]he Second Amendment does not independently protect a proprietor's right to sell firearms."); *United States v. Kazmende*, No. 1:22-CR-236-SDG-CCB, 2023 WL 3872209, at *5 (N.D. Ga. May 17, 2023), *report and recommendation adopted,* No. 1:22-CR-00236-SDG, 2023 WL 3867792 (N.D. Ga. June 7, 2023) (collecting cases and explaining that "[i]t is of little surprise, then, that courts post-*Heller* (and post-*Bruen*, for that matter) have rejected the argument that the Second Amendment protects the right to commercially sell a firearm").

Plaintiffs' cited cases are inapposite.  *See* Mot. at 17–18.  For instance, *Lynchburg Range & Training, LLC v. Northam*, 105 Va. Cir. 159 (2020) is a Virginia state trial court decision concerned with restrictions on firearm training, and Plaintiffs' cited language, Mot. at 17, quotes the wording of a state statute, not a judicial interpretation of the Second Amendment.  Next, *Kole v. Village of Norridge*, No. 11 C 3871, 2017 WL 5128989,

36

at *7 (N.D. Ill. Nov. 6, 2017) held that a prospective gun store owner could assert the rights of "residents' . . . to acquire firearms under the Second Amendment," not that his business itself could assert an independent right to sell guns.  *See also Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) (similar).   Similarly, *United States v. Hicks*, 649 F. Supp. 3d 357, 365 (W.D. Tex. 2023) held that the Second Amendment protected an individual right to "receive" firearms, again distinct from the right of corporations to engage in firearm commerce.

In any event, Plaintiffs cannot show that the AAP's inspection and enforcement procedures governing commercial firearm sales facially violate the Second Amendment. Compl. ¶ 376 (alleging that ATF policy is "invalid on its face"); *id.* ¶ 381 (similar). Plaintiffs' facial challenge imposes a "heavy burden" of persuasion, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (citation omitted), given that such "challenges are disfavored." *Brakebill v. Jaeger*, 905 F.3d 553, 558 (8th Cir. 2018).  To succeed on a facial constitutional challenge, Plaintiffs must show that there is "no set of circumstances exists under which [ATF policy] would be valid." *United States v. Bena*, 664 F.3d 1180, 1182 (8th Cir. 2011) (citation omitted).  Plaintiffs make the breadth of their constitutional challenge clear, contending that "ATF is not authorized to prohibit, deny, or revoke the ability of *anyone* to engage in commerce, manufacturing, retail sales, or other commercial activities that are protected by the Second Amendment."  Mot. at

37

28 (emphasis added).  In other words, Plaintiffs argue that any substantive regulation of gun stores, such as that outlined in the AAP, infringes the Second Amendment.[14]

The Supreme Court has held to the contrary.  In *District of Columbia v. Heller*, the Court emphasized that nothing in its opinion "should be taken to cast doubt" on "laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. 570, 626-27 & n.26 (2008).  In *McDonald v. City of Chicago*, the Court "repeat[ed]" its "assurances" that *Heller* did not "cast doubt on such longstanding regulatory measures" as "laws imposing conditions and qualifications on the commercial sale of arms."  561 U.S. 742, 786 (2010) (citation omitted); *see also Bruen*, 597 U.S. at 81 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating that nothing in *Bruen* "should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms") (citation omitted).  Similarly, another court recently explained that "[t]here is a longstanding distinction between the right to keep and bear[] arms and commercial regulation of firearm sales."  *Morehouse Enters., LLC v. ATF*, No. 3:22-cv-116, 2022 WL 3597299, at *8 (D.N.D. Aug. 23, 2022) (citation omitted).  To reiterate, the AAP provides guidance as to agency inspection and regulatory enforcement procedures

---

[14] Plaintiffs contend, in the alternative, that the Second Amendment does not permit license revocation for "simple bookkeeping errors" or "unintentional technical violations." Mot. at 28–29. While this argument is raised without explanation or support, even had Plaintiffs clearly raised this point, it would fail. As noted above, ATF does not and cannot revoke firearms licenses absent a finding of willfulness, such that Plaintiffs' argument is unfounded. And even if Plaintiffs could point to an example of a license revocation founded on "unintentional technical violations," it would be irrelevant to Plaintiffs' facial challenge, which contends that ATF policy is unconstitutional in every instance. *See* Compl. ¶ 289. For these reasons, the Court need not entertain this argument at any depth.

governing the commercial sale of firearms.  Plaintiffs accordingly cannot show that the

AAP—a presumptively lawful commercial regulation—facially violates the Second

Amendment.

### 2.   *ATF Policy Does Not Violate Individual Second Amendment Rights*

Plaintiffs also argue that ATF infringes the Second Amendment, through

licensing requirements, subsequent revocations, and the closing of certain gun stores,

but this argument fares no better.

Plaintiffs claim that the AAP is causing the revocation of licenses, leading gun

stores to close, which in turn will "impos[e] additional hurdles" on individual consumers

making firearm purchases, and these "hurdles" purportedly constitute a Second

Amendment violation.  Mot. at 27.  Yet there is no longer a possibility that Kiloton's

license may be imminently denied or revoked, and as a result Plaintiffs fail to connect

any of the links in this chain of speculation: Plaintiffs identify (1) no gun stores that will

imminently close because of the AAP, (2) no consumers that will be imminently injured

by such closures, and (3) no imminent expenses or other burdens on customers created

by store closures.  *See supra* Part II.A.  Further, "gun buyers have no right to have a gun

store in a particular location, at least as long as their access is not meaningfully

constrained."  *Teixeira*, 873 F.3d at 680; *Second Amend. Arms v. City of Chicago*, 135 F.

Supp. 3d 743, 754 (N.D. Ill. 2015) ("Requiring an individual to drive to one part of a

city as opposed to another in order to purchase a firearm does not, on its face, burden

the core right to possess a firearm for protection.").  Yet Plaintiffs appear to argue that

any minimal inconvenience affecting the purchase of guns violates the Second Amendment. *See* Mot. at 34 (arguing that Second Amendment was implicated by "less access to firearms for [members and supporters] of the FFL Coalition, who (*even if at the margin*) will find it more expensive and difficult to acquire firearms") (emphasis added). Plaintiffs offer nothing to support this extreme proposition. *Cf. McRorey v. Garland*, No. 7:23-cv-00047-O, 2023 WL 5200670, at *5 (N.D. Tex. Aug. 14, 2023) (rejecting argument that "a potential ten-business-day waiting period is unconstitutional [under the Second Amendment] in all cases").

### 3.  *A Robust Historical Tradition Supports Regulation of Firearm Dealers*

For the reasons set forth above, Plaintiffs cannot show that the AAP implicates any Second Amendment right; as a consequence, the Court need not examine whether the AAP is supported by a historical tradition of analogous commercial regulations. But even still, a robust historical tradition supports the Government's authority to require licenses and inspection of firearm sellers. Of note, in the context of a motion for preliminary relief, the Government does not purport to offer an exhaustive analysis of the relevant history. Instead, Defendants provide below numerous examples of historical laws analogous to the AAP, refuting Plaintiffs' Second Amendment claim.

Where a regulation affects the Second Amendment, the Government may justify it "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation" by pointing to "a well-established and representative historical *analogue*[.]" *Bruen*, 597 U.S. at 24, 30. To be analogous, historical and modern firearms regulations

40

must be "relevantly similar"—*i.e.*, they impose a "comparable burden" on the right of armed self-defense that is "compara[tively] justified." *Id.* at 29. A "historical *twin*" is not required. *Id.* at 30.

Plaintiffs frame the inquiry as looking to whether there has been a "broad and enduring historical tradition of government regulation . . . of firearms . . . dealers." Mot. at 18. In fact, from colonial times, state and local governments have routinely exercised their authority to regulate the sale of firearms, through licensing, inspection, and similar requirements.

For instance, the third U.S. Congress made it unlawful for a limited period "to export from the United States any cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead, bombs, grenad[es], gunpowder, sulphur, or saltpetre," Act of May 22, 1794, 1 Stat. 369, ch. 33, § 1 ("An Act prohibiting for a limited time the Exportation of Arms and Ammunition, and encouraging the Importation of the same"), demonstrating a clear understanding that the Constitution permitted strict regulation of firearm sellers.

Further, as the en banc Ninth Circuit recounted in detail, as early as the 1600s "colonial governments substantially controlled the firearms trade," including through "restrictions on the commercial sale of firearms." *Teixeira*, 873 F.3d at 685. Specifically, the colonies of "Massachusetts, Connecticut, Maryland, and Virginia all passed laws in the first half of the seventeenth century making it a crime to sell, give, or otherwise deliver firearms or ammunition to Indians." *Id.*; *see also id.* (explaining that "Connecticut

41

banned the sale of firearms by its residents outside the colony," and Virginia law criminalized any individual traveling to an Indian town or more than three miles from a plantation with "arms or ammunition above and beyond what he would need for personal use"). Similarly, in the early 19th century, multiple states closely regulated so-called "Bowie Knives," by prohibiting their sale or taxing their sale or possession.[15]

Less restrictive measures on firearm sellers, but similar to the inspection and licensing regime challenged by Plaintiffs, were also commonplace. To take one example, in 1805, Massachusetts required that all musket and pistol barrels manufactured in the state and offered for sale be "proved" (inspected and marked by designated individuals) upon payment of a fee, to ensure their safe condition, and Maine enacted similar requirements in 1821.[16] Further, multiple states, such as Massachusetts (1651, 1809), Connecticut (1775), New Jersey (1776), and New Hampshire (1820), required licenses or inspection to export or sell gunpowder (akin to modern ammunition).[17] *See also United States v. El Libertad*, --- F. Supp. 3d ---, 2023 WL 4378863,

---

[15] *See, e.g.,* An Act to Suppress the Use of Bowie Knives, Act No. 11, §§ 1, 2, 1837 Ala. Acts Called Sess. 7, 7 (imposed $100 tax on sale of Bowie Knives and "Arkansas tooth picks"); An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 1, 1837–1838 Tenn. Pub. Acts 200, 200 (prohibited sale of such knives); An Act to Provide for the Revenue of the State, ch. 1, 1841 Miss. Laws 52 (imposed annual property tax on each Bowie knife); An Act to Amend the Criminal Laws of This State, ch. 81, 1855–1856 Tenn. Laws 92 (1856) (prohibited sale of such knives and other arms to minors).

[16] *See* Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, 259-61 (1807); Laws of the State of Maine 546 (1830).

[17] *See* Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126 (1890); 2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822, 198-200 (1823); 15 The Public Records of the Colony of Connecticut 191 (1890); An Act for the Inspection of

at *7 (S.D.N.Y. July 7, 2023) (finding that historical laws showed "expansive authority exercised by colonial and early state legislatures as well as early congresses over the transfer of firearms between individuals and across borders" including through "licensing requirements [and] registration requirements").  Similar licensing and taxation requirements for the sale of gunpowder and certain arms were enacted through the antebellum and reconstruction eras.[18]

In sum, early American governments closely controlled the sale and manufacture of arms and ammunition, in many cases determining who could buy and sell such arms and ammunition, and even the areas where arms could be offered for sale.  Accordingly, the challenged license and inspection requirements to manufacture or sell arms stand atop this historical precedent.  Plaintiffs can therefore show no Second Amendment violation by ATF's actions in furtherance of these authorities.

## III.   The Balance of the Equities and Public Interest Favor Defendants

The third and fourth requirements for issuance of a preliminary injunction—the balance of equities and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party."  *Nken v. Holder*, 556

---

Gunpowder, ch. 6, § 1, 1776–1777 N.J. Laws 6, 6 (1776); Laws of the State of New Hampshire; with the Constitutions of the United States and of the State Prefixed 276–77 (1830).

[18] Ordinances of the City of Chicago, Ill., ch. 16, § 1 (1851); Ordinances of the City of St. Paul, Minn. ch. 21, § 1 (1863); An Act to Establish Revenue Laws for the State of Alabama, Act No. 1, § 102(27), 1874–1875 Ala. Acts 1, 41 (1875); Act of Feb. 13, 1879, Act No. 314, § 14, 1878–1879 Ala. Acts 434, 436–37.

U.S. 418, 435 (2009).  These factors tilt decidedly against the issuance of a preliminary injunction here.

The public interest is best served by preserving policies that advance public safety and prevent crime.  *See Paylan v. Fla. Bd. of Med.,* No. 8:15-cv-2817-T-33MAP, 2015 WL 8265595, at *4 (M.D. Fla. Dec. 9, 2015) ("paramount public safety concerns implicated by the licen[s]ing of physicians" weighed in favor of denying preliminary relief); *Precision Tactical Arms Co., LLC v. Gerber*, No. 3:23cv7752-TKW-HTC, 2023 WL 4353165, at *1 (N.D. Fla. Apr. 7, 2023) (granting a TRO staying the effect of an ATF revocation decision would not serve the public interest "based on the number and repeated nature of the violations").  The GCA obligates ATF to "trace firearms to ensure they do not end up in the hands of criminals, felons, and other prohibited persons, and to assist law enforcement officials in their efforts to reduce crime and violence and to investigate criminal conduct involving firearms."  *See Oconee Sporting Sales, Inc.*, 2010 WL 11610613, at *1.  This task in turn "depends heavily on records maintained by FFL holders."  *Id.* The AAP recognizes that when FFLs commit certain violations of the law in the sale of firearms, real public safety risks are created.  *Accord RSM, Inc. v. Herbert*, 466 F.3d 316, 324 (4th Cir. 2006) ("When a firearms dealer cannot account for guns or fails to ensure that guns are sold to authorized persons, the public safety is directly and meaningfully implicated."); *Willingham Sports, Inc.*, 415 F.3d at 1278 n.3 (discrepancies in dealer's inventory records were "obviously serious").

44

The AAP accordingly seeks to prevent serious legal violations in the context of gun sales that affect public safety, while still ensuring that statutory protections for FFLs are followed in the administrative process, such as requiring a finding of "willfulness" to support a revocation.  An injunction of this policy would threaten ATF's ability to consider certain facts as evidence of willfulness, and the agency's authority to issue an initial notice of revocation upon discovery of certain serious violations.  *See* Mot. at 13 (complaining that ATF may consider "history of prior violations" or "substantial experience as an FFL" as potential evidence of willfulness); *id.* at 16 (complaining that notice of revocation was issued where no "NICS background check" was completed). Requiring ATF to adopt a laxer investigative policy would effectively curb the agency's ability to monitor and deter FFL violations, and public safety could be threatened as a consequence. *Am. Arms Int'l*, 563 F.3d at 79 n.1 ("Proper records maintenance is crucial to law enforcement, which uses the information contained in these records to trace firearms involved in crimes."(citation omitted)); *Shawano Gun & Loan, LLC v. Hughes*, No. 09-C-150, 2010 WL 3062847, at *6 (E.D. Wis. Aug. 2, 2010) ("The point is not to punish firearms dealers for violations, but rather to protect the public from firearms ending up in the wrong hands[.]"), *aff'd*, 650 F.3d 1070 (7th Cir. 2011).

Plaintiffs provide little on the other side of the ledger.  They argue that an injunction would "maintain[] the status quo," Mot. at 35, but Plaintiffs have it backwards.  An injunction would undo a "policy that was first promulgated in 2021," *id.* at 2, sow confusion, and undermine ATF's ability to apply its statutory authorities.

Plaintiffs also dispute the seriousness of Kiloton's violations, perhaps in attempting to argue that revocation of Kiloton's licenses is unwarranted. *Id.* at 15–23. But as set forth above, ATF has renewed Kiloton's license, and the mere speculative possibility of future revocation—which could ultimately be challenged de novo under 18 U.S.C. § 923(f)(3)—cannot justify the sweeping injunction Plaintiffs request. Finally, Plaintiffs again raise the specter of unnamed FFLs "under threat" of revocation at some future time, and unnamed individuals who "(even if at the margin) will find it more expensive and difficult to acquire firearms[.]" *Id.* at 34. Such vague and unsupported conjecture similarly does not support Plaintiffs' proposed injunction.

Indeed, any relief should be limited to members identified in district court and who have agreed to be bound by the judgment; this restriction would promote the longstanding equitable principle that a party has one opportunity for relief and that the effect of any judgment should be bidirectional. *Cf. Arizona v. Biden*, 40 F.4th 375, 395–98 (6th Cir. 2022) (Sutton, C.J., concurring); *Keener v. Convergys Corp.*, 342 F.3d 1264, 1269 (11th Cir. 2003) ("Injunctive relief should be limited in scope to the extent necessary to protect the interests of the parties.") (citations omitted).

The public interest, and balance of the equities, like all other preliminary injunction factors, support a denial of Plaintiffs' Motion.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for a Preliminary Injunction.

Dated: December 6, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Michael Drezner*
MICHAEL DREZNER (VA Bar No. 83836)
TAYLOR PITZ (CA Bar No. 332080)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 514-4505
Email: Michael.L.Drezner@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF WORD LIMIT

I certify that this motion includes 12,681 words as calculated by Microsoft Word.

/s/ Michael Drezner
MICHAEL DREZNER
Trial Attorney
U.S. Department of Justice

## CERTIFICATE OF SERVICE

On December 6, 2023, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Florida, using the Court's electronic case filing system.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Michael Drezner
MICHAEL DREZNER
Trial Attorney
U.S. Department of Justice